JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Rodney Hargrove and Cindy Hargrove, as Co-Adminstrators of the Estate of Rodney Michael Hargrove, deceased

**DEFENDANTS**
City of Philadelphia, et. al

**(b)** County of Residence of First Listed Plaintiff    Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Gregory S. Spizer, Esquire, VSCP LAW
2001 Market St., Suite 3700, Phila. PA. 19103;
gspizer@vscplaw.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | | [ ] 790 Other Labor Litigation | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 791 Employee Retirement Income Security Act | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [X] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | [ ] 871 IRS—Third Party 26 USC 7609 | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983
Brief description of cause:
Defendant's violation of Plaintiffs'/Decedant's Civil Rights

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [X] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
October 6, 2022

SIGNATURE OF ATTORNEY OF RECORD
*/s/ Gregory S. Spizer*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| **RODNEY HARGROVE AND CINDY** | : | |
| **HARGROVE, ET. AL** | : | |
| | : | |
| v. | : | NO. 21-CV-04082 |
| | : | |
| **CITY OF PHILADELPHIA, ET. AL** | : | |
| | : | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants.  (See §1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS**:

(a)     Habeas Corpus - Cases brought under 28 U.S.C. §2241 through §2255.               (          )

(b)     Social Security - Cases requesting review of a decision of the Secretary
        of Health and Human Services denying plaintiff Social Security Benefits.     (          )

(c)     Arbitration - Cases required to be designated for arbitration under Local
        Civil Rule 53.2.                                                           (          )

(d)     Asbestos - Cases involving claims for personal injury or property damage
        from exposure to asbestos.                                                (          )

(e)     Special Management - Cases that do not fall into tracks (a) through (d)
        that are commonly referred to as complex and that need special or intense
        management by the court.   (See reverse side of this form for a detailed
        explanation of special management cases.)                                 (     x     )

(f)     Standard Management - Cases that do not fall into any one of the other
        tracks.                                                                   (          )

| | | |
|---|---|---|
| 10/06/2022 | Gregory S. Spizer, Esquire | Plaintiff |
| Date | Attorney-at-Law | Attorney for |
| 215-960-0402 | 215-960-0384 | gspizer@vscplaw.com |
| Telephone | Fax Number | E-Mail Address |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## DESIGNATION FORM

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: __C/O VSCP LAW, 2001 Market St., Suite 3700, Philadelphia, PA 19103__

Address of Defendant: __1515 Arch Street, 17th Floor, Philadelphia, PA 19102__

Place of Accident, Incident or Transaction: Curran-Fromhold Correctional Facility, 7901 State Road, Philadelphia, Pa

---

**RELATED CASE, IF ANY:**

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __10/06/2022__  _____  __82435__
                  *Attorney-at-Law / Pro Se Plaintiff*      *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☒ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
    *(Please specify):* _____

**B.** *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
    *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, __Gregory S. Spizer, Esquire__, counsel of record *or* pro se plaintiff, do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: __10/06/2022__  _____  __82435__
                  *Attorney-at-Law / Pro Se Plaintiff*      *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RODNEY HARGROVE AND CINDY HARGROVE, AS CO-ADMINISTRATORS OF THE ESTATE OF RODNEY MICHAEL HARGROVE, DECEASED** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **CIVIL ACTION 21-4082** |
| | : | **SECOND AMENDED** |
| **CITY OF PHILADELPHIA** | : | **COMPLAINT** |
| | : | |
| **AND** | : | |
| | : | |
| **WARDEN NANCY GIANETTA, in her official and individual capacity,** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **AND** | : | |
| | : | |
| **WARDEN MICHELE FARRELL, in her official and individual capacity,** | : | |
| | : | |
| **AND** | : | |
| | : | |
| **PRISON COMMISSIONER BLANCHE CARNEY in her official and individual capacity** | : | |
| | : | |
| **AND** | : | |
| | : | |
| **DION JONES in his official and individual capacity,** | : | |
| | : | |
| **AND** | : | |
| | : | |
| **JOHN DOES (fictitious name) 1-100** | : | |
| | : | |
| **AND** | : | |
| | : | |
| **ABC ENTITIES (fictitious name)  1-10** | : | |
| **Defendants.** | : | |
| | : | |

## SECOND AMENDED COMPLAINT – CIVIL ACTION

Plaintiffs, Rodney Hargrove and Cindy Hargrove, as Co-Administrators of the Estate of

Rodney Michael Hargrove, Deceased, and in their own right, by and through their attorneys,

1

VSCP LAW, by way of a Second Amended Complaint against Defendants, the City of Philadelphia, Warden Nancy Gianetta, Warden Michele Farrell, Commissioner Blanche Carney, Dion Jones, John Does 1-100, and ABC Entities 1-10, aver as follows:

## **INTRODUCTION**

1.      At least two and a half hours after posting bail on March 17, 2021, currently unknown correctional officers loaded Rodney ("Rodie") Michael Hargrove into a prison van at Curran Fromhold Correctional Facility ("CFCF") in the middle of the night on March 18, 2021, drove him 100 feet and dropped him off shortly after 1:00 a.m. at a desolate SEPTA bus stop knowing that the next bus would not come for at least five more hours.

2.      Across the street, at CFCF, where a traffic control arm/barrier was supposed to block access to CFCF grounds, Defendant Dion Jones, the prison guard responsible for opening and closing that barrier, raised the traffic arm and then left his post to use the bathroom.

3.      While standing in the nighttime darkness trying to determine how he would safely return to his home, Rodie was ambushed by a dark-colored vehicle, which fired a flurry of gun shots at him.

4.      Rodie ran back onto prison grounds seeking safety but the unsecured and wide-open access to the CFCF parking lot allowed the vehicle to pursue him back onto prison grounds.

5.      In an opinion awarding compensation to Defendant Jones for PTSD in his Workers' Compensation claim, the court found, *inter alia*, that Rodie's killer "was, arguably (and as feared by Claimant [Defendant Jones]), aided in his killing by the prior actions of Claimant—leaving the metal arm raised." See p. 13 Exhibit B.

6.      The occupants of the vehicle then shot and killed Rodie at close range on prison grounds just a few feet from where a guard should have been stationed in the parking lot of the

Curran-Fromhold Correctional Facility.

7.     The autopsy report reflects that Rodie was shot ten times.

8.     Defendant Jones heard all ten shots fired and after taking cover upon his exit from the bathroom, Defendant Jones watched Rodie take his last breaths as they waited for emergency personnel to arrive.

9.     The shooting was later determined to be a case of mistaken identity and Rodie was not the intended target of the shooters that night.

10.     Within just 47 minutes of his release, 20-year-old Rodie had been killed due to Defendants' total disregard and deliberate indifference towards his safety and security despite all the known dangers in Defendants' nighttime release polices and lack of proper security – several of which were called into question by local authorities, community members and members of the national prison community, in years prior, including a similar incident that occurred in a Philadelphia Department of Prison's parking lot nearly three years earlier.

11.     Against an alarming backdrop of the City's raising crime rates, Defendants knew it was dangerous to release inmates late at night and yet they continued to release prisoners at the desolate SEPTA bus stop and leave them there to fend for themselves against the darkness, the weather, their addictions, and the dangerous streets of North-East Philadelphia, where rising crime and homicide rates were and remain at crisis levels.

12.     Due to Defendants' knowledge of the danger of late-night prison releases—which was previously exposed in a *Philadelphia Inquirer* article one and a half years prior to Rodie's death as well as it being a well-known issue in the prison/jail community—Rodie's killing, though tragic, was predictable, foreseeable, inevitable and a violation of his constitutional rights.[1]

---

[1] *See* Pranshu Verma, Each night, Philly jails release scores of inmates without returning their IDs, cash or phones, The Philadelphia Inquirer.  ((updated)Aug. 12. 2019) https://www.inquirer.com/news/philadelphia-prison-release-

13.     This tragedy is just one of many devastating and preventable casualties of the "dire situation inside the Philadelphia Department of Prisons" resulting from the "chronically unsafe and mismanaged jails." [2] Pennsylvania Prison Society executive director stated **"[w]e have been warning the city for months that the prison is dangerous, unconstitutional in its conditions, and past the boiling point."[3]** (emphasis added).

## JURISDICTION AND VENUE

14.     This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§1331 and 1343.

15.     This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

16.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. §1391(b) in that this is the District in which the claims arose.

## JURY DEMAND

17.     Plaintiffs demand a trial by jury on all issues and claims as set forth in this Second Amended Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure §38(b).

## THE PARTIES

---

afterhours-ids-cashier-closed-20190812.html.

*See* also, Pranshu Verma, Philly jails extend cashier hours, but most inmates still would be released without IDs, cash, or phones. (August 13, 2019) The Philadelphia Inquirer. https://www.inquirer.com/news/philadelphia-jail-release-afterhours-cashier-extend-ids-cash-blanche-carney-20190813.html#loaded          ("Philadelphia       prisons commissioner Blanche Carney extends the hours when released inmates can retrieve their belongings, but it would only help a fraction of the thousands set free at night."

[2] *See* Melamed, Samantha, 'We need help': Video, reports depict violence and 'riots' at Philadelphia jails, The Philadelphia Inquirer. (August 26, 2021) https://www.inquirer.com/news/philadelphia-prison-riot-cfcf-assault-20210826.html

[3] *Id.*

18.     Plaintiffs, Rodney Hargrove and Cindy Hargrove, are the Co-Administrators of the Estate of Rodney Michael Hargrove, Deceased, (hereinafter sometimes referred to as "Co-Administrators" or "Plaintiffs") and are adult citizens of the Commonwealth of Pennsylvania and reside at 5620 Stokes St. Philadelphia, PA 19144. Rodney Hargrove, ("Mr. Hargrove") is the father of Decedent, and Cindy Hargrove ("Mrs. Hargrove") is the mother of the Decedent.

19.     Rodney Michael Hargrove, who was fondly referred to as "Rodie" (hereinafter referred to as "Rodie" or "Decedent"), was killed on March 18, 2021.

20.     Defendant, City of Philadelphia ("City"), at all times relevant hereto, is a municipality of the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the Philadelphia Prison Systems/Philadelphia Department of Prisons (PDP) and Curran-Fromhold Correctional Facility ("CFCF") and had the responsibility of adopting policies and implementing procedures and practices which would create an environment whereby inmates and released inmates would be safe and free from harm.

21.     CFCF is a correctional facility located at 7901 State Road in Philadelphia, Pennsylvania. CFCF consists of four housing buildings and an administration building and is the largest facility operated by the Philadelphia Department of Prisons/Philadelphia Prison System.

22.     PDP is a local government unit within the County and City of Philadelphia with an address of 7901 State Road in Philadelphia, Pennsylvania which is owned, operated, managed, directed and controlled by Defendant, the City of Philadelphia.

23.     Defendant, Warden Nancy Giannetta, (hereinafter "Warden Giannetta"), is an adult individual who, at all times relevant hereto, was the Warden for the Curran-Fromhold Correctional Facility, and, acting under the color of state law and in her authority as the Warden of the Curran-Fromhold Correctional Facility for the Philadelphia Prison System/Philadelphia

Department of Prisons.

24.     Warden Gianetta was, at all relevant times, a decision-maker for CFCF and had knowledge of and control over the unconstitutional policy, practice, and/or custom of late-night releases and their dangers, but continued to enforce the practice and custom of late night releases even though it left released inmates, such as Decedent, with no feasible means of returning home once the doors to CFCF closed behind them.

25.     Warden Gianetta had supervisory control over: employees at CFCF; bail and release procedures and the personnel that enacted them; the location and timing of releases; and perimeter security. Warden Gianetta was also individually involved in in the policies, practices, and customs that were designed, implemented and enforced at CFCF, including training employees who Warden Gianetta directly supervised.

26.     Warden Giannetta is named individually and in her official capacity.

27.     At all times relevant hereto, Warden Giannetta was responsible for ensuring the safety and security of inmates, released individuals and of the premises of the Curran-Fromhold Correctional Facility, including, *inter alia*, appropriate release procedures, security policies and procedures, and premises security and safety.

28.     Defendant, Warden Michele Farrell, (hereinafter "Warden Farrell") is an adult individual who, at all times relevant hereto, was the Warden for the Curran-Fromhold Correctional Facility, and, acting under the color of state law and in her authority as the Warden of the Curran-Fromhold Correctional Facility for the Philadelphia Prison System/Philadelphia Department of Prisons.

29.     Warden Farrell was, at all relevant times, a decision-maker for CFCF and had knowledge of and control over the unconstitutional policy, practice, and/or custom of late-night

releases and their dangers but continued to enforce the practice and custom of late-night releases even though it left released inmates, such as Decedent, with no feasible means of returning home once the doors to CFCF closed behind them.

30.     Warden Farrell had supervisory control over: employees at CFCF;  bail and release procedures and the personnel that enacted them; the location and timing of releases; and perimeter security.  Warden Farrell was also individually involved in the policies, practices, and customs that were designed, implemented and enforced at CFCF, including training employees who Warden Farrell directly supervised.

31.     Warden Farrell is named individually and in her official capacity.

32.     At all times relevant hereto, Warden Farrell was responsible for ensuring the safety and security of inmates, released individuals and of the premises of the Curran-Fromhold Correctional Facility, including, *inter alia*, appropriate release procedures, security policies and procedures, and premises security and safety.

33.     Defendant Commissioner Blanche Carney, (hereinafter "Commissioner Carney"), is an adult individual who, at all times relevant hereto, was the Commissioner for the Philadelphia Prison System of the City of Philadelphia and acting under color of state law and in her authority as Philadelphia Prison Commissioner of the City of Philadelphia.

34.     Commissioner Carney was, at all relevant times, a decision-maker for CFCF and had knowledge of and control over the unconstitutional policy, practice, and/or custom of late-night releases and their dangers but continued to enforce the practice and custom of late-night releases even though it left released inmates with no feasible means of returning home once the doors to CFCF closed behind them.

35.     Commissioner Carney had supervisory control over the Philadelphia Department

of Prisons; employees at CFCF including its wardens; bail and release procedures and the personnel that enacted them; the location and timing of releases; and perimeter security. Commissioner Carney was also individually involved in the policies, practices, and customs that were designed, implemented and enforced at CFCF and has given several public statements on issues at CFCF including the shooting death of Rodie Hargrove.

36.     Commissioner Carney is named individually and in her official capacity as commissioner of the Philadelphia Prison System/Philadelphia Department of Prisons.

37.     Defendant Dion Jones is an adult individual who, at all times relevant hereto, was a prison guard and/or correctional officer employed by the City of Philadelphia and acting under color of state law and in his authority as Philadelphia Prison Guard at CFCF.

38.     According to the allegations in his related worker's compensation claim, Defendant Jones  was "working at the booth at the front of the prison when [he] witnessed an inmate (who had just been released on bail) get fatally shot 10 times, about 10-20 feet away from [Defendant]." See p. 3, Exhibit B.

39.     Defendant Dion Jones is named individually and in his official capacity as a prison guard at CFCF.

40.     A court has already found that Defendant Jones was an employee of Defendant, City of Philadelphia, at the time of this incident, March 18, 2021. See, p. 11 ¶8(a), Exhibit B.

41.     Plaintiffs are unaware of the true names and capacities of those Defendants sued as "John Doe 1-100" and therefore sue these Defendants using their fictitious name. Plaintiffs will amend this Complaint to allege each unknown other named Defendants' true names and capacities when the information becomes known. "John Does 1 – 100" are  "persons" as the term is used in 42 U.S.C. § 1983, and at all times relevant to this Second Amended Complaint,

are believed to include current and former officers, guards, managers, supervisors, administrators, officials, staff, and others who have been employed by or were under the control of the City of Philadelphia, which owns, operates, manages, directs and controls the Philadelphia Department of Prisons and CFCF, who were involved in the incident described herein, acting under color of state law and within the scope of their employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Defendant, the City of Philadelphia. Defendants John Does 1-100 are sued in their individual and official capacities. Upon information and belief, Defendants John Does 1-100 were responsible for the safety, security, management, supervision, and/or release of inmates—specifically Rodie— and/or the safety, security, management, control, and traffic regarding the premises of the CFCF at the time of the incident described herein— including, but not limited to, the individual(s) responsible for the entry of vehicles into the CFCF parking lot, the individual(s) who raised the gate/barrier arm to allow Rodie's assailant onto the CFCF premises, and the individual(s) responsible for the transportation of Rodie to the Septa bus stop.

42.     ABC entities 1-10 are current and/or former public agencies or private entities who were responsible to ensure the safety, security, protection, traffic, and activity on the premises of the CFCF, and/or were responsible to ensure the safety, security and protection of inmates and released inmates at CFCF, including Decedent, and, more specifically, to prevent the injuries and death described more fully herein from occurring.

43.     At all times relevant to this Second Amended Complaint, the individual Defendants named above acted in concert and in conspiracy with one another in order to deprive Decedent of his constitutionally protected rights.

44.     At all times relevant to this Second Amended Complaint, Defendants caused the

injuries and harms to Plaintiffs and Decedent by failing to train, supervise and discipline the staff at CFCF including, but not limited to, Defendant Jones and the John Doe Defendants and, as a result, staff at CFCF, including Defendant Jones and the John Doe Defendants, as a matter of practice and custom, engaged in the prohibited conduct on a systemic basis with the expectation that their conduct would not be subject to discipline or sanctions.

45.     At all times relevant to this Second Amended Complaint, Defendants failed to properly protect Rodie and have shown a reckless disregard and deliberate indifference to the widespread violations of Rodie's constitutional rights despite knowing for decades of the dangerous policies of late-night jail releases  and the corresponding lack of protection for Rodie and other detainees released from CFCF without any realistic or reliable mode of transportation and with complete lack of personal security, in the dark and dangerous hours between midnight and sunrise.

46.     At all times relevant to this Second Amended Complaint, Defendants negligently and recklessly failed to supervise and train, and/or hire competent personnel, including Defendant Jones, in the operation and supervision of the traffic barrier securing the premises of CFCF, and in managing the safety and security of the CFCF premises.

47.     Due to Defendants' reckless and deliberately indifferent actions, as outlined above and in more detail below, Defendants directly and proximately caused the death of Decedent, Rodie Hargrove, and are liable for all damages incurred by his estate and beneficiaries.

 Defendants herein are directly and vicariously liable to Plaintiffs for their state law claims brought under theories of negligence, Wrongful Death and Survival for their negligent, outrageous, and reckless conduct as well as for violations of Decedent Rodie Hargrove's constitutional rights as described further herein, by persons or entities whose conduct was under

10

their control, or right to control which conduct directly and proximately caused the death of Decedent, Rodie Hargrove, and all damages incurred by his estate and beneficiaries.

## FACTS

### A.   A history of danger in late-night prison releases.

48.   Those who own, operate, and oversee correctional institutions have known for years that releasing inmates late at night is dangerous and even deadly for those inmates released.[4]

49.   Yet, despite this well-known danger, the safety and security of released prisoners continued to be ignored by the Defendants in this case.

50.   Although Defendants appreciated the peril with late night prison releases, they did nothing until two weeks *after* Rodie's death when the Defendants finally agreed to review and change its inmate release policies.  Sadly, this was too late for the Hargrove family.

51.   Not only were Defendants on notice of the danger of late night jail releases because it was a well-known issue in the prison/jail community but Philadelphia's own hometown newspaper, *The Inquirer,* highlighted the issue in an investigative report published approximately a year and half before Rodie's death: August 2019.[5]

---

[4] Harris County Jail, the largest county jail in Texas, implemented a policy in 2012 to only release inmates during daylight hours. Before this policy was implemented, female inmates had the choice of waiting to be released during daytime hours in recognition of the danger created by leaving women outside on the street in the middle of the night to fend for themselves and find a way home. This policy change occurred in the wake of two women who were hit and killed by cars after being released from the jail late at night and, with no form of transportation, began walking along a dark roadway. This incident is one of others where inmates were picked up and sexually abused following late-night releases. Anna Whitney, Harris County Stops Late Inmate Releases From Jail, The Texas Tribune. (Feb. 28, 2012) https://www.motherjones.com/crime-justice/2019/07/left-in-the-dark/

In Humboldt County, California, an inmate was stabbed and killed just a few blocks from the prison, less than five hours after his release at 12:38 am, after public transportation stopped running for the night. A County grand jury called for an end to late-night and early-morning jail releases. Grant Scott-Goforth No More Late Night Jail Releases, Says Grand Jury, North Coast Journal of Politics, People & Art (Aug. 6, 2014) https://www.northcoastjournal.com/NewsBlog/archives/2014/08/06/no-more-late-night-jail-releases-says-grand-jury.

In 2011, a woman was found dead after disappearing following her release from custody after midnight in Los Angeles. Anna Whitney, Harris County Stops Late Inmate Releases From Jail, The Texas Tribune ( Feb. 28, 2012) https://www.motherjones.com/crime-justice/2019/07/left-in-the-dark/

[5] *See* Pranshu Verma,  Each night, Philly jails release scores of inmates without returing their IDs, cash or phones, The Philadelphia Inquirer.  ((updated)Aug. 12, 2019) https://www.inquirer.com/news/philadelphia-prison-release-

52.     The *Inquirer* article, which had numerous quotes from Defendants' representatives thus confirming their knowledge of the issue, found that the cashier offices closed at 7 p.m. (8:30 p.m. at CFCF) meaning that prisoners released after these hours are left without identification, money or their phones.

53.     The *Inquirer's* investigation also recognized the concern for late night releases as one section of the article, titled "Confusion Late at Night" reported the following:

> Philadelphia's jail facilities are clustered on State Road. During a recent early morning visit, that stretch was quiet — except for the few times an hour when a white prison van left the prison compound, turned on its red flashing lights, and dropped off the newly freed at the bus stop across the street.
>
> It was a little after 1 a.m., and the men who got out of the van appeared confused. Two SEPTA buses serve that stop, but not at that hour.
>
> "Nothing's running," said one of them. He persuaded two others to join him on a walk up Rhawn Street to see whether there were any other transportation options available.
>
> In fact, according to an Inquirer analysis, about 1,100 newly released inmates from 2017 to 2018 were discharged so late that there was no public transportation running from the prisons.
>
> **If inmates get out after buses quit running, "they're screwed," Innes said.** There are many people who have the best intentions of seeking help when they get out of jail, said Shefner, but when they get out at 1 a.m. they might not want to knock on a family member's door late at night and instead stay outside, relapse or get into some other trouble, she said. [6]

54.     The *Inquirer* found that between May 1, 2016, and September 30, 2019, nearly 50% of the bail-paid releases from the Philadelphia Department of Prisons were processed for release between 9 p.m. to 7 a.m.

---

afterhours-ids-cashier-closed-20190812.html
[6] *Id.* (emphasis added).

55.    After the August 2019 *Philadelphia Inquirer* article highlighted the problems, dangers and constitutional violations with late-night releases that were well known among the correctional community and obvious to the public, the Philadelphia prison system began reducing the number of inmates released during late night and early morning hours.[7]

56.    Within two weeks of the August 2019 *Inquirer* article being published, Defendants' acknowledgement of the danger in their continued practice of late-night releases was clear when, "hours after an *Inquirer* investigation revealed that the Philadelphia Department of Prisons released nearly three-quarters of its inmates without their IDs, cash, or phones, its commissioner extended cashier's office hours to 7 p.m. at four of the city's five jails."[8]

57.    Defendant Commissioner Blanche Carney identified "safety" as the DPD's "first priority" touting an effort "to accelerate the release process and decrease late night releases and we will continue to modify our cashier hours at each facility accordingly."[9]

58.    Statistics from an *Inquirer* article after Rodie's death reveal that Defendants continued to acknowledge and recognize the problem posed by late night releases by significantly decreasing nighttime releases: between October 1, 2019 and March 24, 2021, the data reflects that bail paid releases during the hours of 9 p.m. and 7 a.m. had dropped from 50% to approximately 21%.[10]

59.    However, despite the statistical recognition by Defendants of the dangerous practice of late-night releases, Defendants still released prisoners late at night and continued to

---

[7] *See* Pranshu Verma, After Inquirer probe, Philly jails will release prisoners earlier and with all of their belongings, (Aug. 26, 2019) https://www.inquirer.com/news/philadelphia-jail-release-afterhours-cashier-procedure-update-ids-cash-blanche-carney-20190826.html
[8] *Id.*
[9] *Id.*
[10] *See* Philadelphia prisons to implement changes following man's murder 1 hour after release, 6ABC (April 1, 2021) https://6abc.com/rodney-hargrove-shooting-curran-fromhold-correction-facility-philadelphia-prison-man-just-released-from-killed/10465062/

13

engage in this dangerous late night release practice without appropriate safety precautions when they transported released inmates to the SEPTA bus stop after 1:00 a.m. with no realistic or reliable mode of transportation and no form of personal security.[11]

60.    It remained the policy and practice of the City of Philadelphia, PDP, CFCF, and the individually named Defendants to release prisoners "around the clock" and without any safety measures from all four of the City's jails, all of which are located on the same complex, including CFCF.[12]

61.    In fact, at all relevant times hereto, Defendants did not have a secure area within CFCF to hold individuals after bail had been posted, should they desire to wait inside the secure CFCF facility instead of outside in the dark elements of the night until a transportation option becomes available.[13]

62.    There were no cab vouchers and no ride sharing services offered.  The Defendants safely brought inmates to CFCF and the other City-run prisons, but did not do the same when releasing these same inmates – even if it was the middle of the evening with no public transportation available.

**B.    A "dangerous spot" known and created by the prison.**

63.    On March 17, 2021, after spending less than a week in the custody of the CFCF/PDP, Rodie's bail was paid. Rodie, who was twenty (20) years-old at the time, had been

---

[11] *See* Pranshu Verma, <u>Philly jails extend cashier hours, but most inmates still would be released without IDs, cash, or phones.</u> (August 13, 2019) The Philadelphia Inquirer. <u>https://www.inquirer.com/news/philadelphia-jail-release-afterhours-cashier-extend-ids-cash-blanche-carney-20190813.html#loaded</u> ("Philadelphia prisons commissioner Blanche Carney extends the hours when released inmates can retrieve their belongings, but it would only help a fraction of the thousands set free at night."

