# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RODNEY HARGROVE, *et al.*,

          *Plaintiffs,*

  v.

CITY OF PHILADELPHIA, *et al.*,

          *Defendants.*

CIVIL ACTION
NO. 21-4082

**PAPPERT, J.**                                                        **May 3, 2023**

## MEMORANDUM

Rodney Michael Hargrove was murdered hours after posting bail and being released, in the middle of the night, from the Curran Fromhold Correctional Facility. Taken by prison officials and left alone at a nearby SEPTA bus stop with no bus scheduled to arrive for roughly five hours, Hargrove was defenseless to individuals in a car who shot him to death after chasing him back on to CFCF property.

As co-administrators of their son's estate, Rodney and Cindy Hargrove sued the City of Philadelphia and Dion Jones, Warden Nancy Gianetta, Warden Michele Farrell and Prison Commissioner Blanche Carney. In their Second Amended Complaint, the Hargroves assert claims pursuant to 42 U.S.C § 1983 and Pennsylvania law. Specifically, Count I alleges Fourteenth Amendment due process claims against all defendants under the state-created danger theory. Count II contends all defendants deprived Hargrove of his constitutional rights by virtue of a special relationship created when Hargrove, as an inmate, was placed in their care. In Count III, Jones, Wardens Gianetta and Farrell and Commissioner Carney allegedly failed to intervene to prevent

Hargrove's death and Count IV asserts against the City a municipal liability claim based on the alleged underlying state created danger theory as well as a purported failure to train numerous prison employees. Counts V and VI allege, respectively, state-law wrongful death and survival actions.

The Defendants move to dismiss the federal claims on the merits and the state law claims in the absence of valid claims under federal law. During oral argument on the motion, Plaintiffs withdrew all claims against Dion Jones, all official capacity claims against the remaining individual defendants and Count III in its entirety. After considering the parties' submissions and hearing oral argument, the Court grants Defendants' Motion with respect to Count II and the failure to train claim in Count IV but denies the Motion with respect to all other state and federal claims.

I

Shortly after 1:00 a.m. on March 18, 2021, CFCF prison officials loaded twenty-year-old Rodney Michael Hargrove into a prison van and transported him to a SEPTA bus stop just off prison grounds after Hargrove posted bail. (Second Am. Compl. ¶ 1, ECF 27.) Although Defendants knew the area in which the bus stop was located had seen a substantial increase in homicides, they left Hargrove there, despite also knowing the next bus would not arrive until early morning. (*Id.* at ¶¶ 67–68, 71.) Despite having a policy of releasing prisoners around the clock, CFCF officials provided no secure area for Hargrove to wait while he arranged for transportation. (*Id.* at ¶¶ 60–61.)

As Hargrove waited in the dark, individuals in a car began shooting at him in an orchestrated ambush. (*Id.* at ¶¶ 3– 4, 21.) Hargrove ran back to the prison's parking

lot, but the parking lot's security booth was unmanned, and there was no one to help him.  (*Id*. at ¶¶ 2, 5, 86–87.)  The assailants followed Hargrove onto the prison's grounds, drove past a raised parking security arm and shot Hargrove ten times, killing him.  (*Id*. at ¶¶ 3–10.)

## II

To survive dismissal under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the pleaded facts "allow[] the court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Well-pleaded factual allegations are presumed to be true; the Court must "then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.  But this presumption "attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotations and citation omitted).  This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786–87 (3d Cir. 2016)).

## III

To state a claim under Section 1983, Plaintiffs must show that a person acting under the color of state law violated their son's protected constitutional rights.  *See*

*Morrow v. Balaski*, 719 F.3d 160, 165–66 (3d Cir. 2013).  The state-created danger theory of liability requires Plaintiffs to plausibly allege four elements: (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and Mr. Hargrove existed such that he was a foreseeable victim of the defendants' acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to Mr. Hargrove rendering him more vulnerable to danger than had the state not acted at all.  *Morrow*, 719 F.3d at 177.  Defendants correctly do not contest the third element (Hr'g Tr. 5:15, ECF 39) and Plaintiffs have alleged enough facts to establish the other three.