[12] *See* Aaron Moselle, <u>Questions swirl after Philly man's murder on prison grounds; correctional officers call on commissioner to resign</u>, WHYY, PBS affiliate, (Mar. 22, 2021)   <u>https://whyy.org/articles/questions-swirl-after-philly-mans-murder-on-prison-grounds-correctional-officers-call-on-commissioner-to-resign/</u>

[13] *See* <u>Philadelphia prisons to implement changes following man's murder 1 hour after release</u>, 6ABC (April 1, 2021) <u>https://6abc.com/rodney-hargrove-shooting-curran-fromhold-correction-facility-philadelphia-prison-man-just-released-from-killed/10465062/</u>

arrested and taken into custody on March 11, 2021 for non-violent criminal charges.

64.     Rodie's bail processing took an exceedingly long time of at least 2.5 hours.

65.     Once it was finally completed, Rodie was loaded into a prison van and taken to the CFCF SEPTA bus stop which is no more than 100 feet from CFCF at 1:10 a.m. on March 18, 2021, where he was left to wait for a bus or figure out how to get home.



66.     Defendants were responsible for Rodie's protection when they loaded him into the prison van and ordered him to get out of the van and stand in the dark at the desolate SEPTA bus stop where they abandoned him.

67.     Defendants, who are well-aware of the SEPTA bus schedule, knew that when Rodie was dropped off at the CFCF bus stop at 1:10 a.m. that morning, the last SEPTA bus pick up at this stop occurred just two minutes prior, at 1:08 a.m., and the next bus would not come until 5:48 a.m. *See* SEPTA route and schedules, buses 84 and 70, attached hereto as Exhibit "A."

68.     Disregarding this knowledge of clear danger, Defendants left Rodie to wait five hours for the next bus, in the dark, in an area where criminal activity was known to occur.



69.     The specific bus stop where Defendants released inmates, including Rodie, was known to be dangerous by the Defendants and the community at large.

70.     In fact, Claire Shubick-Richards, executive director of the Pennsylvania Prison Society is reported as acknowledging that **"the bus stop is a 'dangerous' spot for released prisoners,"** and that "she has heard stories from incarcerated women who were offered drugs, as well as propositioned to engage in other criminal activity while waiting at the bus stop."[14]

71.     Against a backdrop of skyrocketing crime and homicide rates throughout the entire City of Philadelphia, the crime rate in the 15th Police District, where Rodie was released, had seen a 38% increase in homicides since the year before and a 4% increase in already-high shooting victims from 2020.[15]

72.      Just three months into the year 2021, Philadelphia Police Department reported a staggering 55% increase in the homicide rate for the year, and was already predicting an even more deadly year than 2020, which was one of the "deadliest years in decades" for the City, which

---

[14] *Id.*
[15] *See* https://www.phillypolice.com/crime-maps-stats/; *see* also, https://www.fox29.com/news/philadelphia-homicides-up-55-so-far-in-2021-following-violent-monday-that-killed-7

has now tragically reached over 500 homicides for the year 2021.[16]

73.     No one was more acutely aware of the rising crime and homicide rates than those involved in the criminal justice community, including all Defendants identified in this Second Amended Complaint.

74.     Further, a violent attack had occurred at CFCF just three years prior (2018) when a just-released inmate ambushed a correctional officer in the parking lot and tried to steal his car.[17]

75.     In the aftermath of the 2018 parking lot attack, (three years before Rodie's death on CFCF ground), questions were raised about the lack of security cameras to capture the incident.[18]

76.     Amazingly, upon information and belief, security cameras had still not been installed in the parking lot or gate area of CFCF where Rodie died – demonstrating the Defendants' total disregard for safety on the CFCF premises.

77.     **Community members interviewed about the 2018 parking lot attack were quoted as saying "[o]n any given night, you can ride down State Road and folks are being released at 10, 11, 12 o'clock at night with two (public transit) tokens and whatever clothes they came in with" adding the eerily prescient warning: "[w]e have a multi-million budgets for security inside the prison, but perhaps City Council and the prison system need to look at what is a more equitable way to release people to make sure they don't come right back into the system or a tragedy doesn't happen."[19]**

---

[16] *Id.*
[17] *See*  Dana DiFlippo, City: Just-released inmate shot after ambushing Philly prison guard, Whyy PBS affiliate (Feb. 10, 2018) https://whyy.org/articles/city-just-released-inmate-shot-ambushing-philly-correctional-officer/
[18] *Id.*
[19] *Id.*

17

78.     A "tragedy" did happen because Defendants refused to prioritize the safety of the inmates in their care and control.

79.     Despite the rising crime rates, the knowledge about the "dangerous spot" where inmates were being dropped off without transportation, and the woeful lack of adequate security on prison grounds, the Defendants' decision to continue late-night releases after transportation hours, shocks the conscience.

80.     Rodie's death was entirely foreseeable and preventable had Defendants simply heeded the numerous warning signs and taken simple steps to make their release policies and customs safe.

### C.     Rodney Michael Hargrove was shot and killed while waiting for a ride.

81.     Rodie was under the care and custody of Defendants when they placed him at the SEPTA bus stop.

82.     Defendants knew that they had created and placed Rodie in a dangerous situation.

83.     As Rodie waited for a ride home, a vehicle pulled up near the SEPTA bus stop and began to ambush Rodie who ran onto prison grounds for safety.

84.     Rodie ran towards the prison's parking lot where vehicles, like the one pursuing him, should have been stopped by a parking gate/traffic barrier arm that was manually operated at all times by a stationed prison guard.

85.     However, Defendant Commissioner Carney initially reported that "for whatever reason", the arm to the gate was in a raised position, allowing the vehicle to continue to chase Rodie onto prison grounds.[20]

---

[20] Defendant, Prison Commissioner Carney said in a press conference of the shooter's access to the premises "[the arm is] raised by the correctional officer assigned to that post. And, for whatever reasons the officer raised it, and at the time of the pursuit, the vehicle was able to proceed through that raised arm." Corey Daivs, 20-year-old man found shot and killed outside Philadelphia prison 1 hour after release: Police. 6ABC action news (Mar. 19, 2021)

86.     Defendant Jones, who was supposed to be manning the booth, later revealed that he raised the arm before leaving his post to go to the bathroom.

87.     While Defendant Jones was in the bathroom, the gate and booth were left unattended.

88.     Defendant Jones stated that he raised the arm "so that the transportation vans could go in and out as they normally do." See p. 4 Exhibit B.

89.     Additionally and/or alternatively, the traffic arm was raised on the night of the incident because it had been "acting up." Id.

90.     Defendants were aware that the parking arm was experiencing mechanical issues and "maintenance was going to look into it". Id.

91.     With the traffic control arm being raised and no one manning the security booth, Rodie was fatally shot multiple times at close range at approximately 1:59 a.m., a few feet from the location where Defendant Jones should have been stationed. He was pronounced dead on the scene shortly thereafter at 2:07 a.m.

92.     Due to Defendants' acts of deliberate indifference and violation of his constitutional rights, Rodie was exposed to danger by being left stranded in a high crime area in the middle of the night.

93.     Defendants' reckless policies were then compounded when Defendant Jones opened the main gate/parking arm/ at the main entrance to CFCF allowing the shooter to kill Rodie on prison grounds.

94.     Defendant Jones returned from the bathroom in time to see Rodie's assailant

---

https://6abc.com/curran-fromhold-correction-facility-philadelphia-prison-shooting-man-just-released-from-killed-holmesburg/10428416/

driving in through the exit side of the access into and out of the CFCF parking lot and firing shots at Rodie.

95.     Defendant Jones was responsible for manning the booth at this entrance at the time of the incident, and was assigned to work this gate alone.

96.     Prior to the night of this incident, Defendant Jones had only worked the main gate approximately 10 times during his nine years of employment with Defendants. See pg. 3, Exhibit B.

97.     Defendant Jones had no formal training in securing the CFCF premises and only had general training which he received at the academy almost ten years prior.  Id.

98.     Defendant Jones, and anyone manning the gate, was required to "check the vehicles coming in and out of the prison grounds, including identification." See pg. 3, of Exhibit B.

99.     With the push of a button, Defendant Jones could allow a vehicle or individual to pass through an entrance otherwise blocked by an aluminum metal traffic arm.

100.    Defendant Jones was armed with a Glock 17 service weapon but failed to use it to deter Rodie's assailant or protect Rodie.[21]

101.    Defendant Jones was not trained in disarming tactics or responding to an active shooter. See p. 4,  Exhibit B.

102.    Defendant Jones acted with deliberate indifference and raised the traffic control arm and left it open, then went to the restroom and left his post completely unattended, and allowed the shooter to pursue and kill Rodie.

---

[21] Mr. Jones was asked to write a memorandum memorializing the incident, which Plaintiffs have not yet obtained. Plaintiffs expect that upon receipt of this memorandum, additional details about the shooting and the involvement of  Defendants will be brought to light.

103.    Defendants, City of Philadelphia, Warden Gianetta, Warden Farrell, and Prison Commissioner Carney and ABC Entities 1-10 failed to properly train employees including Defendant Jones and John Does 1-100, to properly maintain the safety and security of the premises at CFCF.

104.    At the time of Rodie's killing, and despite previous security issues in this same location three years prior and crime in the area in general,[22] Defendants had failed to install any security cameras capturing the main gate and entrance to the CFCF.

105.    Shortly following this entirely preventable event, Defendant, Commissioner Carney, recognized this dangerous incident in a press release saying: "[t]he Philadelphia Department of Prisons remains shocked and horrified that Rodney Hargrove, a 20-year-old Black male who was released on bail, was murdered on our grounds."[23]

106.    Defendant, Commissioner Carney, has also acknowledged that PDP, a City of Philadelphia agency, has now, in the wake of Rodie's murder, taken steps to improve the bail release process and to increase security on the premises including adding cameras, adding license plate readers to track vehicles entering and exiting the facility, reconsidering access to bail processing 24 hours a day, and the use of ride-sharing services when public transportation is not available.[24]

107.    Defendants understood the dangerous situation they had created just outside the doors of CFCF. Commissioner Carney stated in a press conference "[w]e recognize that this

---

[22] *Id.*
In the week before Rodie's death, the City of Philadelphia had seen a 21.6% increase in homicides for the year and a 36.3% increase in shooting victims. *See* Philadelphia Police Department Major Crimes report. (March 15, 2021). https://www.phillypolice.com/crime-maps-stats/
[23] *See* Philadelphia prisons to implement changes following man's murder 1 hour after release, 6ABC (April 1, 2021) https://6abc.com/rodney-hargrove-shooting-curran-fromhold-correction-facility-philadelphia-prison-man-just-released-from-killed/10465062/
[24] *See* Id.

21

murder erodes public trust in the safety and operations of PDP facilities that cause great concern for the families and friends of those employed at the PDP and those in our custody."[25]

108.    Two weeks after Rodie's death, Defendants acknowledged their reckless actions via a statement released by the Department of Prisons: "PDP is exploring with its legal counsel and other criminal justice partners the feasibility of reconsidering access to bail processing 24 hours a day. PDP is also exploring funding for ride sharing services for those instances when public transportation ceases operation and individuals express that they do not have access to private transportation for late night bail release […] PDP has made significant progress[26] in releasing individuals from custody during daylight hours, where they have more access to public transportation and may be picked up by friends and/or family."[27]

109.    Defendant, the City of Philadelphia's Department of Prisons then issued a press release on April 16, 2021, detailing the procedure for individuals posting bail during evening hours which now offers transportation service to those individuals without transportation options and instructs those that are picking up released individuals from the SEPTA bus stop across the street from the PDP campus to do so within two hours of the individual posting bail[28]

110.    Defendant, City of Philadelphia's PDP summarizes their new bail procedures in the following way:

> The newly released individual will be permitted to call the person

---

[25] *See* <u>Philadelphia prisons to implement changes following man's murder 1 hour after release</u>, 6ABC (April 1, 2021) <u>https://6abc.com/rodney-hargrove-shooting-curran-fromhold-correction-facility-philadelphia-prison-man-just-released-from-killed/10465062/</u>

[26] The "significant progress" touted by the PDP began after the publication of the August 26, 2019, *Inquirer* article[26], when, in addition to the known danger in the correctional community of late-night releases, Defendants were further publicly placed on notice that late-night releases were dangerous. Their acknowledgment of the danger and the half-hearted and, inadequate remedy confirms the foreseeable nature of the danger in late-night releases and Defendants' reckless disregard of such risks as they continued to engage in this dangerous and unconstitutional practice.

[27] *Id.*

[28] *See* Bria Spivey, <u>Release procedures due to bail bein posted during evening hours (10 om to 6 am)</u>, City of Philadelphia Official Website (April 16, 2021) *https://www.phila.gov/2021-04-16-release-procedures-due-to-bail-being-posted-during-evening-hours-10pm-to-6am/*

who posted bail or other loved one and arrange for transportation.

The person picking up the newly released individual may pick them up at the Septa bus stop across the street from the PDP campus. The person picking up the individual should head to the PDP campus no later than two hours of posting the bail to await the individuals physical release from custody. If the person posting the bail chooses to secure ride share or taxi services, are required to inform the service of the same information.

If the newly released individual self-discloses that they do not have transportation, they will be referred to the PDP's transport service, and if they accept will be provided transportation.

The above will be available to all newly released individuals during the identified evening hours.

Persons posting bail and newly released individuals are urged to not make any communication disclosing release information inclusive of release time, location of facility and transportation information, or location where they will be dropped off to anyone other than the person picking them up.[29]

111.    At a minimum, these policies easily could and should have been implemented by Defendants long before Rodie was taken into Defendants' custody as the danger of late-night releases was well known throughout the prison community, and the specific dangers posed by late-night releases by the PDP and CFCF's practices were known and consciously disregarded by Defendants.

112.    The ease and swiftness with which Defendants implemented these policies is indicative of the knowledge Defendants had of the safety concerns and their ability to implement practices that addressed those concerns *prior* to Rodie's unnecessary death.

113.    Defendants Warden Nancy Gianetta, Warden Michelle Farrell, and Prison Commissioner Blanche Carney were all directly involved, individually, and by way of their

---

[29] *Id.*

23

official capacity, in the adoption, implementation, and enforcement of policies, practices and customs within the PDP and CFCF.

114.    Rodie's killing was a foreseeable consequence of this continued practice by Defendants as the area surrounding the SEPTA bus stop and CFCF was known to be one of high crime and Defendants were painfully aware of the rapid rise in gun violence and homicides in this community.[30]

115.    At the time of his death, Rodie was a senior at Benjamin Franklin High School with an anticipated graduation date in June 2021.

116.    Defendants' deliberate indifference towards Rodie's life and future prevented him from ever walking across the graduation stage in a cap and gown, leaving his family to mourn his early death and grieve the loss of the man that he was to become.

## **DAMAGES**

117.    The unlawful, intentional, willful, deliberately indifferent, negligent and reckless acts and omissions and constitutional violations of the Defendants directly and proximately caused the death of Rodney Michael Hargrove at the young age of 20, and the resulting injuries and damages suffered by his Estate and surviving family.

118.    Because of Defendants' conduct, Rodie suffered a tragic and untimely death but not before sustaining great fright, anguish, emotional distress, fear of death, mortification, and devastating conscious pain and suffering. Defendants are liable for the same as described more

---

[30] Fox 29 of Philadelphia reported that as of May 31, 2021, Philadelphia Police report a "stunning number" of 264 multi-victim shootings in the first five months of 2021. Including one quadruple shooting and four double shootings (totaling 12 victims) in the 15th Police District, alone, where CFCF is located.  The 15th Police District has also seen a 38% increase in homicides since 2020, a 4% increase in shooting victims (which was already high at 50 total shooting victims in 2020). The Philadelphia Police Department also reported that overall, Philadelphia's homicide rate is up 55% and on pace to be an even more deadly year than 2020 which was one of Philadelphia's "deadliest years in decades." Fox 29 Philadelphia, (Feb 9, 2021), https://www.fox29.com/news/philadelphia-homicides-up-55-so-far-in-2021-following-violent-monday-that-killed-7 *See* also https://www.phillypolice.com/crime-maps-stats/index.html

fully below.

119.    Due to his early death at the age of 20, Rodie also suffered a loss of earnings, earning power, and earning capacity. Defendants are liable for the same as described more fully below.

120.    Rodie is survived by his mother and father, Plaintiffs, Rodney Hargrove and Cindy Hargrove, along with five siblings, who suffered the loss of financial support, future earnings, future earning capacity, services, comfort, funeral expenses and expenses for the administration of the estate of decedent with the total earnings which would have been earned by Rodie through the course of his total life expectancy, due to Rodie's untimely death.

121.    At all times relevant hereto, Defendants were acting directly as well as by and through their duly authorized actual and/or apparent agents, servants and employees, in particular, their staff, officers, guards, medical clinicians, clinical case workers, supervisors and directors acting within the course and scope of their actual and/or apparent agency and/or employment.

122.    Defendants herein are directly and vicariously liable to Plaintiffs for injuries sustained as a result of negligence, gross negligence, outrageous conduct, and reckless misconduct, as described further herein, as well as a violation of Rodie's constitutional rights as described further herein, of persons or entities whose conduct was under their control, or right to control which conduct directly and proximately caused all of Plaintiffs' injuries.

### *Federal Claims*

### **Plaintiffs v. All Defendants**

### **COUNT I: 42 U.S.C. §1983 - Deprivation of Rights by Virtue of State Created Danger**

123.    Plaintiffs incorporate by reference all of the foregoing paragraphs of this Second Amended Complaint as if fully set forth herein.

124.    As set forth herein, this is a civil rights action brought pursuant to 42 U.S.C. § 1983 that challenges the constitutionality of the actions by Defendants that resulted in the death of Rodney Michael Hargrove and the subsequent injuries and harms suffered by Plaintiffs.

125.    At all times relevant thereto, Defendants, including Defendants, Warden Nancy Gianetta, Warden Michele Farrell, Prison Commissioner Blanche Carney, Dion Jones, and John Does 1-100, acting in their individual and official capacities, and the City of Philadelphia, and ABC Entities 1-10, were "persons," and acting under color of state law, pursuant to 42 U.S.C. §1983.

126.    Defendants' constitutional torts are not governed or limited by 42 Pa.C.S.A. § 8451, *et. seq*., or 42 Pa.C.S.A. §8521, *et seq*.

127.    The specific harms to which Defendants exposed Roddie were foreseeable and direct in that they knew that releasing individuals late at night in an area with alarming crime rates with no option for public transportation would result in danger, severe harm and even the death of Rodie.

128.    At all times material hereto, Defendants were bound, as previously set forth herein, by the Fourth and Fourteenth Amendments to the United States Constitution as well as, upon information and belief, their own policies, rules and regulations for the management, safety, care, and oversight of inmates placed in their care, custody and control.

129.    In direct contravention and violation of the Fourth and Fourteenth Amendments as set forth above and, upon information and belief, in violation of their own policies and regulations, Defendants recklessly, willfully and with deliberate indifference, released Rodie and other inmates in the middle of the night, hours before the next SEPTA bus would begin its daily routes past the CFCF, without any mode of transportation or personal protection, and despite the

knowledge that this practice placed inmates, including Rodie, in lethal danger.

130.    While acting under color of state law, Defendants affirmatively created the danger or risk of harm that led to Rodies' death as follows:

a.  Transporting Rodie from CFCF to an out-of-service SEPTA bus stop and releasing him in the middle of the night without any mode of transportation or personal protection despite the known risk of lethal danger;

b.  Affirmatively placing Rodie in a foreseeably dangerous location at a dangerous time of night, and leaving him there despite knowledge of such dangers;

c.  Rendering Rodie more vulnerable to harm by specifically dropping him off at a desolate SEPTA bus stop, knowing that he would be required to withstand the dangers of the night for five hours before the next bus arrived;

d.  Permitting and/or otherwise causing Decedent to be exposed to the harms and dangers of a late-night release, and within the premises of CFCF, as described herein, despite the dangers being known and obvious;

e.  Permitting and/or otherwise causing Decedent to be exposed to physical and psychological harm and death;

f.  Despite recognizing the danger of late-night releases, Defendants continued the dangerous practice of late-night inmate releases, including the policy and practice of taking the inmates and leaving them at a SEPTA bus stop known to be abandoned by public transportation between the hours of approximately 1:00 am and 6:00 am;

g.  Allowing Rodie's assailant to enter the premises of CFCF;

h.   Granting access to the CFCF premises to Rodie's assailant, by opening/raising

the traffic barrier to entry onto the premises;

i.   Leaving the security booth at the entrance of the CFCF premises unattended;

j.   Failing to adequately protect Decedent from physical assault and fatal injuries on their premises by opening the traffic security gate and leaving it in an open position;

k.   Failing to disarm and/or thwart the active shooter be employing the service weapon issued by Defendants.

l.   Failure to enforce codes, regulations and policies with respect to proper custody and release of inmates in the exercise of their power possessed by virtue and authority of state law, including, but not limited to:

    i.   61 P.S.A. §3791 *et seq*. (Inmate Prerelease Plans);

    ii.   61 P.S.A. §1726 (Duties of the Warden);

    iii.   61 P.S.A. §4901 *et seq* (Safe Community Reentry);

    iv.   61 P.S.A. §5001 *et seq* (Community Corrections Centers and Community Corrections Facilities);

    v.   61 P.S.A. § 5901 *et seq*. (Miscellaneous Provisions, (including Physical Welfare of Inmates)).

m.   Willfully subjecting Decedent to physical and psychological harms and death, described herein; and

n.   Such other deliberately indifferent, reckless, and willful and wanton conduct resulting in the violation of Defendant's rights that shall be revealed through discovery prior to trial.

131.   Defendants maintained care and control over Rodie when they ordered him to

leave the secure facility of CFCF, ordered him into the prison van, and when they ordered him to exit the prison van and placed him in the highly and foreseeably dangerous situation at the abandoned SEPTA bus stop.

132.   Rodie would not have been free to disobey the commands of Defendants' agents at any point prior to them leaving him at the SEPTA stop, because he was still in their care, custody and control.

133.   Defendants, while acting under color of state law, unlawfully, and/or unreasonably, willfully, recklessly, maliciously and/or with deliberate indifference to Rodie's rights, violated 42 U.S.C. §1983 and deprived Rodie of his rights as guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution, similar provisions of the Pennsylvania Constitution, Federal Law, State Law, and/or local law in that these Defendants, without lawful basis, caused Rodie's murder by creating the danger to which Rodie was exposed, in violation of his aforesaid guaranteed rights, as set forth in the preceding paragraphs of this Second Amended Complaint.

134.   The danger affirmatively created by Defendants, as set forth above, was foreseeable and direct.

135.   The actions of Defendants in their deliberate or reckless indifference, and callous disregard for the foreseeable danger they created for Rodie, shocks the conscience.

136.   In creating the danger as set forth above, Defendants acted in a willful disregard for the safety of Rodie.

137.   As the facts set forth in this Second Amended Complaint demonstrate, Defendants knew or should have known that the policy of late-night releases was dangerous and that through their actions and by failing to take action to stop and prevent such danger, Rodie was exposed to

serious harm and death and such conduct established a deliberate indifference towards Rodie's life on behalf of Defendants.

138.    Defendants' affirmative actions violated Rodie's constitutional right to personal liberty and security, and his right to substantive due process guaranteed by the Fourteenth Amendment.

139.    Defendants' acts and omissions, as described in the preceding paragraphs of this Second Amended Complaint, were the direct and proximate cause of Rodie's death and Defendants are therefore liable to Plaintiffs under 42 U.S.C. § 1983.

**Plaintiffs v. All Defendants**

**COUNT II: 42 U.S.C. §1983 - Deprivation of Rights by Virtue of a Special Relationship**

140.    Plaintiffs incorporate by reference all of the foregoing paragraphs of this Second Amended Complaint as if fully set forth herein.

141.    As set forth herein, this is a civil rights action brought pursuant to 42 U.S.C. § 1983 that challenges the constitutionality of the actions by Defendants that resulted in severe injuries to Decedent and Plaintiffs.

142.    At all times relevant hereto, Defendants, including Defendants, Warden Nancy Gianetta, Warden Michele Farrell, Prison Commissioner Blanche Carney, Dion Jones, and John Does 1-100, acting in their individual and official capacities, the City of Philadelphia, and ABC Entities 1-10, were all "persons" and were acting under "color of state law" pursuant to 42 U.S.C. §1983 by providing care, custody and/or control over Decedent either directly, by delegated authority or via contractual authority.

143.    The specific harms to which Defendants exposed Decedent were foreseeable and direct in that they knew that allowing continuous and regular late-night releases of inmates from CFCF would result in severe and lasting harm, and even death, to Decedent.

144.    At all times material hereto, Defendants were bound by various Pennsylvania statutes as well as, upon information and belief, its own policies, rules and regulations for the management of inmates placed in their care.

145.    In direct contravention and in violation of those Pennsylvania statutes and upon information and belief, in violation of Defendants' own rules, regulations, and policies, Defendants recklessly and willfully subjected Decedent to physical and psychological harms and death, described herein, even though such harms were foreseeable.

146.    At all times material hereto and upon information and belief, Defendants violated their own rules, regulations and policies for the management and supervision of individuals placed in their custody.

147.    At all times relevant hereto, a "special relationship" existed between Defendants and Decedent.

148.    Upon information and belief, a "special relationship" existed between Decedent and the aforesaid Defendants for purposes of 42 U.S.C. § 1983, as Decedent was placed in their care as an inmate and that care was custodial in nature, and resulted in the deprivation of Decedent's life and liberty.