A

The first prong of the state-created danger theory asks whether "the harm ultimately caused was a foreseeable and a fairly direct result of the state's actions." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 908 (3d Cir. 1997).  To allege that it was, Plaintiffs need only "allege an awareness on the part of the state actors that rises to the level of actual knowledge *or an awareness of risk* that is sufficiently concrete to put the actors on notice of the harm." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 245 (3d Cir. 2016) (emphasis in original) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 238 (3d Cir. 2008)).

Plaintiffs define the harm they claim to have been foreseeable as "bodily harm" to Mr. Hargrove.  (Hr'g Tr. 55:2, ECF 39.)  They contend bodily harm was a foreseeable and fairly direct result of the Defendants taking Hargrove to the bus stop and leaving

4

him there, knowing they were leaving him, alone, in a high crime area with no available transportation and no SEPTA buses running for at least five hours. (Second Am. Compl. ¶¶ 11, 66–68; Hr'g Tr. 54: 23–55:2.) Defendants argue that a more specific type of harm, such as a "violent assault"—as opposed to the specific way Mr. Hargrove was killed—must have been foreseeable. (Defs.' Mem. L. Supp. Third Mot. Dismiss 7, ECF 29-1; *see also* Hr'g Tr. 6:1, 7:4–5.)

Setting aside for a moment that before dying Hargrove was indeed "violently assaulted," foreseeable harm on these alleged facts constitutes "the harm likely to befall" Hargrove, someone left alone to his own devices in a high crime area in the middle of the night. *See Kneipp v. Tedder,* 95 F.3d 1119, 1208 (3d Cir. 1996) (foreseeable that an intoxicated woman separated by police from her husband and left to walk home alone at night in freezing weather would fall, injure herself and suffer hypothermia).

In *L.R. v. School District of Philadelphia*, 836 F.3d 235 (3d Cir. 2016), a woman entered an elementary school, refused to produce identification as the purported mother of a kindergartener and yet was allowed by the teacher to take the child, whom she then sexually assaulted. *Id.* at 836 F.3d at 240. In affirming the District Court's refusal to dismiss the state-created danger claim, the Third Circuit found that "the risk of harm in releasing a five-year-old child to a complete stranger was obvious." *Id.* at 245. In comparing the case to *Kneipp*, the court found the risk of harm in both situations to be not only foreseeable, but obviously so. *Id.*

> Here, it was foreseeable that releasing a young child to a stranger could result in harm to the child. This inherent risk is not only a matter of experience as a teacher in charge of a kindergarten classroom, but, as in *Kneipp*, it is also a matter of common sense.

5

> Regardless of which of the many apparent risks of harm—whether kidnapping, child pornography, human trafficking, sexual assault or some other violation—came to pass, [the child's teacher] knew, or should have known, about the risk of his actions.

*Id.* In both *Kneipp* and *L.R.*, the official was not required to know the specific harm that would befall each plaintiff. Instead, the harm in each case was foreseeable because the state actor should have been aware of the risks in each situation.

Defendants rely on *Mohammed ex rel. Mohammed v. School District of Philadelphia*, 355 F. Supp. 2d 779, 784 (E.D. Pa. 2005), *aff'd sub nom. Mohammed v. Sch. Dist. of Phila.*, 196 F. App'x 79 (3d Cir. 2006) for the proposition that the risk of "bodily harm" to Hargrove was too general to be foreseeable. (Defs.' Mem. L. Supp. Third Mot. Dismiss 7, ECF 29-1; Hr'g Tr. 23:23–24:2, ECF 39.) In *Mohammed*, a student walking up a stairwell found himself behind another student who was about to be attacked by a third party. *Id.* at 781. As the attacker attempted to punch his intended target, the intended victim ducked, with Mohammed instead catching the punch in the face, harm the court found was not foreseeable. *Id* at 781, 784. Defendants also point to the court's finding that "evidence that [the high school] was a dangerous environment generally is insufficient to establish that [Mohammed] would be punched in the stairwell." *Mohammed*, 355 F. Supp. 2d at 784; *see* (Hr'g Tr. 23:23–24:2, ECF 39).