149.    Defendants, while acting under color of state law, unlawfully, and/or intentionally, unreasonably, willfully, maliciously, and/or with deliberate and/or reckless indifference to the Decedent's rights, violated 42 U.S.C. § 1983 and deprived Decedent of his rights as guaranteed under the Fourth and/or Fourteenth Amendments to the United States Constitution, similar

provisions of the Pennsylvania Constitution, Federal Law, State Law, and/or local law in that these Defendants without lawful basis caused the aforementioned injuries and damages to Decedent and Plaintiffs as described in this Civil Action Second Amended Complaint, in violation of the aforesaid guaranteed rights as follows and upon information and belief:

    a.  Negligently, carelessly and recklessly placing Decedent in a place which they knew exposed Decedent to grave danger;

    b.  Failure to properly screen, train, and supervise employees and agents which allowed the harms suffered by Decedent to occur;

    c.  Permitting and/or otherwise causing Decedent to be exposed to the harms and dangers of late-night releases, and within the premises of CFCF as described herein, despite the dangers being known and obvious;

    d.  Permitting and/or otherwise causing Decedent to be exposed to physical and psychological harm and death;

    e.  Failing to adequately protect Decedent from physical assault and fatal injuries on their premises by opening the traffic security gate and leaving it in an open position;

    f.  Despite recognizing the danger of late night releases, Defendants continued the dangerous practice of late-night inmate releases, including the policy and procedure of taking the inmates and leaving them at a SEPTA bus stop known to be abandoned by public transportation between the hours of approximately 1:00 am and 6:00 a.m.;

    g.  Allowing Rodie's assailant to enter the premises of CFCF;

    h.  Leaving the security booth at the entrance of the CFCF premises unattended;

i.   Failing to disarm and/or thwart the active shooter be employing the service weapon issued by Defendants.

j.   Granting access to the CFCF premises to Rodie's assailant, and opening/raising the barrier to entry onto the premises

k.   Failure to enforce codes, regulations and policies with respect to proper custody and release of inmates in the exercise of their power possessed by virtue and authority of state law, including, but not limited to:

   i.   61 P.S.A. § 3701 *et seq.* (Inmate Prerelease Plans);

   ii.   61 P.S.A.§ 1726 (Duties of the Warden);

   iii.   61 P.S.A. § 4901 *et seq*. (Safe Community Reentry);

   iv.   61 P.S.A. § 5001 *et seq*. (Community Corrections Centers and Community Corrections Facilities);

   v.   61 P.S.A. § 5901 *et seq*. (Miscellaneous Provisions, (including Physical Welfare of Inmates).

l.   Such other deliberately indifferent, reckless, and willful and wonton conduct resulting in the violation of Defendant's rights that shall be revealed through discovery prior to trial.

150.   Defendants' aforesaid conduct, initiated under color of state law, unlawfully, and/or intentionally, unreasonably, willfully, maliciously, and/or with deliberate and/or reckless indifference violated 42 U.S.C. § 1983 and deprived Decedent of his rights as guaranteed under the Fourth, and/or Fourteenth Amendments to U.S. Constitution, similar provisions of the Pennsylvania Constitution, Federal Law, State Law, and/or local law without lawful basis, thus causing injuries and damages to Plaintiff as aforesaid.

**Plaintiffs v. Warden Gianetta, Warden Ferrell, Commissioner Carney, Dion Jones, and John Does 1-100**

**COUNT III: 42 U.S.C. §1983 Failure to Intervene**

151.    Plaintiffs incorporate by reference all of the foregoing paragraphs of this Second Amended Complaint as if fully set forth herein.

152.    By their conduct and under color of state law, the individual Defendants, acting within the scope of their employment with Defendant, the City of Philadelphia's PDP and/or CFCF, had opportunities to intervene on behalf of Rodie to prevent his death but with deliberate indifference, declined to do so.

153.    In fact, Defendant Dion Jones, was armed with a firearm issued to him in the course of his employment with Defendant, City of Philadelphia.

154.    Upon information and belief, Defendant Dion Jones never used his firearm to protect Rodie from the active shooter.

155.    Upon information and belief, Defendant Dion Jones hid for his own safety instead of intervening to protect the life of Rodie, who Defendant Dion Jones knew was unarmed.

156.    Upon information and belief, Defendant Dion Jones, could have easily and reasonably intervened to stop the active shooter but choose not to do so in reckless disregard of Rodie's safety, liberty, and life.

157.    Upon information and belief, Defendant, City of Philadelphia, Warden Gianetta, Warden Farrell, and Commissioner Carney failed to train Defendant Dion Jones in the proper use of his issued firearm.

158.    Defendants' failures to intervene violated Rodie's clearly established constitutional rights and privileges as a citizen of the United States, as guaranteed by the Fourth

and Fourteenth Amendments.

159.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Decedents' injuries. Defendants knew, or should have known, that their conduct would result in grave injury and/or death to Rodie.

<div align="center"><strong>Plaintiffs v. The City of Philadelphia</strong></div>

<div align="center"><strong><u>COUNT IV: 42 U.S.C. §1983 Municipal Liability Claim</u></strong></div>

160.    Plaintiffs incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as if fully set forth herein.

161.    Defendant, the City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Rodie's release and death, dangerous policies and practices of late-night releases in violation of the rights of its citizens.

162.    This policy and/or custom of late-night prison releases, into high crime areas with no reliable mode of transportation, whether written and adopted as an official policy, or enforced as a customary practice, were implemented by the City's policymakers and officers, including Defendants, Warden Gianetta, Warden Farrell, and Commissioner Carney.

163.    The dangerous policies and/or customs of late-night releases were a result of the City's deliberate indifference to the longstanding and enduring unconstitutional practices of ABC Entities 1-10 and the individually-named Defendants, including Dion Jones and  John Doe 1-100, and the City's deliberate indifference to the rights of its citizens which are violated by those unconstitutional practices as outlined in the preceding paragraphs of this Second Amended Complaint.

164.    The City had actual and/or constructive notice of the dangers created by these policies, practices and customs, but repeatedly failed to make any meaningful investigation into

<div align="center">35</div>

complaints and concerns[31] about late-night releases.

165.     The City of Philadelphia also did not stop the obviously dangerous practice of late-night releases with no concurrent safety practices including failing to develop plans for safe pick-ups by having designated safe zones or cab or ride sharing services.

166.     Defendants also failed to install security cameras covering the dangerous area in question, and failed to take appropriate remedial actions to curb the pattern of dangerous scenarios at CFCF and its parking lot in deliberate indifference to the rights of the people such as Decedent, Rodney M. Hargrove.

167.     This practice, as exemplified by the reporting conducted by the *Philadelphia Inquirer* and other local news sources, and those detailed herein above, continued for years due to the deliberate indifference of the City of Philadelphia's Department of Prisons, to these policies, practices and customs.

168.     These unconstitutional and improper policies and customs of the City have persisted for a significant period of time, which continued throughout the time during which Rodie was in Defendants' custody, and even in the time thereafter, and which demonstrates the deliberate indifference of Defendant, City of Philadelphia, to the practices of late-night releases and the violations of Rodie's Constitutional right to personal liberty and security and his right to substantive due process guaranteed by the Fourteenth Amendment.

169.     The City, by and through its agents, including Defendants Warden Gianetta, Warden Farrell and Commissioner Carney, also failed, with deliberate indifference, to properly train, supervise and discipline staff at PDP and CFCF, including Defendant Dion Jones and the John Doe 1-100 Defendants. As a direct and proximate result of Defendant's failure to train,

---

[31] *See* prior complaints and concerns as averred and supported by referenced news articles and public sources in ¶¶ 1-11, 42-98, *supra*.

supervise, monitor, discipline, oversee and control the staff at PDP and CFCF, including Defendant Jones and the John Doe Defendants, Rodie was subjected to a deprivation of his personal liberty and security in violation of his Constitutional rights.

170.   The failures of the City to train, supervise and discipline staff at PDP and CFCF included:

    a.   Failure to train and supervise employees to timely process bail payments;

    b.   Failure to train and supervise employees to timely process release paperwork upon receipt of bail payments;

    c.   Failure to train and supervise employees to be informed of the applicable SEPTA bus schedules at the bus stop(s) where inmates were dropped off, including the stop at issue in this case;

    d.   Failure to train and supervise employees to appreciate the time-sensitive consequences of delays in processing an inmate for release;

    e.   Failure to train and supervise employees, including Defendant Jones, to secure and manage the parking/traffic barrier to the CFCF parking lot and premises at all times;

    f.   Failure to train and supervise employees, including Defendant Jones, not to abandon their post at the guard booth at the entrance of the CFCF parking lot/premises and/or not to leave the guard booth and the parking/traffic barrier unoccupied;

    g.   Failure to train and supervise employees against leaving the parking/traffic barrier in the raised position;

    h.   Failure to train and supervise employees to provide safe alternatives for releasing

inmates from CFCF;

i.  Failure to train and supervise employees to provide inmates with access to safe transportation when being released from the CFCF premises;

j.  Failure to train and supervise employees to provide inmates with a secure location while waiting for their transportation from the CFCF premises upon their release;

k.  Failure to train and supervise employees to appreciate the dangers in releasing inmates in the middle of the night with no available public transportation; and

l.  Failure to discipline employees for the above-described actions including untimely processing of bail payments, untimely processing release paperwork, disregard for the applicable SEPTA bus schedules, disregard for the delay in processing releases, and disregard for the dangers in late-night releases.

171.  The failure to adequately train and supervise employees regarding the safe release of inmates, and maintaining a safe premises, illustrates the deliberate indifference to the rights of inmates, including Rodie.

172.  The City could and should have implemented safe release policies for inmates to address the danger in late-night releases after hours of available public transportation.

173.  In the absence of such  necessary policies, the City, by and through its policy makers, including Defendants, Warden Gianetta, Warden Farrell, and Commissioner Carney, knew that their employees would confront situations involving the difficult decision to release inmates after public transportation hours, or to provide them with safe alternatives such as continued shelter at the facility or alternative methods of transportation, and, that the wrong choice by an employee would cause the deprivation of the inmates' constitutional right(s), as

described herein.

174.     Such unconstitutional municipal customs, practices and/or policies were the moving force behind the lethal harm which Rodie was predictably subjected to, and the injuries, damages and death he sustained as a result.

### *State Law Claims*

### **Plaintiffs v. All Defendants**

### <u>COUNT V - WRONGFUL DEATH</u>

175.     Plaintiffs incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as if fully set forth herein.

176.     This action is brought pursuant to the Wrongful Death Act of the Commonwealth of Pennsylvania, at 1955 P.L. 309, as amended, 42 Pa.C.S.A. §8301, *et seq.*

177.     Rodney M. Hargrove was killed on March 18, 2021.

178.     The personal injuries and death of Rodie were a direct and proximate result of the negligent conduct and constitutional violations of all Defendants as described above.

179.     Rodie left surviving him the following persons entitled to recover damages for his death, pursuant to 42 Pa.C.S.A. § 8301 on whose behalf this action is brought:

        a.     Rodney Hargrove (father)

        b.     Cindy Hargrove (mother)

180.     By reason of the foregoing injuries and death of Decedent, the aforesaid persons have suffered and herein make claim for all permissible damages recoverable pursuant to the Wrongful Death Act of the Commonwealth of Pennsylvania at 1955 P.L. 309, as amended, 42 Pa.C.S.A. §8301, et seq., including loss of Rodie's financial support, future earnings, future earning capacity, services, comfort, funeral expenses and expenses for the administration of the

estate of decedent with the total earnings which would have been earned by Rodie throughout his working life expectancy.

181.    By reason of the injuries and death of Rodie, claim is made for the damages of hospital bills, nursing bills, funeral expenses and expenses in the administration of the estate necessitated by reason of the injuries causing Rodd's death and any and all damages recoverable under the Wrongful Death Act.

<div align="center"><b>Plaintiffs v. All Defendants</b></div>

<div align="center"><b><u>COUNT VI - SURVIVAL ACTION</u></b></div>

182.    Plaintiffs incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as if fully set forth herein.

183.    Rodie was killed on March 18, 2021.

184.    The injuries and death of Decedent, Rodney M. Hargrove, on March 18, 2021, were the direct and proximate result of the negligent conduct and constitutional violations of all named Defendants as aforementioned.

185.    By reason of the foregoing, Plaintiffs believe and aver that their late son Rodie sustained great fright, anguish, emotional distress, fear of death, mortification, and devastating conscious pain and suffering prior to his death for which this claim is made.

186.    By reasons of the foregoing, the Estate of Rodney M. Hargrove claims all damages sustained by Rodney M. Hargrove, as aforementioned under and pursuant to the Pennsylvania Survival Statue, 42 Pa.C.S.A. §8302, including loss of earnings, earning power, earning capacity, pain and suffering and emotional distress.

<div align="center"><b><u>PRAYER FOR RELIEF</u></b></div>

**WHEREFORE,** in consideration of the above claims, Plaintiffs request that due to all

Defendants' conduct as alleged herein, Plaintiffs, as Co-Administrators of the Estate of Rodney

M. Hargrove, Deceased, and in their own right, be awarded damages including, but not limited

to, the following:

    a.    all available compensatory damages for the described losses with respect to each cause of action;

    b.    past and future lost wages and loss of earning capacity;

    c.    past and future emotional distress;

    d.    consequential and/or special damages;

    e.    all available non-economic damages, including without limitation pain, suffering, fear, anguish and loss of enjoyment of life;

    f.    punitive damages with respect to each cause of action;

    g.    reasonable and recoverable attorney's fees;

    h.    costs of this action; and

    i.    pre-judgement and all other interest recoverable.

Respectfully Submitted,



Date: October 6, 2022

/s/ Gregory Spizer
Gregory Spizer, Esquire
I.D. No. 82435
Julia Ronnebaum, Esquire
I.D. No. 326785
Two Commerce Square
2001 Market Street,
Suite 3700
Philadelphia, PA 19103
215.960.0000

*Attorneys for Plaintiffs*

41

# EXHIBIT A



**March 21, 2021**

# 84

**Bustleton-Coutny Line
and Philadelphia Mills
to Frankford
Transportation Center**

**Serving
Somerton and
Northeast
Philadelphia**

**FOR MORE INFORMATION:**
**Customer Service:** 215-580-7800
**TDD/TTY:** 215-580-7853
www.septa.org



Available on the App Store

ANDROID APP ON Google play

SEPTA



Connections at Philadelphia Mills: 20, 50, 67, 84, 129, 130
Sam's Club
Dave and Buster's
Academy Rd
Knights Rd
Franklin Mills Circle
Liberty Bell
Marshall's
Burlington Coat Factory
Woodhaven Rd
Walmart
AMC Theater
Philadelphia Mills
Byberry Rd
County Line Rd
Overhill Av
Av
Philmont Av
SOMERTON STATION
Philmont
Pine Rd
FOREST HILLS STATION
Bustleton
Trevose Rd
Byberry Rd
Worthington Rd
Southampton Rd
Somerton
Rennard St
Leo Mall
Tomlinson Rd
Bucks County Technology Park
Neshaminy Interplex
Old Lincoln Hwy
Lincoln Hwy
BENSALEM
BUCKS CO.
PHILADELPHIA CO.
PARX Casino
Street Rd
National Guard Armory
McNulty Rd
National Archives
MAST School
Lincoln Tech
USPS Bulk Mail
Byberry East Industrial Park
Townsend Rd
Community College of Philadelphia
Byberry Rd
Parkwood Manor
Academy Rd
Philadelphia Charter School
Normandy Village
Comly Rd
Thornton Rd
Woodhaven Rd
Red Lion Rd
Washington H. S.
Boulevard Plaza
Roosevelt Blvd
Caroline Rd
Norcom Rd
Verree Rd
Bustleton Av
Red Lion Rd
Decatur Rd
Alburger Av
Welsh Rd
Presidential Plaza
Red Lion Plaza
Swenson H. S.
Orleans Tech
Archbishop Ryan H. S.
Knights Rd
Philadelphia Mills
NORTHEAST PHILADELPHIA
CARMAX
Catalent
Academy Rd
Modena Park
Grant Plaza
Grant Av
Baldi M. S.
Pine Rd
Krewstown Rd
Krewstown Plaza
Bustleton
Whitman Square S. C.
Northeast Philadelphia Airport
Academy Plaza
Red Lion Rd
Keswick Rd
Home Depot Plaza
Verree Rd
Welsh Rd
Northeast S. C.
Grant Av
Jefferson Torresdale
Frankford Av
Pennypack Park
Blue Grass S. C.
Morrell Av
Morrell Plaza
Fox Chase
Bustleton Av
Morrell Park
Andalusia
Ashton Rd
Academy Rd
Holy Family College
State Rd
Roosevelt Blvd
Welsh Rd
Frankford Av
Algon Av
Gloria Dei
Castor Av
Nazareth Hospital
Willits Rd
Academy Gardens
Grant Av
TORRESDALE STATION
Rhawn St
Holme Av
Holme Av
Burholme
Rhawnhurst
Holme Circle
Pennypack Woods
Gregg Loop
Linden Av
Cottman Av
Northeast H. S.
Lexington Park
Welsh Rd
Pennypack Park
Father Judge H. S.
Frankford Av
Torresdale Av
Lincoln Tech
State Rd
Great Northeast Plaza
Cottman & Castor S. C.
Roosevelt Mall
Meehan M. S.
Lincoln H. S.
Rowland Av
Torresdale Filter Plant
Algon Av
Castor Av
Ashburner St
Holmesburg
Ryan Av
Cottman Av
Bustleton Av
Roosevelt Blvd
Magee Av
Frankford Av
State Rd
Philadelphia Police Academy
Levick St
Philadelphia Detention Center
Philadelphia Fire Academy
St Hubert's H. S.
Torresdale Av
Rhawn St
Mayfair
Rowland Av
HOLMESBURG JCT. STATION
Curran-Fromhold Correctional Facility
Connections at Frankford Transportation Center: Market-Frankford Line, 3, 5, 8, 14, 19, 20, 24, 25, 26, 50, 58, 66, 67, 73, 84, 88, R, Boulevard Direct
Princeton Av
Cottman Av
Riverside Correctional Facility
Longshore Av
Bridge St
Pratt St
Oxford Av
Frankford Av
Magee Av
Tacony
TACONY STATION
Levick St
Robbins Av
Devereaux Av
Elbridge St
State Rd
Frankford Transportation Center
Jefferson Frankford
Frankford H. S.
Wissinoming
Barnett St
Milnor St
Bridge St
Torresdale Av
Tacony St
MFL
Arrott Transportation Center
Frankford
Frankford Av
BRIDESBURG STATION
Arsenal Business Center
© SEPTA 10/2020

## Weekdays

### To Bustleton-County Line and Philadelpia Mills

| Frankford Transportation Center | Tacony and Comly Sts | Torresdale and Cottman Avs | Curran–Fromhold Correctional Facility (State Rd & Rhawn St) | Torresdale Station, Grant Av & James St | Frankford and Morrel Avs | Philadelphia Mills (Marshalls) | Roosevelt Blvd and Southampton Rd | Bustleton Av and County Line Rd |
|---|---|---|---|---|---|---|---|---|
| **AM SERVICE** | | | | | | | | |
| 5.44 | 5.52 | 5.59 | 6.03 | 6.11 | 6.14 | 6.24 | 6.27 | --- |
| 6.02 | 6.11 | 6.18 | 6.22 | 6.30 | 6.33 | 6.46 | 6.58 | 7.12 |
| 6.21 | 6.30 | 6.37 | 6.41 | 6.49 | 6.52 | 7.05 | --- | --- |
| 6.45 | 6.54 | 7.01 | 7.05 | 7.13 | 7.17 | 7.32 | 7.44 | 7.58 |
| 7.04 | 7.14 | 7.21 | 7.25 | 7.33 | 7.37 | 7.52 | --- | --- |
| 7.24 | 7.34 | 7.41 | 7.45 | 7.53 | 7.57 | 8.12 | 8.24 | 8.40 |
| 7.46 | 7.56 | 8.03 | 8.07 | 8.15 | 8.18 | 8.32 | --- | --- |
| 8.12 | 8.21 | 8.28 | 8.32 | 8.40 | 8.43 | 8.57 | 9.09 | 9.22 |
| --- | --- | 8.48 | 8.52 | 9.00 | 9.03 | 9.16 | --- | --- |
| 8.37 | 8.46 | 8.53 | 8.57 | 9.05 | 9.08 | 9.21 | --- | --- |
| 9.02 | 9.11 | 9.18 | 9.22 | 9.30 | 9.33 | 9.46 | 9.58 | 10.11 |
| 9.27 | 9.36 | 9.43 | 9.47 | 9.55 | 9.58 | 10.11 | --- | --- |
| 9.51 | 10.00 | 10.08 | 10.12 | 10.20 | 10.23 | 10.35 | 10.46 | 10.59 |
| 10.17 | 10.26 | 10.33 | 10.37 | 10.45 | 10.48 | 11.00 | --- | --- |
| 10.41 | 10.50 | 10.58 | 11.02 | 11.10 | 11.13 | 11.26 | 11.37 | 11.50 |
| 11.05 | 11.15 | 11.23 | 11.27 | 11.35 | 11.38 | 11.51 | --- | --- |
| 11.31 | 11.41 | 11.48 | 11.52 | 12.00 | 12.03 | 12.16 | 12.27 | 12.41 |
| 11.56 | 12.06 | 12.12 | 12.17 | 12.26 | 12.29 | 12.42 | --- | --- |
| **PM SERVICE** | | | | | | | | |
| 12.21 | 12.31 | 12.38 | 12.42 | 12.51 | 12.54 | 1.07 | 1.18 | 1.32 |
| 12.46 | 12.56 | 1.03 | 1.07 | 1.15 | 1.18 | 1.31 | --- | --- |
| 1.11 | 1.21 | 1.28 | 1.32 | 1.40 | 1.43 | 1.56 | 2.07 | 2.23 |
| 1.33 | 1.43 | 1.50 | 1.54 | 2.02 | 2.06 | 2.20 | --- | --- |
| 1.53 | 2.03 | 2.10 | 2.14 | 2.22 | 2.26 | 2.40 | 2.53 | 3.09 |
| 2.13 | 2.23 | 2.30 | 2.34 | 2.42 | 2.46 | 3.00 | --- | --- |
| 2.33 | 2.43 | 2.50 | 2.54 | 3.02 | 3.06 | 3.19 | 3.31 | 3.47 |
| 2.53 | 3.03 | 3.10 | 3.14 | 3.23 | 3.27 | 3.40 | --- | --- |
| 3.13 | 3.23 | 3.30 | 3.34 | 3.43 | 3.47 | 4.00 | --- | --- |
| 3.33 | 3.43 | 3.50 | 3.54 | 4.03 | 4.07 | 4.20 | --- | --- |
| 3.48 | 3.58 | 4.05 | 4.10 | 4.18 | 4.22 | 4.35 | 4.47 | 5.03 |
| 4.08 | 4.18 | 4.25 | 4.30 | 4.38 | 4.42 | 4.55 | --- | --- |
| 4.33 | 4.43 | 4.50 | 4.55 | 5.03 | 5.07 | 5.20 | 5.31 | 5.45 |
| 4.59 | 5.08 | 5.15 | 5.20 | 5.28 | 5.32 | 5.45 | 5.56 | 6.10 |
| 5.24 | 5.33 | 5.40 | 5.45 | 5.53 | 5.57 | 6.10 | 6.20 | 6.34 |
| 5.50 | 5.59 | 6.05 | 6.09 | 6.16 | 6.19 | 6.32 | --- | --- |
| 6.15 | 6.24 | 6.30 | 6.34 | 6.41 | 6.44 | 6.57 | 7.07 | 7.20 |
| 7.05 | 7.14 | 7.20 | 7.24 | 7.31 | 7.34 | 7.46 | 7.56 | 8.09 |
| 8.00 | 8.09 | 8.15 | 8.19 | 8.26 | 8.29 | 8.40 | --- | --- |
| 8.56 | 9.04 | 9.10 | 9.13 | 9.20 | 9.23 | 9.34 | --- | --- |
| 9.56 | 10.04 | 10.10 | 10.13 | 10.20 | 10.23 | 10.34 | --- | --- |
| 10.56 | 11.04 | 11.10 | 11.13 | 11.19 | 11.22 | 11.33 | --- | --- |
| 11.56 | 12.04 | 12.10 | 12.13 | 12.19 | 12.22 | 12.33 | --- | --- |

**Buses leave Cottman Av and Edmund St 2:06 and 2:40 PM to Philadelphia Mills, operating ONLY when school is in session.**

**Buses leave Arsenal Business Center at 3:13 and 3:15 PM to Philadelphia Mills, operating ONLY when school is in session.**