Defendants' reliance on Mohammed is misplaced. Although the Third Circuit affirmed the District Court's finding that there was no state-created danger, it did not agree that Mohammed's harm was unforeseeable. The Court of Appeals held that "[b]ecause of the atmosphere of violence that permeated Olney High School, it was

foreseeable that Richard Mohammed, or any student, could have been attacked at any time and in any location by another student." *Mohammed*, 196 F. App'x at 81.

Defendants also contend this case is more akin to *Morse v. Lower Merion School District*, 132 F.3d 902, 904 (3d Cir. 1997), than *L.R.* or *Kneipp*. *See* (Defs.' Mem. L. Supp. Third Mot. Dismiss 8, ECF 29-1). In *Morse*, a mentally ill individual entered a school through an unlocked door and shot and killed a teacher. *Morse*, 132 F.3d at 904. The Third Circuit held that "defendants, as a matter of law, could not have foreseen that allowing construction workers to use an unlocked back entrance for access to the school building would result in the murderous act of a mentally unstable third party, and that the tragic harm which ultimately befell Diane Morse was too attenuated from defendants' actions to support liability." *Id.* at 908. The court stated that prior cases finding liability under the state-created danger theory had never "stretch[ed] the concepts of foreseeability and causation this far." *Id.* at 909.

While not "stretching" the concept of foreseeability, *Morse* did not narrow it to the extent Defendants think. Central to the Circuit's analysis was that "the complaint contain[ed] no allegation . . . that would demonstrate that defendants were aware of the likelihood that a mentally deranged person would enter the school in search of a victim," and defendants "were unaware that any mentally deranged person, let alone Stovall, was waiting outside the building for an opportunity to cause harm." *Id.* at 910.

The Hargroves allege that Defendants were aware of the risk of late-night prison releases, and specifically of the dangers and risk of harm attendant to leaving their son alone at that bus stop in the middle of the night. (Second Am. Compl. ¶ 11, ECF 27.) They allege that the City's overall rising crime rates—and specifically the increased

incidents of crime in the police district where the Defendants left their son—made it foreseeable to them that Rodney Hargrove could be "violently assaulted."  Plaintiffs augment their allegations with newspaper articles, from more than a year and a half before Hargrove's death, making public Defendants' knowledge that it was dangerous to leave released inmates in that area.[1]  (*Id.* at ¶¶ 11, 12, 71–73.)  Specifically, on August 12, 2019, the *Philadelphia Inquirer* reported that when CFCF released prisoners at night, they were taken to the same SEPTA bus stop where Hargrove was left, even though no buses ran after 1:00 a.m.  *See* Pranshu Verma, *Each Night, Philly Jails Release Scores of Inmates Without Returning Their IDs, Cash or Phones*, PHILA. INQUIRER, (Aug. 12, 2019).  The Director of Prison Services for the Defender Association of Philadelphia was quoted in the story saying that when inmates are released after the buses stop running, "they're screwed."  *Id.*  Notably, a Department of Prisons spokesperson told the newspaper "the Department of Prisons has a policy of not releasing females after 1 a.m. because there is no public transportation available," and that the Department tries to "discourage" the late-night release of women.  *Id.*

The following day, another *Inquirer* article reported that the Department of Prisons extended its cashier's office hours giving inmates greater access to their phones and IDs upon release, with Commissioner Carney stating, "[s]afety is our first priority," and that the Department of Prisons was working to "decrease late night releases."  *See* Prashnu Verma, *Philly Jails Extend Cashier Hours, But Most Inmates Still Would Be Released Without IDs, Cash, or Phones*, PHILA. INQUIRER, (Aug. 13, 2019).