## Weekdays

### To Frankford Transportation Center

| Bustleton Av and County Line Rd | Roosevelt Blvd and Southampton Rd | Philadelphia Mills (Marshalls) | Frankford and Morrel Avs | Torresdale Station, Grant Av & James St | Curran–Fromhold Correctional Facility (State Rd & Rhawn St) | Torresdale and Cottman Avs | Tacony and Comly Sts | Frankford Transportation Center |
|---|---|---|---|---|---|---|---|---|
| **AM SERVICE** | | | | | | | | |
| --- | --- | 5.13 | 5.26 | 5.37 | 5.40 | 5.48 | 5.52 | 6.08 |
| 5.26 | 5.38 | 5.51 | 6.02 | 6.05 | 6.13 | 6.18 | 6.27 | 6.36 |
| --- | --- | 6.16 | 6.27 | 6.30 | 6.38 | 6.43 | 6.52 | 7.01 |
| --- | --- | --- | --- | --- | 6.52 | 6.57 | 7.06 | 7.16 |
| 6.12 | 6.25 | 6.38 | 6.49 | 6.52 | 7.00 | 7.05 | 7.15 | 7.25 |
| --- | --- | 6.55 | 7.09 | 7.12 | 7.20 | 7.25 | 7.35 | 7.45 |
| 6.46 | 7.01 | 7.15 | 7.29 | 7.32 | 7.40 | 7.45 | 7.55 | 8.05 |
| 7.27 | 7.42 | 7.56 | 8.09 | 8.12 | 8.20 | 8.24 | 8.32 | 8.42 |
| --- | --- | 8.16 | 8.29 | 8.32 | 8.40 | 8.44 | 8.52 | 9.02 |
| 8.10 | 8.23 | 8.36 | 8.49 | 8.52 | 9.00 | 9.04 | 9.12 | 9.22 |
| --- | --- | 8.56 | 9.09 | 9.12 | 9.20 | 9.24 | 9.32 | 9.42 |
| 8.52 | 9.04 | 9.16 | 9.29 | 9.32 | 9.40 | 9.44 | 9.52 | 10.02 |
| --- | --- | 9.36 | 9.49 | 9.52 | 10.00 | 10.04 | 10.12 | 10.21 |
| 9.37 | 9.49 | 10.01 | 10.14 | 10.17 | 10.25 | 10.29 | 10.37 | 10.46 |
| 10.27 | 10.39 | 10.51 | 11.04 | 11.07 | 11.15 | 11.19 | 11.27 | 11.36 |
| 11.16 | 11.28 | 11.41 | 11.54 | 11.57 | 12.01 | 12.09 | 12.17 | 12.27 |
| **PM SERVICE** | | | | | | | | |
| --- | --- | 12.05 | 12.19 | 12.22 | 12.30 | 12.34 | 12.42 | 12.52 |
| 12.05 | 12.17 | 12.30 | 12.44 | 12.47 | 12.55 | 12.59 | 1.07 | 1.17 |
| 12.55 | 1.07 | 1.20 | 1.34 | 1.37 | 1.45 | 1.49 | 1.57 | 2.07 |
| --- | --- | 1.44 | 1.58 | 2.01 | 2.09 | 2.14 | 2.24 | 2.34 |
| 1.42 | 1.54 | 2.09 | 2.23 | 2.26 | 2.34 | 2.39 | 2.49 | 2.59 |
| --- | --- | 2.33 | 2.47 | 2.50 | 2.58 | 3.04 | 3.12 | 3.24 |
| 2.30 | 2.42 | 2.57 | 3.10 | 3.14 | 3.23 | 3.29 | 3.37 | 3.49 |
| --- | --- | --- | 3.35 | 3.39 | 3.48 | 3.54 | 4.02 | 4.12 |
| 3.17 | 3.33 | 3.48 | 4.01 | 4.05 | 4.14 | 4.19 | 4.27 | 4.37 |
| 4.08 | 4.23 | 4.13 | 4.26 | 4.30 | 4.39 | 4.44 | 4.52 | 5.02 |
| --- | --- | 4.38 | 4.51 | 4.55 | 5.04 | 5.09 | 5.17 | 5.26 |
| 4.57 | 5.12 | 5.28 | 5.41 | 5.45 | 5.54 | 5.59 | 6.07 | 6.15 |
| --- | --- | 5.58 | 6.11 | 6.14 | 6.22 | 6.26 | 6.34 | 6.42 |
| 6.01 | 6.15 | 6.28 | 6.41 | 6.44 | 6.52 | 6.56 | 7.04 | 7.12 |
| --- | --- | 7.01 | 7.12 | 7.15 | 7.22 | 7.26 | 7.33 | 7.41 |
| 7.31 | 7.43 | 7.54 | 8.05 | 8.08 | 8.15 | 8.19 | 8.26 | 8.34 |
| 8.27 | 8.38 | 8.49 | 9.00 | 9.03 | 9.10 | 9.14 | 9.22 | 9.29 |
| --- | --- | 9.47 | 9.58 | 10.01 | 10.08 | 10.12 | 10.19 | 10.27 |
| --- | --- | 10.48 | 10.58 | 11.01 | 11.08 | 11.12 | 11.19 | 11.27 |
| --- | --- | 11.48 | 11.58 | 12.01 | 12.08 | 12.12 | 12.19 | 12.27 |
| **AFTER MIDNIGHT SERVICE** | | | | | | | | |
| --- | --- | 12.48 | 12.58 | 1.01 | 1.08 | 1.12 | 1.19 | 1.27 |

**Bus leaves Academy Rd & Chalfont Dr 2:35 PM to Frankford & Linden Avs, operating ONLY when school is in session.**

**Buses leave Knights Rd & Fairdale Av at 4:45 PM to Frankford Transportation Center and 4:46 PM to Cottman and Torresdale Avs, operating ONLY when school is in session.**

Subject To Change

## Saturdays

### To Bustleton-County Line and Philadelpia Mills

| Frankford Transportation Center | Tacony and Comly Sts | Torresdale and Cottman Avs | Curran-Fromhold Correctional Facility State Rd & Rhawn St | Torresdale Station, Grant Av & James St | Frankford and Morrell Avs | Philadelphia Mills (Marshalls) | Roosevelt Blvd and Southampton Rd | Bustleton Av and County Line Rd |
|---|---|---|---|---|---|---|---|---|
| **AM SERVICE** | | | | | | | | |
| 5.39 | 5.49 | 5.56 | 6.00 | 6.07 | 6.10 | 6.22 | --- | --- |
| 6.40 | 6.50 | 6.57 | 7.01 | 7.08 | 7.11 | 7.23 | 7.32 | 7.44 |
| 7.40 | 7.50 | 7.57 | 8.01 | 8.09 | 8.12 | 8.25 | 8.35 | 8.47 |
| 8.39 | 8.49 | 8.56 | 9.00 | 9.08 | 9.11 | 9.24 | 9.34 | 9.46 |
| 9.39 | 9.49 | 9.56 | 10.00 | 10.08 | 10.11 | 10.24 | 10.34 | 10.46 |
| 10.39 | 10.49 | 10.56 | 11.00 | 11.08 | 11.11 | 11.25 | 11.36 | 11.49 |
| 11.38 | 11.48 | 11.55 | 11.59 | 12.07 | 12.10 | 12.24 | 12.36 | 12.48 |
| **PM SERVICE** | | | | | | | | |
| 12.37 | 12.47 | 12.54 | 12.58 | 1.06 | 1.09 | 1.23 | 1.34 | 1.47 |
| 1.36 | 1.46 | 1.54 | 1.58 | 2.06 | 2.09 | 2.23 | 2.34 | 2.47 |
| 2.36 | 2.46 | 2.54 | 2.58 | 3.06 | 3.09 | 3.23 | 3.34 | 3.47 |
| 3.36 | 3.46 | 3.54 | 3.58 | 4.06 | 4.09 | 4.22 | 4.33 | 4.46 |
| 4.36 | 4.45 | 4.53 | 4.57 | 5.05 | 5.08 | 5.21 | 5.32 | 5.45 |
| 5.37 | 5.47 | 5.54 | 5.58 | 6.06 | 6.09 | 6.22 | 6.32 | 6.45 |
| 6.39 | 6.48 | 6.55 | 6.59 | 7.07 | 7.10 | 7.22 | 7.33 | 7.46 |
| 7.39 | 7.48 | 7.55 | 7.59 | 8.07 | 8.10 | 8.22 | 8.32 | 8.45 |
| 8.40 | 8.49 | 8.56 | 9.00 | 9.07 | 9.10 | 9.22 | --- | --- |
| 9.40 | 9.49 | 9.56 | 10.00 | 10.07 | 10.10 | 10.21 | --- | --- |
| 10.41 | 10.50 | 10.57 | 11.01 | 11.08 | 11.11 | 11.22 | --- | --- |
| 11.45 | 11.54 | 12.01 | 12.05 | 12.12 | 12.15 | 12.25 | --- | --- |

## Saturdays

### To Frankford Transportation Center

| Bustleton Av and County Line Rd | Roosevelt Blvd and Southampton Rd | Philadelphia Mills (Marshalls) | Frankford and Morrell Avs | Torresdale Station, Grant Av & James St | Curran-Fromhold Correctional Facility State Rd & Rhawn St | Torresdale and Cottman Avs | Tacony and Comly Sts | Frankford Transportation Center |
|---|---|---|---|---|---|---|---|---|
| **AM SERVICE** | | | | | | | | |
| --- | --- | 6.29 | 6.41 | 6.44 | 6.51 | 6.55 | 7.02 | 7.09 |
| --- | --- | 7.29 | 7.41 | 7.44 | 7.51 | 7.55 | 8.02 | 8.10 |
| 8.05 | 8.18 | 8.29 | 8.41 | 8.44 | 8.51 | 8.55 | 9.02 | 9.10 |
| 9.05 | 9.18 | 9.29 | 9.41 | 9.44 | 9.51 | 9.55 | 10.02 | 10.11 |
| 10.03 | 10.17 | 10.28 | 10.41 | 10.44 | 10.51 | 10.55 | 11.03 | 11.11 |
| 11.03 | 11.17 | 11.28 | 11.41 | 11.44 | 11.51 | 11.55 | 12.03 | 12.11 |
| **PM SERVICE** | | | | | | | | |
| 12.03 | 12.17 | 12.28 | 12.41 | 12.44 | 12.51 | 12.55 | 1.03 | 1.11 |
| 1.02 | 1.16 | 1.28 | 1.41 | 1.44 | 1.51 | 1.55 | 2.03 | 2.11 |
| 3.02 | 3.16 | 3.28 | 3.41 | 3.44 | 3.51 | 3.55 | 4.03 | 4.11 |
| 4.02 | 4.16 | 4.28 | 4.41 | 4.44 | 4.51 | 4.55 | 5.03 | 5.11 |
| 5.02 | 5.16 | 5.28 | 5.41 | 5.44 | 5.51 | 5.55 | 6.03 | 6.11 |
| 6.03 | 6.16 | 6.28 | 6.41 | 6.44 | 6.51 | 6.55 | 7.03 | 7.11 |
| 7.03 | 7.16 | 7.28 | 7.41 | 7.44 | 7.51 | 7.55 | 8.03 | 8.11 |
| 8.04 | 8.16 | 8.28 | 8.41 | 8.44 | 8.51 | 8.55 | 9.03 | 9.11 |
| 9.04 | 9.16 | 9.28 | 9.41 | 9.44 | 9.50 | 9.54 | 10.02 | 10.09 |
| --- | --- | 10.29 | 10.41 | 10.44 | 10.48 | 10.54 | 11.02 | 11.09 |
| --- | --- | 11.30 | 11.41 | 11.44 | 11.50 | 11.55 | 12.02 | 12.09 |
| **AFTER MIDNIGHT SERVICE** | | | | | | | | |
| --- | --- | 12.30 | 12.41 | 12.44 | 12.50 | 12.54 | 1.02 | 1.09 |

## Sundays

### To Philadelpia Mills

| Frankford Transportation Center | Tacony and Comly Sts | Torresdale and Cottman Avs | Curran-Fromhold Correctional Facility State Rd & Rhawn St | Torresdale Station, Grant Av & James St | Frankford and Morrell Avs | Philadelphia Mills (Marshalls) |
|---|---|---|---|---|---|---|
| **AM SERVICE** | | | | | | |
| 5.38 | 5.46 | 5.53 | 5.56 | 6.03 | 6.06 | 6.17 |
| 6.38 | 6.46 | 6.53 | 6.56 | 7.03 | 7.06 | 7.17 |
| 7.39 | 7.47 | 7.54 | 7.57 | 8.04 | 8.07 | 8.19 |
| 8.38 | 8.47 | 8.54 | 8.57 | 9.04 | 9.07 | 9.19 |
| 9.38 | 9.47 | 9.54 | 9.57 | 10.04 | 10.07 | 10.19 |
| 10.39 | 10.48 | 10.55 | 10.58 | 11.05 | 11.08 | 11.21 |
| 11.38 | 11.47 | 11.55 | 11.59 | 12.06 | 12.09 | 12.22 |
| **PM SERVICE** | | | | | | |
| 12.38 | 12.47 | 12.55 | 12.59 | 1.06 | 1.09 | 1.22 |
| 1.37 | 1.47 | 1.55 | 1.59 | 2.06 | 2.09 | 2.22 |
| 2.37 | 2.47 | 2.55 | 2.59 | 3.06 | 3.09 | 3.22 |
| 3.35 | 3.45 | 3.53 | 3.57 | 4.05 | 4.08 | 4.21 |
| 4.37 | 4.47 | 4.54 | 4.58 | 5.06 | 5.09 | 5.22 |
| 5.37 | 5.47 | 5.54 | 5.58 | 6.06 | 6.09 | 6.22 |
| 6.39 | 6.49 | 6.56 | 7.00 | 7.07 | 7.10 | 7.22 |
| 7.36 | 7.46 | 7.53 | 7.57 | 8.04 | 8.07 | 8.19 |
| 8.37 | 8.46 | 8.53 | 8.57 | 9.04 | 9.07 | 9.19 |
| 9.38 | 9.47 | 9.54 | 9.58 | 10.05 | 10.08 | 10.19 |
| 10.39 | 10.47 | 10.54 | 10.58 | 11.05 | 11.08 | 11.19 |
| 11.45 | 11.53 | 12.00 | 12.03 | 12.09 | 12.12 | 12.22 |

## Sundays

### To Frankford Transportation Center

| Philadelphia Mills (Marshalls) | Frankford and Morrell Avs | Torresdale Station, Grant Av & James St | Curran-Fromhold Correctional Facility State Rd & Rhawn St | Torresdale and Cottman Avs | Tacony and Comly Sts | Frankford Transportation Center |
|---|---|---|---|---|---|---|
| **AM SERVICE** | | | | | | |
| 6.29 | 6.39 | 6.42 | 6.48 | 6.51 | 6.58 | 7.05 |
| 7.29 | 7.39 | 7.42 | 7.48 | 7.51 | 7.59 | 8.05 |
| 8.29 | 8.39 | 8.42 | 8.48 | 8.52 | 8.59 | 9.07 |
| 9.29 | 9.39 | 9.42 | 9.48 | 9.52 | 9.59 | 10.07 |
| 10.29 | 10.39 | 10.42 | 10.48 | 10.52 | 10.59 | 11.07 |
| 11.29 | 11.40 | 11.43 | 11.50 | 11.54 | 12.01 | 12.09 |
| **PM SERVICE** | | | | | | |
| 12.29 | 12.40 | 12.43 | 12.50 | 12.54 | 1.01 | 1.09 |
| 1.28 | 1.40 | 1.43 | 1.50 | 1.54 | 2.02 | 2.10 |
| 2.28 | 2.40 | 2.43 | 2.50 | 2.54 | 3.02 | 3.10 |
| 3.28 | 3.40 | 3.43 | 3.50 | 3.54 | 4.02 | 4.10 |
| 4.28 | 4.40 | 4.43 | 4.51 | 4.55 | 5.03 | 5.11 |
| 5.28 | 5.40 | 5.43 | 5.51 | 5.55 | 6.03 | 6.11 |
| 6.28 | 6.40 | 6.43 | 6.51 | 6.55 | 7.03 | 7.11 |
| 7.28 | 7.38 | 7.41 | 7.48 | 7.52 | 8.00 | 8.10 |
| 8.27 | 8.38 | 8.41 | 8.48 | 8.52 | 9.00 | 9.07 |
| 9.27 | 9.38 | 9.41 | 9.48 | 9.52 | 10.00 | 10.06 |
| 10.27 | 10.38 | 10.41 | 10.48 | 10.51 | 10.58 | 11.04 |
| 11.27 | 11.38 | 11.41 | 11.48 | 11.51 | 11.58 | 12.04 |
| **AFTER MIDNIGHT SERVICE** | | | | | | |
| 12.29 | 12.38 | 12.41 | 12.47 | 12.50 | 12.56 | 1.00 |

## TRAVEL TIPS

- Sunday schedule will be operated on New Year's, Memorial, Independence, Labor, Thanksgiving, and Christmas days.
- Fare payment options: cash, or SEPTA Key Card with Pass or Travel Wallet Funds. Go to www.septa.org or m.septa.org for schedules & real time information. Try Schedules to Go for next 10 scheduled trips (smart phone users) or SMS Schedules for next 4 scheduled trips (by text message); See bus/trolley locations on TransitView.
- To SAVE Money on Your Commute visit www.thecommuterschoice.com



**November 15, 2020**

# 70

## Frankford-Gregg or Torresdale-Cottman to Fern Rock Transportation Center

### Serving Torresdale and Tacony

| Operating | |
|---|---|
| **15** | **Every 15 Minutes or less** |
| **15** | **15 Hours / Day** 6:00 A.M. – 9:00 P.M. |
| **5** | **5 Days / Week** Monday – Friday |







NORTHEAST PHILADELPHIA
Torresdale
Academy Gardens
Pennypack Woods
Holme Circle
Holmesburg
Lexington Park
Mayfair
Tacony
Rhawnhurst
Burholme
Lawndale
Oxford Circle
Lawncrest
Crescentville
CHELTENHAM
Elkins Park
Oak Lane
East Oak Lane
Melrose Park
Olney
Linden Av
Gregg Loop
Frankford Av
Academy Rd
Torresdale Av
Lincoln Technical Institute
Philadelphia Police Academy
Ashbourne St
State Rd
Philadelphia Detention Center
Curran-Fromhold Correctional Facility
Riverside Correctional Facility
HOLMESBURG JCT. STATION
TACONY STATION
© SEPTA 9/2019
Pennypack Av
Father Judge H. S.
Solly Av
Rhawn St
Welsh Rd
Holme Av
St Hubert's H. S.
Cottman Av
Princeton Av
Longshore Av
Rowland Av
Lincoln H. S.
Meehan M. S.
Nazareth Hospital
Roosevelt Blvd
Revere St
Roosevelt Mall
Hawthorne St
Levick St
Bustleton Av
Great Northeast Plaza
Cottman & Castor S. C.
Castor Av
Magee Av
Gloria Dei Estates
The Shoppes at Rhawnhurst
Northeast H. S.
Algon Av
Whitaker Av
Oxford Av
Cheltenham Av
Verree Rd
RYERS STATION
Rising Sun Av
Martins Mill Rd
Naval Aviation Supply Center
Jeanes Hospital
Fox Chase Cancer Center
Central Av
Township Line Rd
Ashbourne Rd
Moss Rehab Einstein at Elkins Park
Tookany Creek Pkwy
Rising Sun Plaza
Adams Av
Front St
Oak Lane Rd
Connections at Fern Rock Transportation Center: 4, 28, 57, 70, BSL and Regional Rail Lines
One and Olney Square
5th St
66th Av
10th St
11th St
Godfrey Av
Fern Rock Transportation Center
Nedro Av
Olney Av
Tabor Av

**WEEKDAY SERVICE FREQUENCY**

| every **15** minutes or less | every **12** minutes or less | every **15** minutes or less | every **12** minutes or less | every **15** minutes or less |
|---|---|---|---|---|
| 6:00AM | 6:30AM | 8:30AM | 4:00PM | 6:00PM – 9:00PM |

between Fern Rock Transportation Center and Cottman and Torresdale Avs

## Weekdays — To Fern Rock Transportation Center

| Frankford Av and Gregg St | State Rd and Rhawn St | Cottman and Torresdale Avs (Loop) | Cottman Av and Ditman St | Cottman and Bustleton Avs | Cottman and Oxford Avs | Oak Lane Rd and Cheltenham Av | Fern Rock Transportation Center (10th St and Nedro Av) |
|---|---|---|---|---|---|---|---|
| **AM SERVICE** | | | | | | | |
| --- | --- | 5.08 | 5.10 | 5.19 | 5.26 | 5.35 | 5.42 |
| --- | --- | 5.28 | 5.30 | 5.39 | 5.46 | 5.55 | 6.02 |
| --- | --- | 5.47 | 5.49 | 5.58 | 6.06 | 6.16 | 6.23 |
| --- | --- | 6.01 | 6.03 | 6.13 | 6.21 | 6.31 | 6.38 |
| --- | --- | 6.14 | 6.16 | 6.26 | 6.34 | 6.44 | 6.51 |
| --- | --- | 6.25 | 6.27 | 6.37 | 6.45 | 6.55 | 7.02 |
| 6.26 | 6.33 | 6.37 | 6.47 | 6.55 | 7.05 | 7.15 | 7.22 |
| --- | --- | 6.45 | 6.47 | 6.57 | 7.05 | 7.15 | 7.22 |
| --- | --- | 6.54 | 6.56 | 7.07 | 7.15 | 7.25 | 7.32 |
| --- | --- | 7.04 | 7.06 | 7.17 | 7.25 | 7.35 | 7.42 |
| 7.04 | 7.12 | 7.16 | 7.18 | 7.27 | 7.35 | 7.45 | 7.52 |
| --- | --- | 7.24 | 7.26 | 7.37 | 7.45 | 7.55 | 8.02 |
| --- | --- | 7.34 | 7.36 | 7.47 | 7.55 | 8.05 | 8.12 |
| 7.34 | 7.42 | 7.46 | 7.48 | 7.57 | 8.05 | 8.15 | 8.22 |
| --- | --- | 7.56 | 7.58 | 8.09 | 8.17 | 8.27 | 8.34 |
| --- | --- | 8.08 | 8.10 | 8.21 | 8.29 | 8.39 | 8.46 |
| 8.10 | 8.18 | 8.22 | 8.24 | 8.33 | 8.41 | 8.51 | 8.58 |
| --- | --- | 8.34 | 8.36 | 8.47 | 8.55 | 9.05 | 9.12 |
| 8.39 | 8.47 | 8.51 | 8.53 | 9.02 | 9.10 | 9.20 | 9.27 |
| --- | --- | 9.04 | 9.06 | 9.17 | 9.25 | 9.35 | 9.42 |
| --- | --- | 9.19 | 9.21 | 9.32 | 9.40 | 9.50 | 9.57 |
| 9.24 | 9.32 | 9.36 | 9.38 | 9.47 | 9.55 | 10.05 | 10.12 |
| --- | --- | 9.48 | 9.50 | 10.01 | 10.10 | 10.20 | 10.27 |
| --- | --- | 10.03 | 10.05 | 10.16 | 10.25 | 10.35 | 10.42 |
| 10.08 | 10.16 | 10.20 | 10.22 | 10.31 | 10.40 | 10.50 | 10.57 |
| --- | --- | 10.33 | 10.35 | 10.46 | 10.55 | 11.05 | 11.12 |
| --- | --- | 10.48 | 10.50 | 11.01 | 11.10 | 11.21 | 11.28 |
| --- | --- | 11.03 | 11.05 | 11.16 | 11.25 | 11.36 | 11.43 |
| 11.08 | 11.16 | 11.20 | 11.22 | 11.31 | 11.40 | 11.51 | 11.58 |
| --- | --- | 11.33 | 11.35 | 11.46 | 11.55 | 12.06 | 12.13 |
| --- | --- | 11.47 | 11.49 | 12.00 | 12.10 | 12.21 | 12.28 |

## Weekdays — To Frankford-Gregg/Torresdale-Cottman

| Fern Rock Transportation Center (10th St and Nedro Av) | Oak Lane Rd and Cheltenham Av | Cottman and Oxford Avs | Cottman and Bustleton Avs | Cottman Av and Ditman St | Cottman and Torresdale Avs (Loop) | State Rd and Rhawn St | Frankford Av and Gregg St |
|---|---|---|---|---|---|---|---|
| **AM SERVICE** | | | | | | | |
| 5.30 | 5.35 | 5.44 | 5.51 | 6.00 | 5.38 | 6.06 | 6.14 |
| 5.49 | 5.54 | 6.04 | 6.12 | 6.21 | 6.27 | 6.43 | 6.51 |
| 6.03 | 6.09 | 6.19 | 6.27 | 6.37 | 6.43 | --- | 6.51 |
| 6.18 | 6.24 | 6.34 | 6.42 | 6.51 | --- | --- | --- |
| 6.31 | 6.37 | 6.47 | 6.55 | 7.05 | 7.05 | 7.12 | 7.20 |
| 6.43 | 6.49 | 6.59 | 7.07 | 7.19 | --- | 7.16 | 7.28 |
| 6.55 | 7.01 | 7.11 | 7.21 | 7.29 | 7.39 | --- | 7.54 |
| 7.05 | 7.11 | 7.21 | 7.29 | 7.39 | --- | 7.46 | --- |
| 7.15 | 7.21 | 7.31 | 7.39 | --- | --- | 7.48 | --- |
| 7.25 | 7.31 | 7.41 | 7.49 | --- | 7.58 | --- | --- |
| 7.35 | 7.41 | 7.51 | 7.59 | 8.09 | --- | 8.15 | 8.23 |
| 7.44 | 7.50 | 8.01 | 8.09 | --- | 8.28 | 8.18 | --- |
| 7.54 | 8.00 | 8.11 | 8.19 | --- | --- | 8.28 | --- |
| 8.04 | 8.10 | 8.21 | 8.29 | 8.39 | --- | 8.45 | 8.53 |
| 8.14 | 8.20 | 8.31 | 8.39 | --- | 8.48 | --- | --- |
| 8.26 | 8.32 | 8.43 | 8.51 | --- | 9.00 | --- | --- |
| 8.39 | 8.45 | 8.56 | 9.04 | --- | 9.14 | --- | --- |
| 8.54 | 9.00 | 9.11 | 9.19 | 9.30 | --- | 9.36 | 9.45 |
| 9.09 | 9.15 | 9.26 | 9.34 | --- | 9.44 | --- | --- |
| 9.24 | 9.30 | 9.41 | 9.49 | --- | 9.59 | --- | --- |
| 9.39 | 9.45 | 9.56 | 10.05 | --- | 10.15 | --- | --- |
| 9.53 | 10.00 | 10.11 | 10.20 | 10.31 | --- | 10.38 | 10.47 |
| 10.08 | 10.15 | 10.26 | 10.35 | --- | 10.45 | --- | --- |
| 10.23 | 10.30 | 10.41 | 10.50 | --- | 11.00 | --- | --- |
| 10.38 | 10.45 | 10.56 | 11.05 | --- | 11.15 | --- | --- |
| 10.53 | 11.00 | 11.11 | 11.20 | 11.31 | --- | 11.37 | 11.45 |
| 11.08 | 11.15 | 11.26 | 11.35 | --- | 11.45 | --- | --- |
| 11.23 | 11.30 | 11.41 | 11.50 | --- | 12.00 | --- | --- |
| 11.38 | 11.45 | 11.56 | 12.05 | --- | 12.16 | --- | --- |
| 11.53 | 12.00 | 12.11 | 12.20 | 12.32 | --- | 12.38 | 12.46 |