---

[1]      *See Est. of Roman v. City of Newark,* 914 F.3d 789, 799 (3d Cir. 2019) (considering the contents of a news article referenced in the complaint when assessing municipal liability.)

Taken all together, Plaintiffs have plausibly alleged that Hargrove, by being taken to a bus stop and left there in the middle of the night, alone and with no busses running until morning, was at a foreseeable risk of being violently assaulted (or worse) and that Defendants were aware of that risk—having previously taken precautions to protect women from being harmed.

B

Second, the Defendants' conduct must "shock the conscience." *Id*. What does so "depends on the circumstances of each case, and the threshold for liability varies with the state actor's opportunity to deliberate before taking action." *Kedra v. Schroeter*, 876 F.3d 424, 437 (3d Cir. 2017). Split-second decisions taking place in a "hyperpressurized environment," usually do not shock the conscience unless they are done with "an intent to cause harm," while "unhurried judgments" made after careful deliberation may shock the conscience if done with "deliberate indifference." *L.R.*, 836 F.3d at 246. Deliberate indifference is defined as a "conscious disregard of a substantial risk of serious harm," though when a risk is so obvious that it should be known, deliberate indifference can exist without actual knowledge of a risk of harm. *Id*.

The deliberate indifference standard applies in assessing the Defendants' conduct. They had ample time to make an unhurried judgment in deciding when and how to release inmates from custody. Plaintiffs allege Defendants had actual knowledge of the risks of late-night inmate releases because the prison had separate policies for the after-hours release of men and women. *See supra* Section III.A. Despite this knowledge, Defendants continued to release inmates, in some cases alone, into a high crime area in the middle of the night with no available transportation. These facts

9

could establish Defendants' conscious disregard of a substantial risk of harm befalling released inmates like Mr. Hargrove.

C

The fourth factor requires a showing that "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Morrow v. Balaski*, 719 F.3d 160, 177 (3d Cir. 2013). Although "[t]his element is often contested because of the inherent difficulty in drawing a line between an affirmative act and a failure to act," *L.R.*, 836 F.3d at 242, that line is easily drawn here. Defendants affirmatively acted in a way that made Hargrove more vulnerable to danger than had they not acted at all. Specifically, they "loaded [Hargrove] into the prison van and ordered him to get out of the van and stand in the dark at the desolate SEPTA bus stop." (Second Am. Compl. ¶ 66, ECF 27.) In short, Hargrove was in a far worse off position after Defendants affirmatively used their authority than before they did so.

IV

In Count II, Plaintiffs allege a due process violation on the theory that a special relationship existed between Defendants and Hargrove. A "special relationship" exists "only in certain limited circumstances, such as when the state takes a person into custody and holds him there against his will." *Kneipp*, 95 F.3d at 1205; *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197–98 (1989). "[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, *or other similar restraint of personal liberty*—which is the 'deprivation of liberty' triggering the protections of the

10

Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Morrow*, 719 F.3d at 168 (emphasis in original) (quoting *DeShaney,* 489 U.S. at 200).

Counsel at oral argument correctly chose not to protest too much on this one. (Hr'g Tr. 70:6–21).  Plaintiffs fail to allege facts that demonstrate a special relationship existed between Hargrove and Defendants at the time of the attack because they fail to allege Defendants were restraining Hargrove's liberty.  To the contrary, Plaintiffs acknowledge that Defendants released Hargrove at the bus stop and that for between forty and fifty minutes after being left there, Hargrove's freedom or liberty was not restrained.  (Second Am. Compl. ¶¶ 66, 69; Hr'g Tr. 70:2–71:7.)