## WEEKDAY SERVICE FREQUENCY

| every **15** minutes or less | every **12** minutes or less | every **15** minutes or less | every **12** minutes or less | every **15** minutes or less |
|---|---|---|---|---|
| 6:00AM | 6:30AM | 8:30AM | 4:00PM | 6:00PM | 9:00PM |

**between Fern Rock Transportation Center and Cottman and Torresdale Avs**

### Weekdays — To Fern Rock Transportation Center

| Frankford Av and Gregg St | State Rd and Rhawn St | Cottman and Torresdale Avs (Loop) | Cottman Av and Ditman St | Cottman and Bustleton Avs | Cottman and Oxford Avs | Oak Lane Rd and Cheltenham Av | Fern Rock Transportation Center (To Fern Rock/Metro Av) |
|---|---|---|---|---|---|---|---|
| **PM SERVICE** | | | | | | | |
| --- | --- | 12.02 | 12.04 | 12.15 | 12.25 | 12.36 | 12.43 |
| 12.06 | 12.15 | --- | 12.19 | 12.30 | 12.40 | 12.51 | 12.58 |
| --- | --- | 12.32 | 12.34 | 12.45 | 12.55 | 1.06 | 1.13 |
| --- | --- | 12.47 | 12.49 | 1.00 | 1.10 | 1.21 | 1.28 |
| --- | --- | 1.02 | 1.04 | 1.15 | 1.25 | 1.36 | 1.43 |
| 1.06 | 1.15 | --- | 1.19 | 1.30 | 1.40 | 1.51 | 1.58 |
| --- | --- | 1.32 | 1.34 | 1.45 | 1.55 | 2.06 | 2.13 |
| --- | --- | 1.47 | 1.49 | 2.00 | 2.10 | 2.21 | 2.28 |
| --- | --- | 2.01 | 2.03 | 2.15 | 2.25 | 2.36 | 2.43 |
| 2.04 | 2.13 | --- | 2.18 | 2.30 | 2.40 | 2.51 | 2.58 |
| --- | --- | 2.31 | 2.33 | 2.45 | 2.55 | 3.06 | 3.13 |
| --- | --- | --- | 2.37 | 2.49 | 2.59 | --- | --- |
| --- | --- | 2.46 | 2.48 | 3.00 | 3.10 | 3.21 | 3.28 |
| --- | --- | 3.01 | 3.03 | 3.15 | 3.25 | 3.36 | 3.43 |
| 3.04 | 3.13 | --- | 3.18 | 3.30 | 3.40 | 3.51 | 3.58 |
| --- | --- | 3.28 | 3.30 | 3.42 | 3.52 | 4.03 | 4.11 |
| --- | --- | 3.40 | 3.42 | 3.54 | 4.04 | 4.15 | 4.23 |
| --- | --- | 3.52 | 3.54 | 4.06 | 4.16 | 4.27 | 4.35 |
| 3.53 | 4.01 | --- | 4.05 | 4.17 | 4.27 | 4.38 | 4.46 |
| --- | --- | 4.13 | 4.15 | 4.27 | 4.37 | 4.48 | 4.56 |
| --- | --- | 4.23 | 4.25 | 4.37 | 4.47 | 4.58 | 5.06 |
| --- | --- | 4.33 | 4.35 | 4.47 | 4.57 | 5.08 | 5.16 |
| 4.34 | 4.42 | --- | 4.46 | 4.58 | 5.07 | 5.18 | 5.26 |
| --- | --- | 4.56 | 4.58 | 5.10 | 5.19 | 5.30 | 5.38 |
| --- | --- | 5.08 | 5.10 | 5.22 | 5.31 | 5.42 | 5.50 |
| 5.10 | 5.18 | --- | 5.22 | 5.34 | 5.43 | 5.54 | 6.02 |
| --- | --- | 5.32 | 5.34 | 5.46 | 5.55 | 6.06 | 6.13 |
| 5.38 | 5.46 | --- | 5.50 | 6.02 | 6.10 | 6.20 | 6.27 |
| --- | --- | 6.03 | 6.05 | 6.17 | 6.25 | 6.35 | 6.42 |
| 6.08 | 6.16 | --- | 6.20 | 6.32 | 6.40 | 6.50 | 6.57 |
| --- | --- | 6.33 | 6.35 | 6.47 | 6.55 | 7.05 | 7.12 |
| 6.35 | 6.43 | --- | 6.48 | 6.50 | 7.02 | 7.10 | 7.20 | 7.27 |
| --- | --- | 7.03 | 7.05 | 7.17 | 7.25 | 7.35 | 7.42 |
| --- | --- | 7.18 | 7.20 | 7.32 | 7.40 | 7.50 | 7.57 |
| 7.20 | 7.28 | 7.33 | 7.35 | 7.47 | 7.55 | 8.05 | 8.11 |
| --- | --- | 7.49 | 7.51 | 8.02 | 8.10 | 8.20 | 8.26 |
| --- | --- | 8.05 | 8.07 | 8.17 | 8.25 | 8.35 | 8.41 |
| --- | --- | 8.20 | 8.22 | 8.32 | 8.40 | 8.50 | 8.56 |
| 8.24 | 8.31 | 8.35 | 8.37 | 8.47 | 8.55 | 9.05 | 9.11 |
| --- | --- | 8.50 | 8.52 | 9.02 | 9.10 | 9.20 | 9.26 |
| --- | --- | 9.07 | 9.09 | 9.19 | 9.27 | 9.37 | 9.43 |
| 9.16 | 9.23 | 9.27 | 9.29 | 9.39 | 9.47 | 9.57 | 10.03 |
| --- | --- | 9.53 | 9.55 | 10.05 | 10.12 | 10.22 | 10.28 |
| 10.07 | 10.14 | 10.18 | 10.20 | 10.30 | 10.37 | 10.47 | 10.53 |
| --- | --- | 10.50 | 10.52 | 11.01 | 11.08 | 11.17 | 11.23 |
| 11.10 | 11.17 | 11.21 | 11.23 | 11.31 | 11.37 | 11.47 | 11.53 |
| --- | --- | 11.51 | 11.53 | 12.01 | 12.07 | 12.17 | 12.23 |
| **AFTER MIDNIGHT SERVICE** | | | | | | | |
| 12.12 | 12.18 | 12.21 | 12.23 | 12.31 | 12.37 | 12.47 | 12.53 |
| --- | --- | 1.01 | 1.03 | 1.11 | 1.17 | 1.27 | 1.33 |
| --- | --- | 1.43 | 1.45 | 1.53 | 1.59 | 2.09 | 2.15 |

Buses leave Cottman & Algon  Avs 4:45, 4:46, 4:47 PM to Fern Rock Transportation Center, operating ONLY when school is in session.

Bus leaves Ryan Av, east of Sackett St 4:36 PM to Fern Rock Transportation Center, operating ONLY when school is in session.

Bus leaves Cottman Av West of Loretto Av 4:46 PM to Fern Rock Transportation Center, operating ONLY when school is in session.

### Weekdays — To Frankford-Gregg/Torresdale-Cottman

| Fern Rock Transportation Center (To 5th St and Metro Av) | Oak Lane Rd and Cheltenham Av | Cottman and Oxford Avs | Cottman and Bustleton Avs | Cottman Av and Ditman St | Cottman and Torresdale Avs (Loop) | State Rd and Rhawn St | Frankford Av and Gregg St |
|---|---|---|---|---|---|---|---|
| **PM SERVICE** | | | | | | | |
| 12.08 | 12.15 | 12.24 | 12.35 | --- | 12.46 | --- | --- |
| 12.23 | 12.30 | 12.41 | 12.50 | --- | 1.01 | --- | --- |
| 12.38 | 12.45 | 12.56 | 1.06 | --- | 1.18 | --- | --- |
| 12.53 | 1.00 | 1.11 | 1.21 | 1.33 | --- | 1.39 | 1.47 |
| 1.08 | 1.15 | 1.26 | 1.36 | --- | 1.48 | --- | --- |
| 1.23 | 1.30 | 1.41 | 1.51 | --- | 2.03 | --- | --- |
| 1.38 | 1.45 | 1.56 | 2.06 | --- | 2.18 | --- | --- |
| 1.53 | 2.00 | 2.11 | 2.21 | 2.34 | --- | 2.41 | 2.50 |
| 2.08 | 2.15 | 2.26 | 2.36 | --- | 2.48 | --- | --- |
| 2.23 | 2.30 | 2.41 | 2.51 | --- | 3.03 | --- | --- |
| 2.38 | 2.45 | 2.56 | 3.06 | 3.19 | --- | 3.26 | 3.35 |
| 2.51 | 2.58 | 3.11 | 3.21 | --- | 3.34 | --- | --- |
| 3.06 | 3.13 | 3.26 | 3.36 | --- | 3.49 | --- | --- |
| 3.21 | 3.28 | 3.41 | 3.51 | 4.04 | --- | 4.10 | 4.18 |
| 3.35 | 3.42 | 3.55 | 4.05 | --- | 4.18 | --- | --- |
| 3.47 | 3.54 | 4.07 | 4.16 | --- | 4.29 | --- | --- |
| 3.59 | 4.06 | 4.19 | 4.28 | 4.41 | --- | 4.47 | 4.55 |
| 4.11 | 4.18 | 4.31 | 4.40 | --- | 4.51 | --- | --- |
| 4.23 | 4.30 | 4.43 | 4.52 | 5.05 | --- | 5.11 | 5.19 |
| 4.35 | 4.42 | 4.55 | 5.04 | --- | 5.17 | --- | --- |
| 4.46 | 4.53 | 5.05 | 5.14 | --- | 5.27 | --- | --- |
| 4.56 | 5.03 | 5.15 | 5.24 | 5.37 | --- | 5.43 | 5.51 |
| 5.06 | 5.13 | 5.25 | 5.34 | --- | 5.47 | --- | --- |
| 5.16 | 5.23 | 5.35 | 5.44 | --- | 5.57 | --- | --- |
| 5.27 | 5.34 | 5.46 | 5.55 | 6.08 | --- | 6.14 | 6.22 |
| 5.39 | 5.46 | 5.58 | 6.07 | --- | 6.18 | --- | --- |
| 5.52 | 5.59 | 6.10 | 6.19 | --- | 6.30 | --- | --- |
| 6.21 | 6.28 | 6.39 | 6.48 | 6.45 | --- | 6.51 | 6.59 |
| 6.36 | 6.43 | 6.54 | 7.03 | --- | 6.59 | --- | --- |
| --- | --- | --- | --- | --- | 7.13 | --- | --- |
| 6.52 | 6.59 | 7.09 | 7.17 | --- | 7.27 | --- | --- |
| 7.07 | 7.14 | 7.24 | 7.32 | 7.42 | --- | 7.48 | 7.56 |
| 7.22 | 7.29 | 7.39 | 7.47 | --- | 7.57 | --- | --- |
| 7.37 | 7.44 | 7.54 | 8.02 | --- | 8.12 | --- | --- |
| 7.52 | 7.59 | 8.09 | 8.17 | --- | 8.27 | --- | --- |
| 8.07 | 8.14 | 8.24 | 8.32 | 8.41 | --- | 8.46 | 8.53 |
| 8.22 | 8.29 | 8.39 | 8.47 | --- | 8.57 | --- | --- |
| 8.37 | 8.44 | 8.54 | 9.02 | --- | 9.11 | --- | --- |
| 8.52 | 8.59 | 9.09 | 9.17 | --- | 9.26 | --- | --- |
| 9.08 | 9.14 | 9.24 | 9.32 | 9.40 | --- | 9.45 | 9.52 |
| 9.25 | 9.31 | 9.41 | 9.49 | --- | 9.58 | --- | --- |
| 9.47 | 9.53 | 10.03 | 10.11 | --- | 10.20 | --- | --- |
| 10.11 | 10.17 | 10.27 | 10.35 | 10.43 | --- | 10.48 | 10.55 |
| 10.40 | 10.46 | 10.56 | 11.03 | --- | 11.12 | --- | --- |
| 11.10 | 11.16 | 11.26 | 11.33 | 11.41 | --- | 11.46 | 11.52 |
| 11.41 | 11.47 | 11.57 | 12.03 | --- | 12.11 | --- | --- |
| **AFTER MIDNIGHT SERVICE** | | | | | | | |
| 12.12 | 12.18 | 12.27 | 12.33 | --- | 12.41 | --- | --- |
| 12.43 | 12.49 | 12.58 | 1.04 | --- | 1.12 | --- | --- |
| 1.14 | 1.20 | 1.29 | 1.35 | --- | 1.43 | --- | --- |
| 1.45 | 1.51 | 2.00 | 2.06 | --- | 2.14 | --- | --- |
| 2.18 | 2.24 | 2.33 | 2.39 | --- | 2.47 | --- | --- |

Buses leave Cottman and Glendale Avs at 4:44, 4:46, 4:48 PM to Torresdale Loop, operating ONLY when school is in session.

Bus leaves Cottman Av and Frontenac St at 4:41 PM to Torresdale Loop, operating ONLY when school is in session.

Bus leaves Sandyford and Ryan Avs at 4:48 PM to Torresdale Loop, operating ONLY when school is in session.

## Saturdays

### To Fern Rock Transportation Center

| Frankford Av and Gregg St | State Rd and Rhawn St | Cottman and Torresdale Avs (Loop) | Cottman Av and Ditman Av | Cottman and Bustleton Avs | Cottman and Oxford Avs | Oak Lane Rd and Cheltenham Av | Fern Rock Transportation Center (10th St and Metro Av) |
|---|---|---|---|---|---|---|---|
| **AM SERVICE** | | | | | | | |
|  |  | 5.37 | 5.39 | 5.47 | 5.54 | 6.02 | 6.08 |
| 6.01 | 6.08 |  | 6.11 | 6.19 | 6.26 | 6.35 | 6.40 |
|  |  | 6.41 | 6.43 | 6.51 | 6.58 | 7.07 | 7.13 |
| 7.01 | 7.09 |  | 7.12 | 7.22 | 7.29 | 7.38 | 7.44 |
|  |  | 7.40 | 7.42 | 7.52 | 7.59 | 8.08 | 8.15 |
| 8.01 | 8.09 |  | 8.12 | 8.22 | 8.29 | 8.39 | 8.46 |
|  |  | 8.39 | 8.41 | 8.52 | 8.59 | 9.09 | 9.16 |
| 8.58 | 9.06 |  | 9.09 | 9.19 | 9.27 | 9.37 | 9.44 |
|  |  | 9.26 | 9.28 | 9.39 | 9.47 | 9.57 | 10.04 |
|  |  | 9.43 | 9.45 | 9.56 | 10.05 | 10.15 | 10.22 |
| 9.52 | 10.00 |  | 10.14 | 10.23 | 10.33 | 10.40 |  |
|  |  | 10.19 | 10.21 | 10.32 | 10.41 | 10.51 | 10.58 |
|  |  | 10.37 | 10.39 | 10.50 | 10.59 | 11.09 | 11.16 |
|  |  | 10.55 | 10.57 | 11.08 | 11.17 | 11.27 | 11.34 |
| 11.03 | 11.11 |  | 11.15 | 11.25 | 11.35 | 11.45 | 11.52 |
|  |  | 11.31 | 11.33 | 11.44 | 11.53 | 12.03 | 12.10 |
|  |  | 11.48 | 11.50 | 12.02 | 12.11 | 12.21 | 12.28 |
| 11.55 | 12.04 |  | 12.20 | 12.29 | 12.39 | 12.46 |  |
| **PM SERVICE** | | | | | | | |
|  |  | 12.24 | 12.26 | 12.38 | 12.47 | 12.57 | 1.04 |
|  |  | 12.42 | 12.44 | 12.56 | 1.05 | 1.15 | 1.22 |
| 12.49 | 12.58 |  | 1.02 | 1.14 | 1.23 | 1.33 | 1.40 |
|  |  | 1.18 | 1.20 | 1.32 | 1.41 | 1.51 | 1.58 |
|  |  | 1.36 | 1.38 | 1.50 | 1.59 | 2.09 | 2.16 |
|  |  | 1.54 | 1.56 | 2.08 | 2.17 | 2.27 | 2.34 |
| 2.02 | 2.10 |  | 2.14 | 2.26 | 2.35 | 2.45 | 2.52 |
|  |  | 2.30 | 2.32 | 2.44 | 2.53 | 3.03 | 3.11 |
|  |  | 2.48 | 2.50 | 3.02 | 3.11 | 3.21 | 3.29 |
| 2.57 | 3.04 |  | 3.08 | 3.20 | 3.29 | 3.39 | 3.47 |
|  |  | 3.24 | 3.26 | 3.38 | 3.47 | 3.57 | 4.05 |
|  |  | 3.42 | 3.44 | 3.56 | 4.05 | 4.15 | 4.23 |
| 3.51 | 3.58 |  | 4.02 | 4.14 | 4.23 | 4.33 | 4.41 |
|  |  | 4.18 | 4.20 | 4.32 | 4.41 | 4.51 | 4.59 |
|  |  | 4.36 | 4.38 | 4.50 | 4.59 | 5.09 | 5.16 |
|  |  | 4.54 | 4.56 | 5.07 | 5.17 | 5.27 | 5.34 |
| 5.02 | 5.10 |  | 5.14 | 5.25 | 5.35 | 5.46 | 5.53 |
|  |  | 5.30 | 5.32 | 5.43 | 5.53 | 6.03 | 6.10 |
|  |  | 5.49 | 5.51 | 6.02 | 6.11 | 6.21 | 6.28 |
| 5.57 | 6.04 |  | 6.08 | 6.19 | 6.29 | 6.39 | 6.46 |
|  |  | 6.26 | 6.28 | 6.38 | 6.47 | 6.57 | 7.04 |
|  |  | 6.45 | 6.47 | 6.57 | 7.05 | 7.15 | 7.22 |
| 6.52 | 6.59 |  | 7.03 | 7.15 | 7.23 | 7.33 | 7.40 |
|  |  | 7.21 | 7.23 | 7.33 | 7.41 | 7.51 | 7.58 |
|  |  | 7.39 | 7.41 | 7.51 | 7.59 | 8.09 | 8.16 |
| 7.46 | 7.53 |  | 7.57 | 8.07 | 8.17 | 8.27 | 8.34 |
|  |  | 8.16 | 8.18 | 8.28 | 8.36 | 8.46 | 8.53 |
|  |  | 8.36 | 8.38 | 8.48 | 8.56 | 9.06 | 9.13 |
| 8.47 | 8.54 |  | 8.57 | 9.07 | 9.16 | 9.25 | 9.32 |
|  |  | 9.19 | 9.21 | 9.29 | 9.36 | 9.45 | 9.52 |
|  |  | 9.39 | 9.41 | 9.49 | 9.56 | 10.05 | 10.11 |
| 9.51 | 9.57 |  | 10.03 | 10.12 | 10.19 | 10.28 | 10.34 |
|  |  | 10.26 | 10.28 | 10.35 | 10.42 | 10.51 | 10.57 |
|  |  | 10.51 | 10.53 | 11.00 | 11.07 | 11.16 | 11.22 |
| 11.09 | 11.16 |  | 11.20 | 11.22 | 11.30 | 11.37 | 11.46 | 11.52 |
|  |  | 11.53 | 11.54 | 12.00 | 12.07 | 12.15 | 12.21 |
| **AFTER MIDNIGHT SERVICE** | | | | | | | |
| 12.11 | 12.17 | 12.20 | 12.22 | 12.30 | 12.37 | 12.47 | 12.51 |
|  |  | 1.02 | 1.03 | 1.11 | 1.17 | 1.25 | 1.31 |
|  |  | 1.44 | 1.45 | 1.52 | 1.59 | 2.07 | 2.13 |

## Saturdays

### To Frankford-Gregg/Torresdale-Cottman

| Fern Rock Transportation Center (10th St and Metro Av) | Oak Lane Rd and Cheltenham Av | Cottman and Oxford Avs | Cottman and Bustleton Avs | Cottman Av and Ditman St | Cottman and Torresdale Avs (Loop) | State Rd and Rhawn St | Frankford Av and Gregg St |
|---|---|---|---|---|---|---|---|
| **AM SERVICE** | | | | | | | |
|  |  |  |  | 5.34 | 5.41 | 5.46 | 5.52 |
| 6.09 | 6.14 | 6.23 | 6.30 | 6.38 |  | 6.43 | 6.50 |
| 6.48 | 6.53 | 7.03 | 7.10 | 7.19 |  | 7.24 | 7.31 |
| 7.20 | 7.25 | 7.35 | 7.42 |  | 7.51 |  |  |
| 7.53 | 7.58 | 8.08 | 8.15 | 8.24 |  | 8.29 | 8.37 |
| 8.23 | 8.29 | 8.39 | 8.46 |  | 8.55 |  |  |
| 8.51 | 8.57 | 9.08 | 9.17 | 9.27 |  | 9.32 | 9.40 |
| 9.21 | 9.27 | 9.38 | 9.47 |  | 9.57 |  |  |
| 9.38 | 9.44 | 9.55 | 10.04 | 10.15 |  |  |  |
| 9.56 | 10.02 | 10.13 | 10.22 | 10.32 |  | 10.37 | 10.45 |
| 10.14 | 10.20 | 10.31 | 10.40 |  | 10.51 |  |  |
| 10.32 | 10.38 | 10.49 | 10.58 |  | 11.09 |  |  |
| 10.51 | 10.57 | 11.08 | 11.17 | 11.27 |  | 11.32 | 11.40 |
| 11.09 | 11.15 | 11.26 | 11.35 |  | 11.46 |  |  |
| 11.27 | 11.33 | 11.44 | 11.53 | 12.04 |  |  |  |
| 11.45 | 11.51 | 12.02 | 12.11 | 12.21 |  | 12.26 | 12.34 |
| **PM SERVICE** | | | | | | | |
| 12.03 | 12.09 | 12.20 | 12.29 |  | 12.41 |  |  |
| 12.21 | 12.27 | 12.38 | 12.47 |  | 12.59 |  |  |
| 12.39 | 12.45 | 12.56 | 1.05 |  | 1.17 |  |  |
| 12.57 | 1.04 | 1.14 | 1.23 | 1.35 |  | 1.41 | 1.49 |
| 1.15 | 1.22 | 1.32 | 1.41 |  | 1.53 |  |  |
| 1.33 | 1.40 | 1.50 | 1.59 |  | 2.11 |  |  |
| 1.51 | 1.58 | 2.08 | 2.17 | 2.29 |  | 2.35 | 2.43 |
| 2.07 | 2.16 | 2.26 | 2.35 |  | 2.47 |  |  |
| 2.27 | 2.34 | 2.44 | 2.53 |  | 3.05 |  |  |
| 2.44 | 2.51 | 3.01 | 3.10 | 3.22 |  | 3.28 | 3.36 |
| 3.01 | 3.08 | 3.18 | 3.27 |  | 3.39 |  |  |
| 3.19 | 3.26 | 3.36 | 3.45 |  | 3.57 |  |  |
| 3.37 | 3.44 | 3.54 | 4.03 |  | 4.15 |  |  |
| 3.56 | 4.02 | 4.12 | 4.21 | 4.32 |  | 4.38 | 4.45 |
| 4.14 | 4.20 | 4.30 | 4.39 |  | 4.51 |  |  |
| 4.32 | 4.38 | 4.48 | 4.57 |  | 5.09 |  |  |
| 4.50 | 4.56 | 5.06 | 5.14 | 5.25 |  | 5.32 | 5.39 |
| 5.08 | 5.14 | 5.24 | 5.32 |  | 5.44 |  |  |
| 5.26 | 5.32 | 5.42 | 5.50 |  | 6.02 |  |  |
| 5.44 | 5.50 | 6.00 | 6.07 | 6.17 |  | 6.24 | 6.31 |
| 6.01 | 6.08 | 6.18 | 6.25 |  | 6.35 |  |  |
| 6.19 | 6.26 | 6.36 | 6.43 |  |  |  |  |
| 6.37 | 6.44 | 6.54 | 7.01 | 7.10 |  | 7.17 | 7.24 |
| 6.55 | 7.02 | 7.12 | 7.19 |  | 7.28 |  |  |
| 7.14 | 7.21 | 7.31 | 7.38 |  | 7.47 |  |  |
| 7.33 | 7.40 | 7.50 | 7.57 |  | 8.06 |  |  |
| 7.52 | 7.59 | 8.09 | 8.16 | 8.24 |  | 8.29 | 8.37 |
| 8.13 | 8.19 | 8.29 | 8.36 |  | 8.45 |  |  |
| 8.33 | 8.39 | 8.49 | 8.56 |  | 9.05 |  |  |
| 8.53 | 8.59 | 9.09 | 9.15 | 9.23 |  | 9.28 | 9.36 |
| 9.13 | 9.19 | 9.29 | 9.35 |  | 9.43 |  |  |
| 9.33 | 9.39 | 9.49 | 9.55 | 10.03 |  |  |  |
| 9.55 | 10.01 | 10.11 | 10.17 | 10.25 |  | 10.30 | 10.37 |
| 10.17 | 10.23 | 10.33 | 10.39 |  | 10.49 |  |  |
| 10.41 | 10.47 | 10.57 | 11.03 |  | 11.10 |  |  |
| 11.10 | 11.16 | 11.26 | 11.32 | 11.40 |  | 11.45 | 11.51 |
| **AFTER MIDNIGHT SERVICE** | | | | | | | |
| 12.11 | 12.17 | 12.26 | 12.32 |  | 12.39 |  |  |
| 12.41 | 12.47 | 12.56 | 1.02 |  | 1.09 |  |  |
| 1.11 | 1.17 | 1.26 | 1.32 |  | 1.39 |  |  |
| 1.42 | 1.48 | 1.57 | 2.03 |  | 2.10 |  |  |
| 2.18 | 2.24 | 2.33 | 2.39 |  | 2.46 |  |  |