V

Plaintiffs also bring a claim for municipal liability pursuant to *Monell v. Department of Social Service,* 436 U.S. 658 (1978).  Under *Monell,* a municipality cannot be held liable under Section 1983 based solely on the conduct of its employees. *Id.* at 691.  For liability to attach under Section 1983, the municipality itself must cause the constitutional violation at issue.  *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989).  A successful *Monell* claim must therefore establish: (1) an underlying constitutional violation; (2) a policy or custom attributable to the municipality; and (3) that the constitutional violation was caused by the municipality's policy or custom. *Wilson v. City of Phila.*, 177 F. Supp. 3d 885, 908 (E.D. Pa. 2016) (citing *Monell*, 436 U.S. at 658).  The municipality is liable when either the policy or custom facially violates the Constitution, or if not unconstitutional itself, is the "moving force" behind the constitutional violation.  *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir.

11

2014).  As explained above, Plaintiffs have adequately pleaded an underlying constitutional violation under the state-created danger theory.

A

A policy is created "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict, while a custom "can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quotations and citations omitted).  Regardless, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (citing *Andrews*, 895 F.2d at 1480). However, a plaintiff need not specifically identify the responsible decisionmaker in the pleadings, nor must a plaintiff prove the custom had the City's formal approval.  *Est. of Roman*, 914 F.3d at 798.

After identifying the policy or custom, the Plaintiff must also show that it was the "proximate cause" of his injuries by demonstrating a "plausible nexus" or "affirmative link" between the municipality's policy or custom and the specific harm sustained.  *Bielevicz*, 915 F.2d at 850; *see also Est. of Roman,* 914 F.3d at 798. Plaintiffs can establish custom as the proximate cause of an injury by demonstrating the City had knowledge of "similar unlawful conduct in the past, . . . failed to take precautions against future violations, and that [its] failure, at least in part, led to

12

[Hargrove's] injury." *Est. of Roman,* 914 F.3d at 798 (quoting *Bielevicz,* 915 F.2d at 851).

Plaintiffs have adequately alleged, as supplemented by the news stories in local media discussed, that the City had a policy or custom of releasing inmates late at night into a high crime area with no reliable mode of transportation, proximately causing Hargrove's death.  (Second Am. Compl. ¶¶ 161–168.)  Plaintiffs allege that the City of Philadelphia owns and operates the Philadelphia Department of Prisons, which owns, operates, and is responsible for the policies and procedures at CFCF.  (*Id.* at ¶¶ 20–22.)  Plaintiffs allege that Warden Gianetta, Warden Farrell, and Commissioner Carney were decision-makers for CFCF and had knowledge and control over the policy of late-night prison releases.  (*Id.* at ¶¶ 23–36, 51); Pranshu Verma, *Each Night, Philly Jails Release Scores of Inmates Without Returning Their IDs, Cash or Phones*, PHILA. INQUIRER, (Aug. 12, 2019) ("Philadelphia's policy is to release people as soon as orders are signed—regardless of the time of day.")

With respect to custom, Plaintiffs have demonstrated that the City's practice of releasing prisoners late at night with no accessible transportation was a well-settled and permanent one, and that Commissioner Carney knew of and acquiesced to it.  (Second Am. Compl. ¶¶ 55–59, ECF 27.)  Additionally, through the same allegations referenced above, Plaintiffs have plausibly alleged this custom was the proximate cause of Hargrove's death.

## B

Plaintiffs also seek to hold the City liable for Hargrove's death based on the theory that it failed to train numerous unnamed prison department and CFCF staff on

a myriad of functions.  (Second. Am. Compl. ¶ 170a–l, ECF 27.)  A *Monell* claim based

on a municipality's failure to train its employees is subject to different pleading

requirements.  *Est. of Roman*, 914 F.3d at 798.  To establish liability under a failure to

train theory, a plaintiff need not allege a municipal policy or custom, but must show

that the failure to train amounts to a "deliberate indifference" to the rights of persons

with whom employees come into contact.  *Forrest v. Parry*, 930 F.3d 93, 107 (3d Cir.