**Subject To Change**

## Sundays — To Fern Rock Transportation Center

| Frankford Av and Gregg St | State Rd and Rhawn St | Cottman and Torresdale Avs (Loop) | Cottman Av and Ditman St | Cottman and Bustleton Avs | Cottman and Oxford Avs | Fern Rock Transportation Center (10th St and Nedro Av) |
|---|---|---|---|---|---|---|
| **AM SERVICE** | | | | | | |
| 6.02 | 6.08 | --- | 6.11 | 6.20 | 6.27 | 6.41 |
| --- | --- | 6.41 | 6.42 | 6.51 | 6.58 | 7.12 |
| 7.04 | 7.10 | --- | 7.13 | 7.22 | 7.29 | 7.43 |
| --- | --- | 7.43 | 7.44 | 7.53 | 8.00 | 8.14 |
| 8.05 | 8.11 | --- | 8.14 | 8.24 | 8.31 | 8.45 |
| --- | --- | 8.43 | 8.44 | 8.54 | 9.02 | 9.17 |
| 9.05 | 9.11 | --- | 9.14 | 9.25 | 9.33 | 9.48 |
| --- | --- | 9.44 | 9.45 | 9.56 | 10.04 | 10.19 |
| 10.06 | 10.12 | --- | 10.15 | 10.26 | 10.34 | 10.49 |
| --- | --- | 10.40 | 10.41 | 10.52 | 11.00 | 11.15 |
| --- | --- | 10.59 | 11.00 | 11.11 | 11.19 | 11.34 |
| 11.10 | 11.16 | --- | 11.19 | 11.30 | 11.38 | 11.53 |
| --- | --- | 11.37 | 11.38 | 11.49 | 11.57 | 12.12 |
| --- | --- | 11.55 | 11.56 | 12.07 | 12.16 | 12.31 |
| **PM SERVICE** | | | | | | |
| 12.05 | 12.11 | --- | 12.14 | 12.25 | 12.34 | 12.49 |
| --- | --- | 12.31 | 12.32 | 12.43 | 12.52 | 1.06 |
| --- | --- | 12.49 | 12.50 | 1.01 | 1.10 | 1.25 |
| 12.59 | 1.05 | --- | 1.08 | 1.19 | 1.28 | 1.43 |
| --- | --- | 1.25 | 1.26 | 1.37 | 1.46 | 2.01 |
| --- | --- | 1.43 | 1.44 | 1.55 | 2.04 | 2.19 |
| 1.53 | 1.59 | --- | 2.02 | 2.13 | 2.22 | 2.37 |
| --- | --- | 2.19 | 2.20 | 2.31 | 2.40 | 2.55 |
| --- | --- | 2.37 | 2.38 | 2.49 | 2.58 | 3.13 |
| 2.47 | 2.53 | --- | 2.56 | 3.07 | 3.16 | 3.31 |
| --- | --- | 3.13 | 3.14 | 3.25 | 3.34 | 3.49 |
| --- | --- | 3.31 | 3.32 | 3.43 | 3.52 | 4.08 |
| 3.41 | 3.47 | --- | 3.50 | 4.01 | 4.10 | 4.26 |
| --- | --- | 4.08 | 4.09 | 4.19 | 4.28 | 4.44 |
| --- | --- | 4.27 | 4.28 | 4.38 | 4.47 | 5.03 |
| 4.40 | 4.46 | --- | 4.49 | 4.59 | 5.07 | 5.23 |
| --- | --- | 5.07 | 5.08 | 5.18 | 5.27 | 5.43 |
| --- | --- | 5.27 | 5.28 | 5.38 | 5.47 | 6.03 |
| 5.38 | 5.44 | --- | 5.51 | 6.01 | 6.09 | 6.25 |
| --- | --- | 6.17 | 6.18 | 6.28 | 6.37 | 6.53 |
| 6.36 | 6.42 | --- | 6.48 | 6.59 | 7.07 | 7.23 |
| --- | --- | 7.20 | 7.21 | 7.31 | 7.39 | 7.55 |
| 7.42 | 7.48 | --- | 7.54 | 8.04 | 8.11 | 8.26 |
| --- | --- | 8.26 | 8.27 | 8.36 | 8.43 | 8.58 |
| 8.46 | 8.52 | 8.58 | 8.59 | 9.08 | 9.15 | 9.30 |
| --- | --- | 9.30 | 9.31 | 9.40 | 9.47 | 10.02 |
| 9.53 | 9.59 | 10.05 | 10.06 | 10.15 | 10.22 | 10.37 |
| 11.03 | 11.09 | 11.15 | 11.16 | 11.25 | 11.32 | 11.47 |
| --- | --- | 11.50 | 11.51 | 12.00 | 12.07 | 12.21 |
| **AFTER MIDNIGHT SERVICE** | | | | | | |
| 12.13 | 12.19 | 12.25 | 12.26 | 12.35 | 12.42 | 12.56 |
| --- | --- | 1.00 | 1.01 | 1.10 | 1.17 | 1.31 |
| --- | --- | 1.40 | 1.41 | 1.50 | 1.57 | 2.11 |

## Sundays — To Frankford-Gregg/Torresdale-Cottman

| Fern Rock Transportation Center (10th St and Nedro Av) | Cottman and Oxford Avs | Cottman and Bustleton Avs | Cottman Av and Ditman St | Cottman and Torresdale Avs (Loop) | State Rd and Rhawn St | Frankford Av and Gregg St |
|---|---|---|---|---|---|---|
| **AM SERVICE** | | | | | | |
| --- | --- | 5.36 | 5.43 | --- | 5.48 | 5.54 |
| 6.07 | 6.21 | 6.28 | 6.36 | --- | 6.41 | 6.47 |
| 6.38 | 6.52 | 6.59 | --- | 7.07 | --- | --- |
| 7.09 | 7.23 | 7.30 | 7.38 | --- | 7.43 | 7.49 |
| 7.38 | 7.52 | 8.00 | --- | 8.08 | --- | --- |
| 8.08 | 8.22 | 8.30 | 8.38 | --- | 8.43 | 8.49 |
| 8.38 | 8.52 | 9.00 | --- | 9.09 | --- | --- |
| 9.08 | 9.22 | 9.30 | 9.39 | --- | 9.44 | 9.50 |
| 9.38 | 9.52 | 10.00 | --- | 10.09 | --- | --- |
| 10.06 | 10.22 | 10.30 | 10.40 | --- | 10.45 | 10.51 |
| 10.36 | 10.52 | 11.00 | --- | 11.09 | --- | --- |
| 11.06 | 11.20 | 11.28 | 11.38 | --- | 11.43 | 11.49 |
| 11.32 | 11.48 | 11.56 | --- | 12.05 | --- | --- |
| 11.54 | 12.10 | 12.18 | 12.28 | --- | 12.33 | 12.39 |
| **PM SERVICE** | | | | | | |
| 12.12 | 12.28 | 12.36 | --- | 12.46 | --- | --- |
| --- | 12.46 | 12.54 | --- | 1.04 | --- | --- |
| 12.48 | 1.04 | 1.12 | 1.22 | --- | 1.27 | 1.33 |
| 1.06 | 1.22 | 1.30 | --- | 1.41 | --- | --- |
| 1.24 | 1.40 | 1.48 | --- | 1.59 | --- | --- |
| 1.42 | 1.58 | 2.06 | 2.17 | --- | 2.22 | 2.28 |
| 2.00 | 2.16 | 2.24 | --- | 2.35 | --- | --- |
| 2.18 | 2.34 | 2.42 | --- | 2.53 | --- | --- |
| 2.36 | 2.52 | 3.00 | 3.11 | --- | 3.16 | 3.22 |
| 2.56 | 3.11 | 3.19 | --- | 3.30 | --- | --- |
| 3.15 | 3.30 | 3.38 | --- | 3.49 | --- | --- |
| 3.17 | 3.32 | 3.40 | --- | --- | 4.13 | 4.19 |
| 3.53 | 4.08 | 4.16 | --- | 4.27 | --- | --- |
| 4.12 | 4.27 | 4.35 | --- | 4.46 | --- | --- |
| 4.33 | 4.48 | 4.56 | 5.07 | --- | 5.12 | 5.18 |
| 4.55 | 5.10 | 5.18 | --- | 5.28 | --- | --- |
| 5.17 | 5.32 | 5.40 | --- | 5.50 | --- | --- |
| 5.39 | 5.54 | 6.01 | 6.10 | --- | 6.15 | 6.21 |
| 6.01 | 6.16 | 6.23 | --- | 6.33 | --- | --- |
| 6.23 | 6.38 | 6.45 | --- | 6.55 | --- | --- |
| 6.45 | 7.00 | 7.07 | 7.16 | --- | 7.21 | 7.27 |
| 7.14 | 7.29 | 7.36 | --- | 7.46 | --- | --- |
| 7.46 | 8.01 | 8.08 | 8.17 | --- | 8.22 | 8.28 |
| 8.19 | 8.34 | 8.41 | --- | 8.51 | --- | --- |
| 8.55 | 9.09 | 9.16 | 9.25 | --- | 9.30 | 9.36 |
| 9.31 | 9.45 | 9.52 | --- | 10.02 | --- | --- |
| 10.07 | 10.20 | 10.27 | 10.36 | --- | 10.41 | 10.47 |
| 10.42 | 10.55 | 11.02 | --- | 11.11 | --- | --- |
| 11.17 | 11.30 | 11.37 | 11.46 | --- | 11.51 | 11.57 |
| 11.52 | 12.05 | 12.12 | --- | 12.21 | --- | --- |
| **AFTER MIDNIGHT SERVICE** | | | | | | |
| 12.26 | 12.39 | 12.46 | --- | 12.55 | --- | --- |
| 1.01 | 1.14 | 1.21 | --- | 1.30 | --- | --- |
| 1.36 | 1.49 | 1.56 | --- | 2.05 | --- | --- |
| 2.16 | 2.29 | 2.36 | --- | 2.45 | --- | --- |

### TRAVEL TIPS

- Sunday schedule will be operated on New Year's, Memorial, Independence, Labor, Thanksgiving, and Christmas days.
- Please consult separate Fox Chase Line Timetable for details relating to service To/From Ryers Station.
- Fare payment options: cash, or SEPTA Key Card with Pass or Travel Wallet Funds. Go to www.septa.org or m.septa.org for schedules & real time information. Try Schedules to Go for next 10 scheduled trips (smart phone users) or SMS Schedules for next 4 scheduled trips (by text message); See bus/trolley locations on TransitView.
- To SAVE Money on Your Commute visit www.thecommuterschoice.com

# EXHIBIT B

CIRCULATION DATE: 06/28/2022

## DECISION RENDERED COVER LETTER

**WCAIS CLAIM NUMBER:** 8677666

**DISPUTE NUMBER:**        DSP-8677666-1

**PETITIONS:**
Claim Petition (LIBC-362)
Petition To/For (LIBC-378)  Penalties (For violation of
the Act, Rules and Regulations)

**PARTIES:**

DION JONES
2611 N 33rd St
Philadelphia, PA 19132–2811

Ruxandra Osgood
2005 MARKET ST 18TH FLOOR
PHILADELPHIA, PA 19103–7042

                    vs

Curran-Fromhold Correctional Facility
7901 STATE RD
PHILADELPHIA, PA 19136

DAVID A PORTER, ESQ
1500 MARKET ST 32ND FLOOR
PHILADELPHIA, PA 19102–2100

**INSURER CLAIM NUMBER:**

**INJURY DATE:**  03/18/2021

**JUDGE:**

Lawrence Beck

The attached Decision of the Judge is final unless
an appeal is taken to the Workers' Compensation
Appeal Board as provided by law.

If you do not agree with this Decision, an appeal
must be filed with the Workers' Compensation
Appeal Board within 20 days from, but not
including, the date of this notice.

An appeal may be filed online, at
https://www.wcais.pa.gov, or paper forms for an
appeal may be obtained from:

Workers' Compensation Appeal Board
1171 S Cameron Street Rm 120B
Harrisburg, PA 17104
717-783-7838

| Claimant/Employee Exhibits | | | |
|---|---|---|---|
| **Number** | **Name** | **Admitted** | **Submitted For** |
| C01 | Fee Agreement | Yes | JONES, DION |
| C02 | Deposition of Claimant | Yes | JONES, DION |
| C03 | Deposition of Dr. Kim | Yes | JONES, DION |
| C04 | Act 109 documents | Yes | JONES, DION |
| C05 | Litigation Costs | Yes | JONES, DION |

| Defendant/Employer Exhibits | | | |
|---|---|---|---|
| **Number** | **Name** | **Admitted** | **Submitted For** |
| D01 | Memorandum | Yes | Curran-Fromhold Correctional Facility |
| D02 | Dr. Springer deposition transcript | Yes | Curran-Fromhold Correctional Facility |

| Judge Exhibits | | | |
|---|---|---|---|
| **Number** | **Name** | **Admitted** | **Submitted For** |
| J01 | Notice of Denial | Yes | Beck, Lawrence |
| J02 | SOW - AGREED | Yes | Beck, Lawrence |

| Witnesses | | |
|---|---|---|
| **Name** | **Witness For** | **Hearing Date** |
| DION JONES | Claimant/Employee | 01/20/2022 |

| Events | | | |
|---|---|---|---|
| **Date** | **Time** | **Location** | **Status** |
| 01/20/2022 | 14:00:00 | Philadelphia Field Office | Conducted |
| 10/22/2021 | 11:30:00 | Philadelphia Field Office | Conducted |
| 07/21/2021 | 13:30:00 | Philadelphia Field Office | Conducted |

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

## PROCEDURAL HISTORY

On June 15, 2021, Dion Jones (Claimant) filed a Claim Petition for workers' compensation alleging he suffered a psychological injury on March 18, 2021 in the course of his employment as a corrections officer for Curran-Fromhold Correctional Facility (Employer). Claimant alleged he was "working at the booth at the front of the prison when [he] witnessed an inmate (who had just been released on bail) get fatally shot 10 times, about 10-20 feet away from [Claimant]". Claimant alleged that he sustained PTSD, anxiety, depression, and migraines as a result of the incident. Claimant sought temporary total disability benefits as a result of his alleged injuries from the date of the incident and ongoing, based upon alleged wages of $1,040.00 a week. Employer filed a timely Answer to Claimant's Claim Petition.

On June 21, 2021, Employer issued a Notice of Workers' Compensation Denial indicating Claimant did not suffer a work-related injury.

On June 30, 2021, Claimant filed a Penalty Petition alleging Employer violated the Workers' Compensation Act by failing to issue Bureau documents timely.

## FINDINGS OF FACT

1.  Claimant testified by deposition on September 15, 2021 and live before this Judge on January 20, 2022. This Judge has reviewed Claimant's testimony and summarizes it as follows:

    a.  Claimant worked for Employer as a corrections officer for nine years. Claimant worked six to seven days a week in numerous areas of the prison. He worked as a grounds officer making certain the inmates cleaned the outside areas, lounge areas, and bathrooms. Claimant also worked in the segregation unit, various housing units, and in the main gate; he had only worked the main gate approximately 10 times during his in his nine years. Claimant related each post required different duties.

    b.  Claimant related that working the main gate required him to check the vehicles coming in and out of the prison grounds, including identification. He further related that the main gate has a booth, as well as an entrance and exit for visitors, employees, and transportation for the parking lot area. After checking identification, Claimant would push a button on the outside of the booth to let the vehicle or individual pass through an aluminum metal arm. While working an outside post, including the main gate, Claimant carried a firearm but was not provided a bullet proof vest, handcuffs, or a TASER.

    c.  Claimant's only general training was in 2012, while he was at the academy for 11 weeks. At the academy, he learned different defenses for altercations with an inmate, how to respond and keep distance, and gain control of the situation. Claimant related

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

that it was a lot of hand to hand training and learning how to use pepper spray. Claimant also trained to use his service weapon, a Glock 17; he is recertified in its use every year. Claimant was trained in how to respond to a physical altercation and how to respond to a health issue; he was not trained in disarming an inmate or how to respond to a shooting.

d.  Claimant was working the main gate alone on March 18, 2021 at 1:50 AM. He was inside the bathroom, located at the rear of the main gate booth. As he was exiting the bathroom, a car, driving at a high speed, approached the main gate. When Claimant got to the front of the booth, he saw the car drive the wrong way through the exit side before he could check for identification. Claimant explained during his deposition that the metal arm was up at the time because it was acting up and maintenance was going to look into it; during his live testimony, Claimant related that the gate was up so the transportation vans could go in and out as they normally do.

e.  When Claimant opened the booth door, he heard gunshots. Claimant related that he ran back into the booth and took cover below the booth windows because he believed he was being targeted. Claimant called for assistance using his walkie-talkie, relaying that shots were being fired at the main gate and he needed assistance. Claimant then looked out the back window of the booth and saw that the car was stopped and a person was standing near the front of it. Claimant watched as the person was shot approximately 20 feet away from him; the person went from standing to dropping to his knees. Approximately ten shots were fired. Claimant related that the gunshot victim was a former inmate, who had just been released and was waiting at the bus stop across the street. After the released inmate was shot, the car drove away. Claimant was unable to identify the vehicle or its occupants with any specificity.

f.  Claimant related that, after the incident, it took a few minutes for the transportation officer to arrive at the scene and Claimant had to wait approximately an hour before he was cleared to leave. While he was waiting, Claimant saw the former inmate take his last breath and lay on the ground while the responding units waited for the coroner.

g.  Claimant related that, although he had radioed to call 911, no one did so he was asked to call 911. He was asked to write a memorandum memorializing the incident right away.

h.  Claimant related that nothing like the March 18, 2021 incident had never happened to him before; he had never witnessed an inmate being killed or dying. While he has seen fights, which occur about three times a month, and responded to situations where people have been stabbed, Claimant had never actually seen stabbings occur.

i.  Claimant had one training session on inmate releases years ago but none since a new procedure was instituted. He has never been made aware of an inmate being released while he was working the main booth; none of the responsibilities of working the

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

       main booth involve releasing inmates and none of the other duties he has performed
       dealt with observing an inmate release.

j.    Claimant has not worked since the incident. About a day after the incident, Claimant
       was having trouble sleeping and getting headaches; he then began having anxiety
       and feeling depressed. He felt guilty because he was unable to help the victim. He
       was easily startled by loud noises and thought he was being followed.

k.    Clamant was not asked to complete an incident report so he contacted Deputy Warden
       Gordon, deputy of the safety office, and informed him that he was experiencing
       anxiety, headaches, nightmares, trouble sleeping, flashback, and loss of appetite. He
       asked to be sent to Employer's workers' compensation clinic. Claimant was provided
       a list of people to contact but never received a call back and was unable to get an
       appointment at Behavioral Health. Claimant reached out to his union and was referred
       to Behavioral Health of Palm Beaches, Florida, where he was admitted for two weeks
       beginning April 19, 2021. By April 2021, he was having headaches, lasting four hours
       at a time, every other day. Claimant related his appetite had decreased and he was not
       eating.

l.    When Claimant returned to Pennsylvania, he began treating at Mirmont Treatment
       Center. Claimant went to group and individual therapy; he had never had depression,
       anxiety, headaches, loss of appetite, or seen a therapist before March 18, 2021.

m.  Claimant eventually began seeing Dr. Kim every two weeks in addition to his group
       therapy. Both treatments have provided help.

n.    As of his deposition, Claimant related that he is easily startled and on high alert. He
       still has occasional flashbacks. He has headaches once or twice a week for a few
       hours at a time. He felt he had improved, but it was day to day. He takes Prazosin
       and Trazodne, which are prescribed by Dr. Julianne Walters, a psychiatrist; Dr.
       Walters provides medication management and Dr. Kim provides trauma therapy. Dr.
       Kim is helping him by pushing him to do more things and to go out to places that
       make him uncomfortable, including driving by the prison. He did not feel capable of
       returning to work because, every time he wants to get back, his anxiety increases.
       His anxiety is triggered by fireworks and crowds. He did not think it would be safe
       to go back to work.

o.    As of his live testimony, Claimant was continuing to see Dr. Kim for therapy. He
       related the therapy has decreased his anxiety and depression. His appetite has also
       improved. He still gets anxious and agitated on some days, but he had not been
       getting any headaches lately. He still has difficulty sleeping but experiences
       nightmare less often. He does not feel fully recovered or able to return to full duty
       due to his ongoing symptoms. He, with Dr. Kim, is working to see if he could

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

      perform transitional, part-time work with less contact beginning in March 2022. He
has been in contact with Employer's human resources department about the process.

    p.   Claimant has not had any income or worked since the incident. Claimant used his
personal time for about three months after the incident but he has not received
unemployment compensation or short/long term disability payments.

    q.   Claimant has a contingent fee agreement with his counsel.

2.    Claimant presented the September 22, 2021 deposition of Michelle Kim, Ph.D. This
Judge has reviewed Dr. Kim's testimony and summarizes it as follows:

    a.   Dr. Kim is licensed to practice clinical psychology in the Commonwealth of
Pennsylvania. In her profession, as a licensed clinical psychologist, Dr. Kim
conducts psychological testing assessments, evaluations, and psychotherapy. She is
not a board-certified physician.

    b.   Dr. Kim first saw Claimant on June 17, 2021, at which time he provided a history of
the incident. Claimant related that, on March 18, 2021 a car approached the guard
booth where he was stationed, drove by him at a high speed, and started shooting.
Claimant related to Dr. Kim that, after he retreated to the booth, he looked out the
window and saw a person struggling to get up and then falling to the ground. A total
of approximately 10 shots were fired during the incident. After the incident, his
supervisor sent him to the crisis center at Penn Hospital, which subsequently referred
him to an outpatient clinic. Claimant could not get an appointment at Behavioral
Health through his employee assistance program (EAP). On April 19, 2021, he was
admitted to an inpatient unit in Florida for two weeks for increased alcohol
consumption, nightmares, insomnia anxiety, depression, and racing thoughts. While in
the inpatient unit, Claimant attended individual and groups sessions; he was
prescribed Vistaril to help his mood. After he was released, Claimant began attending
psychotherapy at Mirmont in Media. He initially went three hours a day five days a
week. Claimant also met with a therapist weekly and attended group sessions three
times a week. Claimant related that the therapy and medication helped with his
anxiety and nightmares. Claimant reported he had no prior psychiatric history or
family history; he denied any other stressors in his life.

    c.   Dr. Kim related that, as of his initial examination, Claimant's mood was anxious with
a congruent affect. He reported poor mood, problems focusing and concentrating, and
word finding difficulty. Dr. Kim administered the post-traumatic stress disorder
evaluation, which revealed a score of 49 indicating moderate symptoms of PTSD.

    d.   Claimant complained of repeated disturbing implicit memory of the man dying and
of the dead body. Claimant reported that this type of incident had never happened in
his employment before; he had never witnessed anyone die or getting killed while he

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

was working as a corrections officer. He related that his body freezes and he gets heart palpations when the trauma memory is triggered. He avoids any cues or stimuli that remind him of the trauma and avoids driving by his workplace. Dr. Kin related that Claimant was hypervigilant and hyperalert. Claimant reported feeling guilty he did not do more to help the person. He was also easily irritated over trigger matters.

e.  Following her examination, Dr. Kim diagnosed Claimant with post-traumatic stress disorder as a result of the March 18, 2021 incident as well as alcohol use disorder, in early remission. Her treatment plan involved cognitive behavior therapy, the goal of which was an eventual return to work.

f.  Dr. Kim sees Claimant every two weeks. During his sessions, Claimant reported getting angry easily over trigger matters, being scared of, and freezing when he hears, fireworks, and continued avoidance. Claimant did report some improvement in that he no longer uses alcohol.

g.  Dr. Kim related that she initiated a cognitive therapy called prolonged exposure therapy, where Claimant was to look at photos of the prison on the internet and monitor his anxiety until it decreased by 50 percent. Claimant was able to drive by the facility as part of his therapy; however, he started to shake and cry when he did so.

h.  Dr. Kim related that, as of September 2, 2021, Claimant reported his mood was up and down. He still got sad and scared when he thought about going back to work. His psychiatrist had increased his psychotropic medications. Claimant continued to have anxiety and nightmares.

i.  During his most recent visit on September 16, 2021, Claimant reported having intrusive memories of the incident, hypervigilance, insomnia, and being hyperalert. Dr. Kim related that Claimant was having panic attacks during his session. Dr. Kim conducted eye movement desensitization and reprocessing (EMDR), bilateral stimulation, and deep breathing causing Claimant's anxiety to be decreased.

j.  Claimant has related that he would like to have weekly sessions because he found them helpful.

k.  Throughout his sessions, Claimant's motivation has been to get back to work.

l.  Dr. Kim related that Claimant's most concerning symptom occurs when he dissociates and is not aware of his surroundings during his session.

m.  As of her testimony, Dr. Kim related that her diagnoses remained post-traumatic stress disorder related to the March 18, 2021 incident, and the (early remission) alcohol use disorder.