2019).  A plaintiff alleging deliberate indifference must show that the "(1) municipal

policymakers know that employees will confront a particular situation, (2) the situation

involves a difficult choice or a history of employees mishandling, and (3) the wrong

choice by an employee will frequently cause deprivation of constitutional rights."

*Forrest*, 930 F.3d at 106 (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir.

1999)),

Usually, "a pattern of similar constitutional violations by untrained employees is

necessary to demonstrate deliberate indifference for purposes of failure to train."

*Thomas,* 749 F.3d at 223 (quotation omitted).  This is because "[w]ithout notice that a

course of training is deficient in a particular respect, decisionmakers can hardly be said

to have deliberately chosen a training program that will cause violations of

constitutional rights."  *Id.* at 222 (quotation omitted).  However, under certain

circumstances, a single incident can implicate municipal liability where "the need for

training can be said to be so obvious, that failure to do so could properly be

characterized as deliberate indifference to constitutional rights even without a pattern

of constitutional violations."  *Id.* (quotation omitted); *see Canton,* 489 U.S. at 390 n.10.

Plaintiffs proceed under this theory.  (Hr'g Tr. 73:22–74:1.)  A plaintiff's burden "in

such a case is high." *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000).  In order to establish deliberate indifference from a single-incident violation, Hargrove's death must be a "highly predictable consequence" of the City's failure to train its employees. *Thomas*, 749 F.3d at 225 (quoting *Connick v. Thompson*, 563 U.S. 51, 64 (2011)).

Additionally, "the identified deficiency in a city's training program must be closely related to the ultimate injury," which requires a plaintiff to show that the deficiency in training "actually caused" the constitutional violation. *Canton*, 489 U.S. at 391.  Such a high standard of causation is required because in "virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city could have done to prevent the unfortunate incident." *Id.* at 392 (quotations omitted).  Accordingly, a plaintiff bringing a Section 1983 claim under a failure to train theory "must identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1030 (3d Cir. 1991).

Plaintiffs allege in conclusory fashion that the City failed to train employees on the general need for, *inter alia*, timely processing of bail payments and paperwork, to be informed of the SEPTA bus schedules, of an awareness of the time-sensitive consequences of delays, on safe alternatives for inmate release, safe transportation, safe locations for waiting for transportation and appreciation of the dangers of late-night releases.  (Second Am. Compl. ¶ 170, ECF 27).  Although Plaintiffs recite a litany of

ways the City failed to train its employees in isolated tasks, a failure to train theory cannot be established "solely on a showing that the City's employees could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury." *Colburn,* 946 F.2d at 1029–30.

Plaintiffs' failure to train claim fails because "the link between [the constitutional violation] and the alleged deficiencies in the training program is simply too tenuous." *Forrest v. Parry*, 930 F.3d 93, 109 (3d Cir. 2019). Although Plaintiffs argue that these shortcomings are all "part of a causal chain," (Hr'g Tr. 80:10, ECF 39), these alleged deficiencies in employee training are not closely connected to the underlying constitutional violation. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985) (finding that the allegation of inadequate police training was "nebulous, and a good deal further removed from the constitutional violation.") In *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989), the Supreme Court was explicit that "the identified deficiency" in the training program must be "closely related" and have "actually caused" the constitutional violation. *Canton*, 489 U.S. at 391–92. Here, Plaintiffs allege unknown individuals who work at CFCF were improperly trained in bail processing. Yet these individuals, and their functions at the prison, are too attenuated from the constitutional violation: the decision to drop Hargrove off at the bus stop in the middle of the night, without, for instance, providing him with a secure area in which to wait or arranging alternate transportation for him, knowing that public transportation was not an option. Because the deficiency in training must "actually cause" the constitutional violation, Plaintiffs' "domino effect" theory is insufficient to sustain a failure to train claim in this case. (Hr'g Tr. 82:21, 84:6–7, ECF 39.)

16

VI

Finally, because Plaintiffs have stated claims under Section 1983, the Court will

retain supplemental jurisdiction over the state-law claims.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.