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

n. Dr. Kim explained that, per the DSM-5, for a diagnosis of post-traumatic stress disorder (PTSD), the associated symptoms must cause a clinically significant distress or impairment in social occupation or in other important areas of functioning. The trauma must occur when the person is exposed to a situation where they experienced, witnessed, or were confronted with an event involving actual threats of death or serious injury. Based on this, Dr. Kim found Claimant met the criteria for PTSD. Dr. Kim related that Claimant also met the other criteria for PTSD: he was re-experiencing the trauma through unwanted, distressing memories, recollections and nightmares; he was experiencing persistent avoidance of any stimulus associated with the trauma; and, he was having increased anxiety and panic attacks. Dr. Kim also related that Claimant complained of difficulty focusing and concentrating. Claimant also experiences irrational guilt, which is a symptom of PTSD.

o. Dr. Kim related that the incident was extremely traumatic and had never occurred to Claimant before. There were multiple gunshots fired and he witnessed the person being killed. This indicated a very severe traumatic stressor.

p. Claimant is improving with therapy. He has strong motivation to get better and his desire to reenter the workforce has improved. Claimant's ability to monitor his anxiety and panic attacks and his understanding of coping techniques are also improving.

q. Claimant has not fully recovered from his PTSD and is unable to return to work as a result.

r. Dr. Kim related that she did not review the memorandum Claimant drafted immediately after the incident. She conceded that she was unaware of Claimant's training or work environment. She did not review Claimant's deposition.

3. Employer presented the March 18, 2021 memorandum completed by Claimant following the incident. This Judge has reviewed the memorandum, which states [typographical errors, included]:

> On March 18, 2021 I C/O D. Jones was assigned to CFC Main Gate on the 11pm- 7am shift. At approximately 1:50am a transportation van exited the gate. I returned to the booth to use the restroom. While I was using the restroom I heard multiple gun shots I got down took cover I fixed my clothing while staying low I opened up the bathroom door and looked out and in the distance I saw a dark colored vehicle turning left out of the driveway. I got on the radio an called for assistance I exited the booth and scanned the area I noticed someone laying on the ground near the grass area to the right behind the gate, all the while on the radio calling for assistance, within second Transportation Officer Barnes arrived. I stated to him and pointed in the direction of where the person was laying. At this point other

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

    transportation vehicles arrived along with CFCF Sgt. Thomas. Sgt Thomas instructed me to call 911.

4.    Employer submitted the January 12, 2022 deposition of David Springer. MD. This Judge has reviewed Dr. Springer's testimony and summarizes it as follows:

    a.    Dr. Springer is licensed to practice medicine in the Commonwealth of Pennsylvania and is board-certified in psychiatry. Dr. Springer has worked in two prison settings. He related that PTSD is a common diagnosis he treats. Dr. Springer related that an extraordinary experience can result in a number of different symptoms, and that people, with different backgrounds and make-up, have different reactions to the same event. Some may have no reaction, most may have some transitory reaction, and some will have a significant reaction, with long-lasting symptoms.

    b.    Dr. Springer examined Claimant on October 26, 2021. As part of his examination, he reviewed the deposition and treatment notes of Dr. Kim, Claimant's memorandum, Claimant's records from Center for Alcohol and Drug Studies, Lake Worth, Florida, and Claimant's treatment records from the Center of Alcohol and Drug Studies.

    c.    Dr. Springer related that Claimant provided a history of not being enthusiastic about working in the prison, but that he did like his coworkers. Claimant did experience some violent episodes among the prisoners, including stabbings, fights, and suicide, which Dr. Springer related were typical in prisons.

    d.    Claimant reported that, on March 18, 2021, he was stationed at the entry booth to the grounds of the prison, there were two checkpoint arms for going in and out of the prison grounds. Claimant relieved a coworker, who transferred a firearm to him. Claimant was working the overnight shift. There was not much traffic. Claimant had to use the restroom, which was in the rear of the booth. Claimant related that, when he did that, he would leave the arm up so people could go more readily in and out. Claimant related that, when he was coming out of the bathroom, he saw a vehicle in front of the booth, moving fast. As soon as he got to the outside doorway at the front of the booth, the car had gone through the exit lane. Claimant then heard shots and thought someone was shooting at him. Claimant took cover in the booth and tried to call for assistance and requested someone call 911. Claimant related he then went to the bathroom in the back of the booth. Looking out the window there, he saw the car and a person on his knees. Claimant related he saw the person drop to the ground but did not see the actual shooting. Claimant later learned that the person was a recently released inmate; the person had been on the other side of the street, waiting for a bus, and was chased back onto the prison grounds by the car.

    e.    Dr. Springer related that there were several factors causing Claimant's psychological condition, not just the March 18, 2021 incident. Dr. Springer related that Claimant was very disturbed and felt like he was being blamed for the person's death. Claimant felt

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

guilt that he was in the bathroom and not able to come out and protect the individual. Claimant felt that the prison blamed him for not being at his post. Claimant felt the news reporting made it seem like he was not fulfilling his duties. Claimant was anxious that there was a lawsuit that the person's family had filed against the prison and he was being blamed for the shooting. Claimant reported there was an issue with leaving the traffic arm up and he was uncertain whether he was going to be blamed for that. Claimant was uncertain regarding how his co-workers would treat him. Claimant was stressed as that the prison had potentially become more dangerous.

f.  In his examination, Dr. Springer performed two tests: the Structured Inventory of Malingered Symptomatology and the Trauma Symptom Inventory Two. The Structure Inventory of Malingered Symptomatology tests for people who are truly having symptoms or feigning symptoms. Dr. Springer related that there is a scale and a norm; Claimant had scores above the cutoff. The Trauma Symptom Inventory Two test assesses posttraumatic stress or other kind of traumatic exposures and resulting symptoms. Claimant scored extremely high on the test: over 99 percent on the posttraumatic stress and intrusive experience scales, which includes memories and flashbacks of the incident. Dr. Springer related that Claimant did not describe anything to that degree during his interview. Dr. Springer related that, generally, combat veterans have a score of 61 to 64 on the scale of posttraumatic stress trauma; Claimant scored over 75 on the test.

g.  Dr. Springer opined that Claimant did not have posttraumatic stress disorder but does have adjustment disorder and depressed mood. Dr. Springer explained that Claimant's diagnosis is related to feelings about the guilt that he could not help the man, the media portrayal, the lawsuit, the way Employer treated him, and his fear of going back to the prison and being around his coworkers.

h.  Dr. Springer related that, based upon Claimant's initial description contained in the memorandum drafted immediately following the incident, Claimant was in the bathroom when the incident occurred. Dr. Springer opined that Claimant was likely embarrassed and felt guilty that he was not at his post. Claimant did not experience the event directly; Claimant did not see anything. Dr. Springer related that, even if Claimant had seen a shooting, the incident is within the range of what a corrections officer could expect to see in a prison setting, which includes violence and death.

i.  Dr. Springer related that there needed to be a shift in focus of Claimant's treatment. Dr. Springer related that his treatment now focuses on reaffirming Claimant's view of himself having PTSD rather than his true issues. Dr. Springer recommended Claimant transition to a different focus in his treatment to help him to move forward.

5.  The parties agreed that Claimant's average weekly wage was $2,124.24, with a corresponding compensation rate of $1,130.00.

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

6.   This Judge has reviewed Claimant's testimony and finds it credible. Claimant's description of the incident is not disputed in any meaningful way. Indeed, the only minor inconsistencies in Claimant's description of the incident this Judge can ascertain pertain to whether Claimant actually witnessed the entirety of the shooting and the victim actually being struck by gunfire. Claimant's reaction to the incident, and his subsequent treatment, are not subject to any real debate. While the efficacy of that treatment is questioned, it is undisputed that Claimant sought and received treatment following the incident. Regarding Claimant's testimony as to his present condition, regardless of whether the source of same is PTSD or adjustment disorder with depressed mood, this Judge finds Claimant credible. While this Judge is aware that Claimant's reaction is, and always will be, subjective in some way, this Judge has no doubt that Claimant's reaction is earnest and true. This determination is based, in part, on Claimant's demeanor and deportment while testifying live.

7.   This Judge has reviewed the testimony of Dr. Kim and Dr. Springer and accepts the testimony of Dr. Kim, where they differ regarding Claimant's diagnoses and present status. Dr. Kim, as Claimant's treating therapist, is in a better position to diagnose and comment on Claimant's status, as compared to Dr. Springer. Despite not reading Claimant's deposition, Dr. Kim provided a clear understanding of Claimant's history and treatment and provided a clear, concise, and credible explanation of Claimant's symptoms and their relationship to the incident. Dr. Springer's opinions are rejected where they conflict with Dr. Kim.

8.   Regarding Claimant's Claim Petition, this Judge finds as follows:

   a.   Claimant was employed by Employer on March 18, 2021.

   b.   Claimant's time of injury average weekly wage was $2,124.24, with a corresponding compensation rate of $1,130.00.

   c.   On March 18, 2021, Claimant experienced an abnormal working condition in witnessing a violent shooting resulting in the death of another.

   d.   As a result of the abnormal working condition, Claimant suffered post-traumatic stress disorder, from which he has not recovered.

   e.   Claimant is entitled to indemnity benefits from March 18, 2021 and ongoing, together with statutory interest. Employer is entitled to a credit for all wages, Heart & Lung Act benefits, or any unemployment compensation paid to Claimant on and after March 18, 2021.

   f.   Employer is responsible for all reasonable and necessary treatment related to Claimant's post-traumatic stress disorder.

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

9.  Claimant's Penalty Petition is granted. Employer knew Claimant experienced the incident on the day it occurred. Following such incident, Claimant was referred to Employer's panel provider. Despite this, Employer failed to issue a Bureau document prior to June 30, 2021, more than three months after the incident. For such failure, Employer is penalized 30 percent of all indemnity benefits, plus interest thereon and notwithstanding any credit, payable to Claimant from March 18, 2021 to June 30, 2021.

10. Claimant's counsel's contingent fee agreement is approved. Claimant's counsel is entitled to a twenty-percent fee calculated on Claimant's indemnity benefits. Except where such fee is to be paid as an unreasonable contest, as set forth below, Claimant's counsel's fee agreement is chargeable to and from Claimant's indemnity benefit award.

11. Employer's contest regarding Claimant's Claim and Penalty Petitions was unreasonable up to the October 26, 2021 the date of Dr. Springer's examination. Regarding the Penalty Petition, Employer presented no evidence as to why it delayed three months prior to issuing a Bureau document despite having obvious notice of the incident and Claimant's request for treatment. For such unreasonable contest of the Penalty Petition, Claimant's counsel's twenty percent fee shall be calculated on, but not chargeable to, Claimant's awarded penalty.

Regarding the Claim Petition, Employer's contest was reasonable only as of Dr. Springer's examination, which provided an alternative, though ultimately rejected, diagnosis and (unrelated) cause. While this Judge is aware it was, and remained, Claimant's relatively high burden to show an abnormal working condition gave rise to his claimed psychological injuries, Employer presented no evidence to contradict the basic and accepted facts of the incident's occurrence and Claimant's subsequent treatment. Employer presented no evidence, other than the anecdotal evidence provided by Dr. Springer's training and experience, to indicate that the violence at the heart of this matter was not abnormal. As such, Employer's contest of Claimant's Claim Petition was unreasonable until October 26, 2021. For such unreasonable contest of the Claim Petition, Claimant's counsel's twenty percent fee shall be calculated on, but not chargeable to, Claimant's awarded indemnity benefits for such time period. The calculation of the basis for such fee (i.e., Claimant's indemnity award) shall not include any credit for prior wages, Heart & Lung Act benefits, or unemployment compensation.

12. Claimant's counsel expended reasonable litigation costs in the amount of $4,163.97 in successful prosecution of the Claim and Penalty Petitions. Employer shall reimburse Claimant's counsel for such costs.

13. Claimant is not subject to a Domestic Relations lien.

## CONCLUSIONS OF LAW

1.  The parties are bound by the Workers' Compensation Act, as amended (Act).

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

2.      An employee who seeks workers' compensation benefits through an original claim
        petition has the burden to prove all of the elements necessary to support an award of
        those benefits, including the nature of the injury and the duration of any disability. Vista
        International Hotel v. WCAB (Daniels), 742 A.2d 640 (Pa. 2000); Fox v. WCAB (Eazor
        Express, Inc.), 373 A.2d 141 (Pa.Cmwlth. 1977); Inglis House v. WCAB (Reedy), 634
        A.2d 592 (Pa.Cmwlth. 1993).  While disabilities caused by psychological elements can
        be considered injuries under the Act, an employee who claims that the psychological
        disability resulted from emotional, non-physical stimuli at work bears a greater burden of
        proof than an employee whose alleged psychological disability results from physical
        injury or stimuli. Martin v. Ketchum, Inc., 568 A.2d 159 (Pa. 1990). As part of this
        burden, the employee must show that the work-related stress is caused by actual objective
        abnormal working conditions rather than subjective, perceived, or imagined employment
        events. Thomas v. WCAB (Atlantic Refining Co.), 423 A.2d 784 (Pa.Cmwlth. 1980).
        Determining whether a working condition is abnormal is highly fact sensitive and is
        based on the "content, intensity, duration, and frequency of the offending behavior."
        RAG (Cyprus) Emerald Resources, LP v. WCAB (Hopton), 912 A.2d 1278 (Pa. 2007).
        Events must be considered in relation to the specific employment. Antus v. WCAB
        (Sawhill Tubular Div. Cyclops Industries, Inc.), 625 A,2d 760 (Pa.Cmwlth, 1993).
        However, the conditions of employment, or the inherent risk related to the employment,
        does not determine whether a condition is abnormal or not and a singular, extraordinary
        event, may be considered abnormal despite its potential inclusion in that inherent risk or
        even in the presence of specific training relative to the risk. Payes v. WCAB
        (Commonwealth PA State Police), 79 A.3d 543 (Pa. 2013); Pennsylvania Liquor Control
        Board v. WCAB (Kochanowicz), 108 A.3d 922 (Pa.Cmwlth. 2014).

        Here, there is no dispute that Claimant bore witness to a disturbing event: the intentional
        killing of another individual. The circumstances of that killing, in relation to Claimant's
        employment, render the incident even more tragic. The victim, a former inmate, was killed
        after apparently seeking safety on the prison's grounds. The perpetrator of that killing was,
        arguably (and as feared by Claimant), aided in his killing by the prior actions of Claimant –
        leaving the metal arm raised. Claimant viewed the unintended consequences of his actions
        firsthand. The full extent of Claimant's experience with this tragedy is not completely
        known; however, whether Claimant actually witnessed the bullets striking the victim is,
        ultimately, irrelevant. Claimant's experience is sufficient to "involve" him in the event:
        Claimant's watching as the speeding vehicle followed the victim onto prison grounds, the
        eruption of gunfire (which Claimant initially, and not unreasonably, thought may have
        been directed at him), and watching the victim fall after having been struck.

        The question then remains whether this incident was abnormal or, as Employer contends,
        should be viewed in relation to Claimant's employment as a correction officer, a position
        for which violence, if not accepted, is expected. First, this Judge is not prepared to find,
        conclude, or declare that the violent event at the heart of this case is de rigueur for this
        employment or expected in today's society: the witnessing of a killing of one human

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

being by another should not be considered "normal", especially absent any contrary evidence. Given the totality of the circumstances, as set forth above, and including Claimant's unintended role in the occurrence of the incident, this Judge finds and concludes that the incident was abnormal and not incident to Claimant's employment. This Judge notes that the only evidence regarding the abnormality of these circumstances came from Claimant, notwithstanding anecdotal testimony from Dr. Springer. Employer's defense, or attack on Claimant's supporting evidence, boils down to the following: it is a prison; violence, even a killing, is expected and a circumstance for which Claimant was trained. While not its burden to establish the lack of "abnormality", Employer presented no evidence regarding the frequency of violence within Claimant's employment so as to conclude that this incident was not abnormal. Absent any evidence that this incident was either not abnormal or, while abnormal occurred directly as a result of Claimant's own malfeasance, this Judge is limited to the evidence presented, which, as herein stated, establishes an abnormal working condition resulting in Claimant's psychological disability.

3.   As set forth above, for its failure to issue timely Bureau documents accepting, or denying, the claim, Employer is penalized 30 percent of all indemnity benefits, plus interest thereon, payable to Claimant from March 18, 2021 to June 30, 2021.

4.   Employer's contest of the Claim and Penalty Petitions was unreasonable, in part, as set forth above.

DION JONES vs Curran-Fromhold Correctional Facility
DSP-8677666-1

## <u>ORDER</u>

AND NOW, Claimant's Claim Petition is GRANTED.

On March 18, 2021, Claimant experienced an abnormal working condition in witnessing a violent shooting resulting in the death of another. As a result of the abnormal working condition, Claimant suffered post-traumatic stress disorder, from which he has not recovered.

Claimant's time of injury average weekly wage was $2,124.24, with a corresponding compensation rate of $1,130.00. Claimant is entitled to indemnity benefits from March 18, 2021 and ongoing, together with statutory interest. Employer is entitled to a credit for all wages, Heart & Lung Act benefits, and any unemployment compensation paid to Claimant on and after March 18, 2021.

Employer is responsible for all reasonable and necessary treatment related to Claimant's post-traumatic stress disorder.

Claimant's Penalty Petition is GRANTED, as set forth herein. Employer is penalized 30 percent of all indemnity benefits, plus interest thereon, payable to Claimant from March 18, 2021 to June 30, 2021.

Claimant's counsel's contingent fee agreement is approved and calculated on Claimant's indemnity benefits. Except where such fee is to be paid as an unreasonable contest, as set forth below, Claimant's counsel's fee agreement is chargeable to, and from, Claimant's indemnity benefit award.

Employer's contest of the Claim and Penalty Petitions was unreasonable, in part. For the unreasonable contest of the Penalty Petition, Claimant's counsel's 20 percent fee shall be calculated on, but not chargeable to, Claimant's awarded penalty. For the unreasonable contest of the Claim Petition, Claimant's counsel's 20 percent fee shall be calculated on, but not chargeable to, Claimant's awarded indemnity benefits for such time period. The calculation of the basis for such fee (i.e., Claimant's indemnity award) shall not include any credit for prior wages, Heart & Lung Act benefits, or unemployment compensation.

Employer shall reimburse Claimant's counsel $4,163.97 in litigation costs as set forth herein.

Lawrence Beck

DION JONES vs Curran-Fromhold Correctional Facility
DSP-8677666-1

Workers' Compensation Judge
Philadelphia Field Office

# MOTION EXHIBIT B

CIRCULATION DATE: 06/28/2022

## DECISION RENDERED COVER LETTER

**WCAIS CLAIM NUMBER:** 8677666

**DISPUTE NUMBER:**        DSP-8677666-1

**PETITIONS:**
Claim Petition (LIBC-362)
Petition To/For (LIBC-378)  Penalties (For violation of the Act, Rules and Regulations)

**PARTIES:**

DION JONES
2611 N 33rd St
Philadelphia, PA 19132–2811

Ruxandra Osgood
2005 MARKET ST 18TH FLOOR
PHILADELPHIA, PA 19103–7042

        vs

Curran-Fromhold Correctional Facility
7901 STATE RD
PHILADELPHIA, PA 19136

DAVID A PORTER, ESQ
1500 MARKET ST 32ND FLOOR
PHILADELPHIA, PA 19102–2100

**INSURER CLAIM NUMBER:**

**INJURY DATE:**  03/18/2021

**JUDGE:**

Lawrence Beck

The attached Decision of the Judge is final unless an appeal is taken to the Workers' Compensation Appeal Board as provided by law.

If you do not agree with this Decision, an appeal must be filed with the Workers' Compensation Appeal Board within 20 days from, but not including, the date of this notice.

An appeal may be filed online, at https://www.wcais.pa.gov, or paper forms for an appeal may be obtained from:

Workers' Compensation Appeal Board
1171 S Cameron Street Rm 120B
Harrisburg, PA 17104
717-783-7838

| Claimant/Employee Exhibits | | | |
|---|---|---|---|
| **Number** | **Name** | **Admitted** | **Submitted For** |
| C01 | Fee Agreement | Yes | JONES, DION |
| C02 | Deposition of Claimant | Yes | JONES, DION |
| C03 | Deposition of Dr. Kim | Yes | JONES, DION |
| C04 | Act 109 documents | Yes | JONES, DION |
| C05 | Litigation Costs | Yes | JONES, DION |

| Defendant/Employer Exhibits | | | |
|---|---|---|---|
| **Number** | **Name** | **Admitted** | **Submitted For** |
| D01 | Memorandum | Yes | Curran-Fromhold Correctional Facility |
| D02 | Dr. Springer deposition transcript | Yes | Curran-Fromhold Correctional Facility |

| Judge Exhibits | | | |
|---|---|---|---|
| **Number** | **Name** | **Admitted** | **Submitted For** |
| J01 | Notice of Denial | Yes | Beck, Lawrence |
| J02 | SOW - AGREED | Yes | Beck, Lawrence |

| Witnesses | | |
|---|---|---|
| **Name** | **Witness For** | **Hearing Date** |
| DION JONES | Claimant/Employee | 01/20/2022 |

| Events | | | |
|---|---|---|---|
| **Date** | **Time** | **Location** | **Status** |
| 01/20/2022 | 14:00:00 | Philadelphia Field Office | Conducted |
| 10/22/2021 | 11:30:00 | Philadelphia Field Office | Conducted |
| 07/21/2021 | 13:30:00 | Philadelphia Field Office | Conducted |

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

## PROCEDURAL HISTORY

On June 15, 2021, Dion Jones (Claimant) filed a Claim Petition for workers' compensation alleging he suffered a psychological injury on March 18, 2021 in the course of his employment as a corrections officer for Curran-Fromhold Correctional Facility (Employer). Claimant alleged he was "working at the booth at the front of the prison when [he] witnessed an inmate (who had just been released on bail) get fatally shot 10 times, about 10-20 feet away from [Claimant]". Claimant alleged that he sustained PTSD, anxiety, depression, and migraines as a result of the incident. Claimant sought temporary total disability benefits as a result of his alleged injuries from the date of the incident and ongoing, based upon alleged wages of $1,040.00 a week. Employer filed a timely Answer to Claimant's Claim Petition.

On June 21, 2021, Employer issued a Notice of Workers' Compensation Denial indicating Claimant did not suffer a work-related injury.

On June 30, 2021, Claimant filed a Penalty Petition alleging Employer violated the Workers' Compensation Act by failing to issue Bureau documents timely.

## FINDINGS OF FACT

1.   Claimant testified by deposition on September 15, 2021 and live before this Judge on January 20, 2022. This Judge has reviewed Claimant's testimony and summarizes it as follows:

   a.   Claimant worked for Employer as a corrections officer for nine years. Claimant worked six to seven days a week in numerous areas of the prison. He worked as a grounds officer making certain the inmates cleaned the outside areas, lounge areas, and bathrooms. Claimant also worked in the segregation unit, various housing units, and in the main gate; he had only worked the main gate approximately 10 times during his in his nine years. Claimant related each post required different duties.

   b.   Claimant related that working the main gate required him to check the vehicles coming in and out of the prison grounds, including identification. He further related that the main gate has a booth, as well as an entrance and exit for visitors, employees, and transportation for the parking lot area. After checking identification, Claimant would push a button on the outside of the booth to let the vehicle or individual pass through an aluminum metal arm. While working an outside post, including the main gate, Claimant carried a firearm but was not provided a bullet proof vest, handcuffs, or a TASER.

   c.   Claimant's only general training was in 2012, while he was at the academy for 11 weeks. At the academy, he learned different defenses for altercations with an inmate, how to respond and keep distance, and gain control of the situation. Claimant related

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

that it was a lot of hand to hand training and learning how to use pepper spray. Claimant also trained to use his service weapon, a Glock 17; he is recertified in its use every year. Claimant was trained in how to respond to a physical altercation and how to respond to a health issue; he was not trained in disarming an inmate or how to respond to a shooting.

d.  Claimant was working the main gate alone on March 18, 2021 at 1:50 AM. He was inside the bathroom, located at the rear of the main gate booth. As he was exiting the bathroom, a car, driving at a high speed, approached the main gate. When Claimant got to the front of the booth, he saw the car drive the wrong way through the exit side before he could check for identification. Claimant explained during his deposition that the metal arm was up at the time because it was acting up and maintenance was going to look into it; during his live testimony, Claimant related that the gate was up so the transportation vans could go in and out as they normally do.

e.  When Claimant opened the booth door, he heard gunshots. Claimant related that he ran back into the booth and took cover below the booth windows because he believed he was being targeted. Claimant called for assistance using his walkie-talkie, relaying that shots were being fired at the main gate and he needed assistance. Claimant then looked out the back window of the booth and saw that the car was stopped and a person was standing near the front of it. Claimant watched as the person was shot approximately 20 feet away from him; the person went from standing to dropping to his knees. Approximately ten shots were fired. Claimant related that the gunshot victim was a former inmate, who had just been released and was waiting at the bus stop across the street. After the released inmate was shot, the car drove away. Claimant was unable to identify the vehicle or its occupants with any specificity.

f.  Claimant related that, after the incident, it took a few minutes for the transportation officer to arrive at the scene and Claimant had to wait approximately an hour before he was cleared to leave. While he was waiting, Claimant saw the former inmate take his last breath and lay on the ground while the responding units waited for the coroner.

g.  Claimant related that, although he had radioed to call 911, no one did so he was asked to call 911. He was asked to write a memorandum memorializing the incident right away.

h.  Claimant related that nothing like the March 18, 2021 incident had never happened to him before; he had never witnessed an inmate being killed or dying. While he has seen fights, which occur about three times a month, and responded to situations where people have been stabbed, Claimant had never actually seen stabbings occur.

i.  Claimant had one training session on inmate releases years ago but none since a new procedure was instituted. He has never been made aware of an inmate being released while he was working the main booth; none of the responsibilities of working the

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

    main booth involve releasing inmates and none of the other duties he has performed
    dealt with observing an inmate release.

j.    Claimant has not worked since the incident. About a day after the incident, Claimant
    was having trouble sleeping and getting headaches; he then began having anxiety
    and feeling depressed. He felt guilty because he was unable to help the victim. He
    was easily startled by loud noises and thought he was being followed.

k.    Clamant was not asked to complete an incident report so he contacted Deputy Warden
    Gordon, deputy of the safety office, and informed him that he was experiencing
    anxiety, headaches, nightmares, trouble sleeping, flashback, and loss of appetite. He
    asked to be sent to Employer's workers' compensation clinic. Claimant was provided
    a list of people to contact but never received a call back and was unable to get an
    appointment at Behavioral Health. Claimant reached out to his union and was referred
    to Behavioral Health of Palm Beaches, Florida, where he was admitted for two weeks
    beginning April 19, 2021. By April 2021, he was having headaches, lasting four hours
    at a time, every other day. Claimant related his appetite had decreased and he was not
    eating.

l.    When Claimant returned to Pennsylvania, he began treating at Mirmont Treatment
    Center. Claimant went to group and individual therapy; he had never had depression,
    anxiety, headaches, loss of appetite, or seen a therapist before March 18, 2021.

m.    Claimant eventually began seeing Dr. Kim every two weeks in addition to his group
    therapy. Both treatments have provided help.

n.    As of his deposition, Claimant related that he is easily startled and on high alert. He
    still has occasional flashbacks. He has headaches once or twice a week for a few
    hours at a time. He felt he had improved, but it was day to day. He takes Prazosin
    and Trazodne, which are prescribed by Dr. Julianne Walters, a psychiatrist; Dr.
    Walters provides medication management and Dr. Kim provides trauma therapy. Dr.
    Kim is helping him by pushing him to do more things and to go out to places that
    make him uncomfortable, including driving by the prison. He did not feel capable of
    returning to work because, every time he wants to get back, his anxiety increases.
    His anxiety is triggered by fireworks and crowds. He did not think it would be safe
    to go back to work.

o.    As of his live testimony, Claimant was continuing to see Dr. Kim for therapy. He
    related the therapy has decreased his anxiety and depression. His appetite has also
    improved. He still gets anxious and agitated on some days, but he had not been
    getting any headaches lately. He still has difficulty sleeping but experiences
    nightmare less often. He does not feel fully recovered or able to return to full duty
    due to his ongoing symptoms. He, with Dr. Kim, is working to see if he could

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

       perform transitional, part-time work with less contact beginning in March 2022. He
       has been in contact with Employer's human resources department about the process.

   p.  Claimant has not had any income or worked since the incident. Claimant used his
       personal time for about three months after the incident but he has not received
       unemployment compensation or short/long term disability payments.

   q.  Claimant has a contingent fee agreement with his counsel.

2.   Claimant presented the September 22, 2021 deposition of Michelle Kim, Ph.D. This
    Judge has reviewed Dr. Kim's testimony and summarizes it as follows:

   a.  Dr. Kim is licensed to practice clinical psychology in the Commonwealth of
       Pennsylvania. In her profession, as a licensed clinical psychologist, Dr. Kim
       conducts psychological testing assessments, evaluations, and psychotherapy. She is
       not a board-certified physician.

   b.  Dr. Kim first saw Claimant on June 17, 2021, at which time he provided a history of
       the incident. Claimant related that, on March 18, 2021 a car approached the guard
       booth where he was stationed, drove by him at a high speed, and started shooting.
       Claimant related to Dr. Kim that, after he retreated to the booth, he looked out the
       window and saw a person struggling to get up and then falling to the ground. A total
       of approximately 10 shots were fired during the incident. After the incident, his
       supervisor sent him to the crisis center at Penn Hospital, which subsequently referred
       him to an outpatient clinic. Claimant could not get an appointment at Behavioral
       Health through his employee assistance program (EAP). On April 19, 2021, he was
       admitted to an inpatient unit in Florida for two weeks for increased alcohol
       consumption, nightmares, insomnia anxiety, depression, and racing thoughts. While in
       the inpatient unit, Claimant attended individual and groups sessions; he was
       prescribed Vistaril to help his mood. After he was released, Claimant began attending
       psychotherapy at Mirmont in Media. He initially went three hours a day five days a
       week. Claimant also met with a therapist weekly and attended group sessions three
       times a week. Claimant related that the therapy and medication helped with his
       anxiety and nightmares. Claimant reported he had no prior psychiatric history or
       family history; he denied any other stressors in his life.

   c.  Dr. Kim related that, as of his initial examination, Claimant's mood was anxious with
       a congruent affect. He reported poor mood, problems focusing and concentrating, and
       word finding difficulty. Dr. Kim administered the post-traumatic stress disorder
       evaluation, which revealed a score of 49 indicating moderate symptoms of PTSD.

   d.  Claimant complained of repeated disturbing implicit memory of the man dying and
       of the dead body. Claimant reported that this type of incident had never happened in
       his employment before; he had never witnessed anyone die or getting killed while he

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

was working as a corrections officer. He related that his body freezes and he gets
heart palpations when the trauma memory is triggered. He avoids any cues or stimuli
that remind him of the trauma and avoids driving by his workplace. Dr. Kin related
that Claimant was hypervigilant and hyperalert. Claimant reported feeling guilty he
did not do more to help the person. He was also easily irritated over trigger matters.

e.   Following her examination, Dr. Kim diagnosed Claimant with post-traumatic stress
     disorder as a result of the March 18, 2021 incident as well as alcohol use disorder, in
     early remission. Her treatment plan involved cognitive behavior therapy, the goal of
     which was an eventual return to work.

f.   Dr. Kim sees Claimant every two weeks. During his sessions, Claimant reported
     getting angry easily over trigger matters, being scared of, and freezing when he
     hears, fireworks, and continued avoidance. Claimant did report some improvement
     in that he no longer uses alcohol.

g.   Dr. Kim related that she initiated a cognitive therapy called prolonged exposure
     therapy, where Claimant was to look at photos of the prison on the internet and
     monitor his anxiety until it decreased by 50 percent. Claimant was able to drive by the
     facility as part of his therapy; however, he started to shake and cry when he did so.

h.   Dr. Kim related that, as of September 2, 2021, Claimant reported his mood was up
     and down. He still got sad and scared when he thought about going back to work.
     His psychiatrist had increased his psychotropic medications. Claimant continued to
     have anxiety and nightmares.

i.   During his most recent visit on September 16, 2021, Claimant reported having
     intrusive memories of the incident, hypervigilance, insomnia, and being hyperalert.
     Dr. Kim related that Claimant was having panic attacks during his session. Dr. Kim
     conducted eye movement desensitization and reprocessing (EMDR), bilateral
     stimulation, and deep breathing causing Claimant's anxiety to be decreased.

j.   Claimant has related that he would like to have weekly sessions because he found
     them helpful.

k.   Throughout his sessions, Claimant's motivation has been to get back to work.

l.   Dr. Kim related that Claimant's most concerning symptom occurs when he
     dissociates and is not aware of his surroundings during his session.

m.   As of her testimony, Dr. Kim related that her diagnoses remained post-traumatic
     stress disorder related to the March 18, 2021 incident, and the (early remission)
     alcohol use disorder.

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

    n.   Dr. Kim explained that, per the DSM-5, for a diagnosis of post-traumatic stress disorder (PTSD), the associated symptoms must cause a clinically significant distress or impairment in social occupation or in other important areas of functioning. The trauma must occur when the person is exposed to a situation where they experienced, witnessed, or were confronted with an event involving actual threats of death or serious injury. Based on this, Dr. Kim found Claimant met the criteria for PTSD. Dr. Kim related that Claimant also met the other criteria for PTSD: he was re-experiencing the trauma through unwanted, distressing memories, recollections and nightmares; he was experiencing persistent avoidance of any stimulus associated with the trauma; and, he was having increased anxiety and panic attacks. Dr. Kim also related that Claimant complained of difficulty focusing and concentrating. Claimant also experiences irrational guilt, which is a symptom of PTSD.

    o.   Dr. Kim related that the incident was extremely traumatic and had never occurred to Claimant before. There were multiple gunshots fired and he witnessed the person being killed. This indicated a very severe traumatic stressor.

    p.   Claimant is improving with therapy. He has strong motivation to get better and his desire to reenter the workforce has improved. Claimant's ability to monitor his anxiety and panic attacks and his understanding of coping techniques are also improving.

    q.   Claimant has not fully recovered from his PTSD and is unable to return to work as a result.

    r.   Dr. Kim related that she did not review the memorandum Claimant drafted immediately after the incident. She conceded that she was unaware of Claimant's training or work environment. She did not review Claimant's deposition.

3.    Employer presented the March 18, 2021 memorandum completed by Claimant following the incident. This Judge has reviewed the memorandum, which states [typographical errors, included]:

> On March 18, 2021 I C/O D. Jones was assigned to CFC Main Gate on the 11pm- 7am shift. At approximately 1:50am a transportation van exited the gate. I returned to the booth to use the restroom. While I was using the restroom I heard multiple gun shots I got down took cover I fixed my clothing while staying low I opened up the bathroom door and looked out and in the distance I saw a dark colored vehicle turning left out of the driveway. I got on the radio an called for assistance I exited the booth and scanned the area I noticed someone laying on the ground near the grass area to the right behind the gate, all the while on the radio calling for assistance, within second Transportation Officer Barnes arrived. I stated to him and pointed in the direction of where the person was laying. At this point other

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

transportation vehicles arrived along with CFCF Sgt. Thomas. Sgt Thomas
instructed me to call 911.

4.    Employer submitted the January 12, 2022 deposition of David Springer. MD. This Judge
      has reviewed Dr. Springer's testimony and summarizes it as follows:

      a.    Dr. Springer is licensed to practice medicine in the Commonwealth of Pennsylvania
            and is board-certified in psychiatry. Dr. Springer has worked in two prison settings.
            He related that PTSD is a common diagnosis he treats. Dr. Springer related that an
            extraordinary experience can result in a number of different symptoms, and that
            people, with different backgrounds and make-up, have different reactions to the same
            event. Some may have no reaction, most may have some transitory reaction, and
            some will have a significant reaction, with long-lasting symptoms.

      b.    Dr. Springer examined Claimant on October 26, 2021. As part of his examination, he
            reviewed the deposition and treatment notes of Dr. Kim, Claimant's memorandum,
            Claimant's records from Center for Alcohol and Drug Studies, Lake Worth, Florida,
            and Claimant's treatment records from the Center of Alcohol and Drug Studies.

      c.    Dr. Springer related that Claimant provided a history of not being enthusiastic about
            working in the prison, but that he did like his coworkers. Claimant did experience
            some violent episodes among the prisoners, including stabbings, fights, and suicide,
            which Dr. Springer related were typical in prisons.

      d.    Claimant reported that, on March 18, 2021, he was stationed at the entry booth to the
            grounds of the prison, there were two checkpoint arms for going in and out of the
            prison grounds. Claimant relieved a coworker, who transferred a firearm to him.
            Claimant was working the overnight shift. There was not much traffic. Claimant had
            to use the restroom, which was in the rear of the booth. Claimant related that, when
            he did that, he would leave the arm up so people could go more readily in and out.
            Claimant related that, when he was coming out of the bathroom, he saw a vehicle in
            front of the booth, moving fast. As soon as he got to the outside doorway at the front
            of the booth, the car had gone through the exit lane. Claimant then heard shots and
            thought someone was shooting at him. Claimant took cover in the booth and tried to
            call for assistance and requested someone call 911. Claimant related he then went to
            the bathroom in the back of the booth. Looking out the window there, he saw the car
            and a person on his knees. Claimant related he saw the person drop to the ground but
            did not see the actual shooting. Claimant later learned that the person was a recently
            released inmate; the person had been on the other side of the street, waiting for a bus,
            and was chased back onto the prison grounds by the car.

      e.    Dr. Springer related that there were several factors causing Claimant's psychological
            condition, not just the March 18, 2021 incident. Dr. Springer related that Claimant was
            very disturbed and felt like he was being blamed for the person's death. Claimant felt

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

guilt that he was in the bathroom and not able to come out and protect the individual. Claimant felt that the prison blamed him for not being at his post. Claimant felt the news reporting made it seem like he was not fulfilling his duties. Claimant was anxious that there was a lawsuit that the person's family had filed against the prison and he was being blamed for the shooting. Claimant reported there was an issue with leaving the traffic arm up and he was uncertain whether he was going to be blamed for that. Claimant was uncertain regarding how his co-workers would treat him. Claimant was stressed as that the prison had potentially become more dangerous.

f.  In his examination, Dr. Springer performed two tests: the Structured Inventory of Malingered Symptomatology and the Trauma Symptom Inventory Two. The Structure Inventory of Malingered Symptomatology tests for people who are truly having symptoms or feigning symptoms. Dr. Springer related that there is a scale and a norm; Claimant had scores above the cutoff. The Trauma Symptom Inventory Two test assesses posttraumatic stress or other kind of traumatic exposures and resulting symptoms. Claimant scored extremely high on the test: over 99 percent on the posttraumatic stress and intrusive experience scales, which includes memories and flashbacks of the incident. Dr. Springer related that Claimant did not describe anything to that degree during his interview. Dr. Springer related that, generally, combat veterans have a score of 61 to 64 on the scale of posttraumatic stress trauma; Claimant scored over 75 on the test.

g.  Dr. Springer opined that Claimant did not have posttraumatic stress disorder but does have adjustment disorder and depressed mood. Dr. Springer explained that Claimant's diagnosis is related to feelings about the guilt that he could not help the man, the media portrayal, the lawsuit, the way Employer treated him, and his fear of going back to the prison and being around his coworkers.

h.  Dr. Springer related that, based upon Claimant's initial description contained in the memorandum drafted immediately following the incident, Claimant was in the bathroom when the incident occurred. Dr. Springer opined that Claimant was likely embarrassed and felt guilty that he was not at his post. Claimant did not experience the event directly; Claimant did not see anything. Dr. Springer related that, even if Claimant had seen a shooting, the incident is within the range of what a corrections officer could expect to see in a prison setting, which includes violence and death.

i.  Dr. Springer related that there needed to be a shift in focus of Claimant's treatment. Dr. Springer related that his treatment now focuses on reaffirming Claimant's view of himself having PTSD rather than his true issues. Dr. Springer recommended Claimant transition to a different focus in his treatment to help him to move forward.

5.  The parties agreed that Claimant's average weekly wage was $2,124.24, with a corresponding compensation rate of $1,130.00.

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

6.      This Judge has reviewed Claimant's testimony and finds it credible. Claimant's description of the incident is not disputed in any meaningful way. Indeed, the only minor inconsistencies in Claimant's description of the incident this Judge can ascertain pertain to whether Claimant actually witnessed the entirety of the shooting and the victim actually being struck by gunfire. Claimant's reaction to the incident, and his subsequent treatment, are not subject to any real debate. While the efficacy of that treatment is questioned, it is undisputed that Claimant sought and received treatment following the incident. Regarding Claimant's testimony as to his present condition, regardless of whether the source of same is PTSD or adjustment disorder with depressed mood, this Judge finds Claimant credible. While this Judge is aware that Claimant's reaction is, and always will be, subjective in some way, this Judge has no doubt that Claimant's reaction is earnest and true. This determination is based, in part, on Claimant's demeanor and deportment while testifying live.

7.      This Judge has reviewed the testimony of Dr. Kim and Dr. Springer and accepts the testimony of Dr. Kim, where they differ regarding Claimant's diagnoses and present status. Dr. Kim, as Claimant's treating therapist, is in a better position to diagnose and comment on Claimant's status, as compared to Dr. Springer. Despite not reading Claimant's deposition, Dr. Kim provided a clear understanding of Claimant's history and treatment and provided a clear, concise, and credible explanation of Claimant's symptoms and their relationship to the incident. Dr. Springer's opinions are rejected where they conflict with Dr. Kim.

8.      Regarding Claimant's Claim Petition, this Judge finds as follows:

   a.   Claimant was employed by Employer on March 18, 2021.

   b.   Claimant's time of injury average weekly wage was $2,124.24, with a corresponding compensation rate of $1,130.00.

   c.   On March 18, 2021, Claimant experienced an abnormal working condition in witnessing a violent shooting resulting in the death of another.

   d.   As a result of the abnormal working condition, Claimant suffered post-traumatic stress disorder, from which he has not recovered.

   e.   Claimant is entitled to indemnity benefits from March 18, 2021 and ongoing, together with statutory interest. Employer is entitled to a credit for all wages, Heart & Lung Act benefits, or any unemployment compensation paid to Claimant on and after March 18, 2021.

   f.   Employer is responsible for all reasonable and necessary treatment related to Claimant's post-traumatic stress disorder.

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

9.      Claimant's Penalty Petition is granted. Employer knew Claimant experienced the incident on the day it occurred. Following such incident, Claimant was referred to Employer's panel provider. Despite this, Employer failed to issue a Bureau document prior to June 30, 2021, more than three months after the incident. For such failure, Employer is penalized 30 percent of all indemnity benefits, plus interest thereon and notwithstanding any credit, payable to Claimant from March 18, 2021 to June 30, 2021.

10.     Claimant's counsel's contingent fee agreement is approved. Claimant's counsel is entitled to a twenty-percent fee calculated on Claimant's indemnity benefits. Except where such fee is to be paid as an unreasonable contest, as set forth below, Claimant's counsel's fee agreement is chargeable to and from Claimant's indemnity benefit award.

11.     Employer's contest regarding Claimant's Claim and Penalty Petitions was unreasonable up to the October 26, 2021 the date of Dr. Springer's examination. Regarding the Penalty Petition, Employer presented no evidence as to why it delayed three months prior to issuing a Bureau document despite having obvious notice of the incident and Claimant's request for treatment. For such unreasonable contest of the Penalty Petition, Claimant's counsel's twenty percent fee shall be calculated on, but not chargeable to, Claimant's awarded penalty.

        Regarding the Claim Petition, Employer's contest was reasonable only as of Dr. Springer's examination, which provided an alternative, though ultimately rejected, diagnosis and (unrelated) cause. While this Judge is aware it was, and remained, Claimant's relatively high burden to show an abnormal working condition gave rise to his claimed psychological injuries, Employer presented no evidence to contradict the basic and accepted facts of the incident's occurrence and Claimant's subsequent treatment. Employer presented no evidence, other than the anecdotal evidence provided by Dr. Springer's training and experience, to indicate that the violence at the heart of this matter was not abnormal. As such, Employer's contest of Claimant's Claim Petition was unreasonable until October 26, 2021. For such unreasonable contest of the Claim Petition, Claimant's counsel's twenty percent fee shall be calculated on, but not chargeable to, Claimant's awarded indemnity benefits for such time period. The calculation of the basis for such fee (i.e., Claimant's indemnity award) shall not include any credit for prior wages, Heart & Lung Act benefits, or unemployment compensation.

12.     Claimant's counsel expended reasonable litigation costs in the amount of $4,163.97 in successful prosecution of the Claim and Penalty Petitions. Employer shall reimburse Claimant's counsel for such costs.

13.     Claimant is not subject to a Domestic Relations lien.

## CONCLUSIONS OF LAW

1.      The parties are bound by the Workers' Compensation Act, as amended (Act).

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

2.      An employee who seeks workers' compensation benefits through an original claim
        petition has the burden to prove all of the elements necessary to support an award of
        those benefits, including the nature of the injury and the duration of any disability. Vista
        International Hotel v. WCAB (Daniels), 742 A.2d 640 (Pa. 2000); Fox v. WCAB (Eazor
        Express, Inc.), 373 A.2d 141 (Pa.Cmwlth. 1977); Inglis House v. WCAB (Reedy), 634
        A.2d 592 (Pa.Cmwlth. 1993).  While disabilities caused by psychological elements can
        be considered injuries under the Act, an employee who claims that the psychological
        disability resulted from emotional, non-physical stimuli at work bears a greater burden of
        proof than an employee whose alleged psychological disability results from physical
        injury or stimuli. Martin v. Ketchum, Inc., 568 A.2d 159 (Pa. 1990). As part of this
        burden, the employee must show that the work-related stress is caused by actual objective
        abnormal working conditions rather than subjective, perceived, or imagined employment
        events. Thomas v. WCAB (Atlantic Refining Co.), 423 A.2d 784 (Pa.Cmwlth. 1980).
        Determining whether a working condition is abnormal is highly fact sensitive and is
        based on the "content, intensity, duration, and frequency of the offending behavior."
        RAG (Cyprus) Emerald Resources, LP v. WCAB (Hopton), 912 A.2d 1278 (Pa. 2007).
        Events must be considered in relation to the specific employment. Antus v. WCAB
        (Sawhill Tubular Div. Cyclops Industries, Inc.), 625 A,2d 760 (Pa.Cmwlth, 1993).
        However, the conditions of employment, or the inherent risk related to the employment,
        does not determine whether a condition is abnormal or not and a singular, extraordinary
        event, may be considered abnormal despite its potential inclusion in that inherent risk or
        even in the presence of specific training relative to the risk. Payes v. WCAB
        (Commonwealth PA State Police), 79 A.3d 543 (Pa. 2013); Pennsylvania Liquor Control
        Board v. WCAB (Kochanowicz), 108 A.3d 922 (Pa.Cmwlth. 2014).

        Here, there is no dispute that Claimant bore witness to a disturbing event: the intentional
        killing of another individual. The circumstances of that killing, in relation to Claimant's
        employment, render the incident even more tragic. The victim, a former inmate, was killed
        after apparently seeking safety on the prison's grounds. The perpetrator of that killing was,
        arguably (and as feared by Claimant), aided in his killing by the prior actions of Claimant –
        leaving the metal arm raised. Claimant viewed the unintended consequences of his actions
        firsthand. The full extent of Claimant's experience with this tragedy is not completely
        known; however, whether Claimant actually witnessed the bullets striking the victim is,
        ultimately, irrelevant. Claimant's experience is sufficient to "involve" him in the event:
        Claimant's watching as the speeding vehicle followed the victim onto prison grounds, the
        eruption of gunfire (which Claimant initially, and not unreasonably, thought may have
        been directed at him), and watching the victim fall after having been struck.

        The question then remains whether this incident was abnormal or, as Employer contends,
        should be viewed in relation to Claimant's employment as a correction officer, a position
        for which violence, if not accepted, is expected. First, this Judge is not prepared to find,
        conclude, or declare that the violent event at the heart of this case is de rigueur for this
        employment or expected in today's society: the witnessing of a killing of one human

Dion Jones v. Curran-Fromhold Correctional Facility
DSP-8677666-1
Claim Petition; Penalty Petition

being by another should not be considered "normal", especially absent any contrary evidence. Given the totality of the circumstances, as set forth above, and including Claimant's unintended role in the occurrence of the incident, this Judge finds and concludes that the incident was abnormal and not incident to Claimant's employment. This Judge notes that the only evidence regarding the abnormality of these circumstances came from Claimant, notwithstanding anecdotal testimony from Dr. Springer. Employer's defense, or attack on Claimant's supporting evidence, boils down to the following: it is a prison; violence, even a killing, is expected and a circumstance for which Claimant was trained. While not its burden to establish the lack of "abnormality", Employer presented no evidence regarding the frequency of violence within Claimant's employment so as to conclude that this incident was not abnormal. Absent any evidence that this incident was either not abnormal or, while abnormal occurred directly as a result of Claimant's own malfeasance, this Judge is limited to the evidence presented, which, as herein stated, establishes an abnormal working condition resulting in Claimant's psychological disability.

3.   As set forth above, for its failure to issue timely Bureau documents accepting, or denying, the claim, Employer is penalized 30 percent of all indemnity benefits, plus interest thereon, payable to Claimant from March 18, 2021 to June 30, 2021.

4.   Employer's contest of the Claim and Penalty Petitions was unreasonable, in part, as set forth above.

DION JONES vs Curran-Fromhold Correctional Facility
DSP-8677666-1

## **ORDER**

AND NOW, Claimant's Claim Petition is GRANTED.

On March 18, 2021, Claimant experienced an abnormal working condition in witnessing a violent shooting resulting in the death of another. As a result of the abnormal working condition, Claimant suffered post-traumatic stress disorder, from which he has not recovered.

Claimant's time of injury average weekly wage was $2,124.24, with a corresponding compensation rate of $1,130.00. Claimant is entitled to indemnity benefits from March 18, 2021 and ongoing, together with statutory interest. Employer is entitled to a credit for all wages, Heart & Lung Act benefits, and any unemployment compensation paid to Claimant on and after March 18, 2021.

Employer is responsible for all reasonable and necessary treatment related to Claimant's post-traumatic stress disorder.

Claimant's Penalty Petition is GRANTED, as set forth herein. Employer is penalized 30 percent of all indemnity benefits, plus interest thereon, payable to Claimant from March 18, 2021 to June 30, 2021.

Claimant's counsel's contingent fee agreement is approved and calculated on Claimant's indemnity benefits. Except where such fee is to be paid as an unreasonable contest, as set forth below, Claimant's counsel's fee agreement is chargeable to, and from, Claimant's indemnity benefit award.

Employer's contest of the Claim and Penalty Petitions was unreasonable, in part. For the unreasonable contest of the Penalty Petition, Claimant's counsel's 20 percent fee shall be calculated on, but not chargeable to, Claimant's awarded penalty. For the unreasonable contest of the Claim Petition, Claimant's counsel's 20 percent fee shall be calculated on, but not chargeable to, Claimant's awarded indemnity benefits for such time period. The calculation of the basis for such fee (i.e., Claimant's indemnity award) shall not include any credit for prior wages, Heart & Lung Act benefits, or unemployment compensation.

Employer shall reimburse Claimant's counsel $4,163.97 in litigation costs as set forth herein.

Lawrence Beck

DION JONES vs Curran-Fromhold Correctional Facility
DSP-8677666-1

                                        Workers' Compensation Judge
                                        Philadelphia Field Office