IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RODNEY HARGROVE, et al., *Plaintiffs,* v. CITY OF PHILADELPHIA, et al., *Defendants.* | CIVIL ACTION NO. 21-4082 |

**Pappert, J.**                                                                                                    **December 8, 2025**

## MEMORANDUM

In the early morning hours of March 18, 2021, Curran-Fromhold Correctional Facility officials released Rodney Michael Hargrove after he posted bail. He was placed in a van, along with four other released inmates, and taken outside the prison's gates, near a SEPTA bus stop. Minutes later, Ameen Hurst murdered Rodney in a drive-by shooting. The two did not know each other; Hurst mistook Rodney for a rival.

As co-administrators of their son's estate, Rodney and Cindy Hargrove filed this lawsuit under 42 U.S.C. § 1983 against the City of Philadelphia, Philadelphia Department of Prisons Commissioner Blanche Carney, Warden Nancy Gianetta, Warden Michelle Farrell and Correctional Officer Dion Jones. They asserted claims under the Fourth and Fourteenth Amendments to the United States Constitution, as well as related tort claims under Pennsylvania law.

The Court previously dismissed the claims against Jones and certain claims against Carney, the City, Gianetta and Farrell. *Hargrove v. City of Philadelphia*, 671 F. Supp. 3d 595 (E.D. Pa. 2023). And the parties recently agreed to dismiss the remaining claims against Gianetta and Farrell, leaving the Hargroves' (1) Fourteenth

1

Amendment state-created-danger claim, and derivative Pennsylvania tort claims, against Carney and (2) *Monell* claim against the City. The Hargroves, Carney and the City all moved for summary judgment. After reviewing the record, considering the parties' submissions and hearing oral argument, the Court grants the defendants' motion and denies the Hargroves'.

The Hargroves fail to establish their state-created-danger claim. No reasonable jury could find (1) Rodney suffered a foreseeable and fairly direct harm, (2) Carney acted with deliberate indifference or (3) Carney took an affirmative act putting Rodney in harm's way. And with no state-created-danger claim, the Hargroves cannot prevail on their state-law and *Monell* claims.

I

On March 10, 2021, Rodney Michael Hargrove was arrested for fleeing from police following a traffic stop. (Phila. Police Dep't Arrest Rep. at 000019, Dkt. No. 83-1); *see also* (Mun. Ct. Dkt. at 01577, Dkt. No. 75-5). He was incarcerated the following day at the Curran-Fromhold Correctional Facility in Northeast Philadelphia. (Admission Hist. Rep. at 01662, Dkt. No. 83-2.)

At 9:30 p.m. on March 17, the Philadelphia Department of Prisons verified the posting of Rodney's bail. (Phila. Dep't of Prisons Release Checklist & Inst. Release Notice at 01582, Dkt. No. 75-7.) Once an inmate posts bail, he is entitled to timely release—no matter the time of day. *See* (Phila. Prisons Pol'ys & Procs. at 00366, Dkt. No. 75-18). But before releasing an inmate, PDP staff must follow various administrative procedures. *See* (*id.* at 00370–76). It usually takes four hours for the PDP to effectuate the release of an inmate. *See* (Patricia Powers Dep. at 94–95, Dkt.

No. 72-8). At the time Rodney was in the CFCF, an executive order issued by Commissioner Carney in February of 2018 governed the actual release of inmates. Under the order, prison officials drove released inmates to the SEPTA stop across from the CFCF's driveway. (Exec. Order 18-01 at 01753–54, Dkt. No. 75-20.)

The PDP released Rodney about four hours after his bail posted. At 12:43 a.m. on March 18, Rodney retrieved his personal belongings: $109 in cash, a cell phone and keys. (Lock & Track Rep. at 4–5, Dkt. No. 83-3.) Then, at about 1:50 a.m., prison officials placed Rodney in a van, along with four other inmates, and dropped them at the front of the CFCF's driveway. (Special Investigations Rep. at 01682, Dkt. No. 75-9.) One of the inmates was picked up in the driveway; Rodney and the three others walked across the street to the SEPTA stop. (*Id.*) The next bus was scheduled to arrive approximately four hours later, at around 6:00 a.m. *See* (SEPTA Schedules at 46–55, Dkt. No. 27).

A few minutes later, at about 1:57 a.m., Ameen Hurst drove up in a dark sedan, chased Rodney back onto CFCF property and shot him several times. *See* (Aff. of Probable Cause at 000008, Dkt. No. 75-12); (Medical Examiner Rep. at 000137, Dkt. No. 75-11). Hurst thought Rodney was a rival named "Sid," who was also an inmate at the CFCF and who bore a "striking resemblance" to Rodney. (Aff. of Probable Cause at 1.) Medical personnel pronounced Rodney dead a few minutes after the shooting. (Special Investigations Rep. at 01681).

## II

Federal Rule of Civil Procedure 56 directs a district court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This language compels judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A nonmoving party fails to satisfy this standard if "the record taken as a whole could not lead a rational trier of fact to find" in his favor. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal quotation marks and citation omitted). The nonmoving party must identify "specific facts, as opposed to general allegations," establishing each element of his claim. 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2727.2 (4th ed. 2016). Faced with cross-motions for summary judgment, the Court must "rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* § 2720.

## III

Section 1983 allows plaintiffs to sue state actors who violate their federal constitutional rights. 42 U.S.C. § 1983. The Hargroves claim Carney violated the substantive due process guarantees of the Fourteenth Amendment because her executive order requiring inmates to be released at the SEPTA stop placed Rodney in danger—here by exposing him to his killer.

Such a claim emanates from the United States Supreme Court's opinion in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989). There, a four-year-old named Joshua DeShaney suffered permanent brain damage after being beaten by his father, with whom he lived and about whom county social workers

4

had received several abuse complaints. *Id.* at 191. The county officials "had reason to believe" the abuse was ongoing but "did not act to remove [Joshua] from his father's custody." *Id.* In fact, after officials took Joshua into state custody for a short period of time, they returned him to his father, who beat him severely. *Id.* at 192–93. The Supreme Court held the officials' actions did not violate the Due Process Clause of the Fourteenth Amendment. "[N]othing in the language of the Due Process Clause itself," the Supreme Court reasoned, "requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195.

The Court's opinion, however, gave rise to an exception to this general rule. The Court stated that "[w]hile the State may have been aware of the dangers that [Joshua] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201. After *DeShaney*, the Third Circuit Court of Appeals crafted from this language a "state-created-danger" constitutional tort. *See Johnson v. City of Philadelphia*, 975 F.3d 394, 398–99 (3d Cir. 2020) (recounting the origins of the state-created-danger claim). To establish such a claim, the Hargroves must prove: (1) Rodney suffered a "foreseeable and fairly direct" harm, (2) Carney "acted with a degree of culpability that shocks the conscience," (3) Rodney was a "foreseeable victim" or a "member of a discrete class of persons" potentially harmed by Carney's actions and (4) Carney "affirmatively used [her] authority" to "create[] a danger" to Rodney or to make him "more vulnerable to [the] danger." *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotation marks and citation omitted).

A

The Hargroves must initially show the "harm ultimately caused" to Rodney "was a foreseeable and a fairly direct result" of Carney's conduct. *Phillips v. County of Allegheny*, 515 F.3d 224, 237 (3d Cir. 2008). The Hargroves define the "harm ultimately caused" as "bodily harm." But defining the relevant harm at such a high level of generality vitiates the foreseeability inquiry. At the appropriate level of generality—a reasonably particularized one—the harm Rodney suffered is physical violence. *See e.g.*, *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 909 (3d Cir. 1997) (defining the harm a teacher suffered when a mentally ill person killed her in school as a "deadly attack"); *Phillips*, 515 F.3d at 238 (defining the harm at issue in *Morse* as "violence"); *Quinn v. Badolato*, 709 F. App'x 126, 130 (3d Cir. 2017) (explaining the "relevant harm" is the specific harm suffered—there, a plaintiff "breaking his wrist") (emphasis deleted).

1

To prove Rodney suffered foreseeable violence, the Hargroves must show Carney had "actual knowledge or an awareness of risk that [wa]s sufficiently concrete to put [her] on notice of the harm." *Phillips*, 515 F.3d at 238. Proving an "awareness of risk" requires the Hargroves to show Carney—based on "information" available to her—had a "sufficiently concrete" "awareness of [a] risk" of violence to Rodney. *Id.*; *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 245 (3d Cir. 2016); *Mears v. Connolly*, 24 F.4th 880, 884–85 (3d Cir. 2022). They cannot do so on this record.

To begin, there is no evidence upon which a jury could find Carney had notice of "the danger posed by [Hurst]" on the day he killed Rodney. *Morse*, 132 F.3d at 908.

Carney did not know Hurst would be waiting outside the CFCF when Rodney was released, nor for that matter did Rodney—there is nothing to indicate he and Hurst even knew each other. *See id.*; *Est. of Smith v. Marasco*, 318 F.3d 497, 508 (3d Cir. 2003). Even if she did, Carney had no notice of Hurst's "violent propensities" or his "history of violent behavior." *Morse*, 132 F.3d at 908. There is no record evidence to show Hurst had threatened Rodney or any other inmate released on March 18. *Id.*

Nor is there evidence that Carney had any reason to know that newly released inmates faced "a credible threat of violence" outside the CFCF. *Id.* Nothing in the record could show that violent individuals customarily loitered outside the CFCF. *See id.*; *Est. of Smith*, 318 F.3d at 508. And no "prior incidents with similar circumstances" put Carney on notice of a risk of violence to Rodney. *Lesher v. Zimmerman*, 822 F. App'x 116, 120 (3d Cir. 2020); *Morse*, 132 F.3d at 908. In the more than three years between the executive order's issuance (February of 2018) and Rodney's murder (March of 2021), not one released inmate suffered any act of violence outside the CFCF. (Tr. of Oral Arg. at 24:1–8.) And there is nothing which could show such an "atmosphere of violence . . . permeated" the area outside the CFCF that any newly released inmate "could have been attacked at any time." *Mohammed v. Sch. Dist. of Phila.*, 196 F. App'x 79, 81 (3d Cir. 2006).

Counsel acknowledged that there was nothing in the record to show Carney was aware of a credible threat of violence to persons at the SEPTA stop, with one exception: Before Rodney's murder, a newly released inmate had attacked a correctional officer in the CFCF parking lot. (Tr. of Oral Arg. 57–58.) But this does nothing to evidence any risks to released inmates.

7

To be sure, certain risks of harm are "obvious." *L.R.*, 836 F.3d at 245. A kindergarten teacher, for example, should know the risk that a small child released to an unidentified stranger in violation of school policy could be a victim of physical abuse. *Id.* at 245–46. Police officers should know the risk of injury in allowing a woman to drunkenly stagger home by herself in the freezing cold. *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996); *L.R.*, 836 F.3d at 245 (characterizing *Kneipp* as a case involving common sense). And a nurse should know the risk of attack in leaving someone alone with a violent psychiatric patient. *Mears*, 24 F.4th at 885. This is not such a case. The risk of violence in releasing a male inmate, and four others, with cash and a phone near a SEPTA stop in the early morning hours across from a correctional facility patrolled by armed guards is not "obvious." *See* (Tr. of Oral Arg. at 28–29).

The Hargroves try in various ways to show that Rodney's murder was a foreseeable result of Carney's conduct. None of them succeed. *First*, they argue certain newspaper and online articles put Carney on notice that Rodney was at risk of being killed. As an initial matter, these stories are inadmissible hearsay, which cannot be considered at summary judgment. *Sec. & Data Techs., Inc. v. Sch. Dist. of Phila.*, 145 F. Supp. 3d 454, 463 (E.D. Pa. 2015). The Hargroves contend they offer the articles, not to prove the truth of their contents, but rather to prove foreseeability—to show Carney had an awareness of a risk of violence to Rodney. *See* (Tr. of Oral Arg. at 45:17–25, 46:1–25, 47:1–25); (Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. at 7, Dkt. No. 89-1). But the Court would seemingly have to presume the truth of the facts the articles reported to assess any risk Rodney faced. And in any event, Carney apparently did not read the articles, making it difficult to find they put her on notice of anything. She

8

testified that before Rodney's death she "[n]ever read any articles" addressing the "potential dangers of late-night prison releases" from the CFCF. (Blanche Carney Dep. at 88:16–24, Dkt. No. 75-25.)

Even if the Court could consider them, and even if Carney knew of them, the articles provide no evidence that Rodney's murder was foreseeable. The Hargroves first point to an August 12, 2019 article in the *Philadelphia Inquirer*, which primarily claimed the PDP had released thousands of inmates from Philadelphia jails without giving them their personal belongings—"cash, phone or other possessions." (Each Night, Philly Jails Release Scores of Inmates Without Returning their IDs, Cash or Phones at 000354, Dkt. No. 75-22.) The article opines that, "the first 72 hours after an inmate is released are critical" and "[w]ithout identification and other possessions, simple things such as buying food, getting prescriptions and putting a cell phone number down for a job interview or a landlord can prove impossible." (*Id.* at 000354.) This, however, does not show newly released inmates faced a risk of physical violence outside the CFCF; and here, Rodney had his cash, phone and keys. The Hargroves emphasize one quote from Tom Innes, the director of prison services for the Defender Association of Philadelphia, who said that if inmates are released from the CFCF in the middle of the night, after "buses quit running," they are "screwed." (*Id.* at 000357.) At oral argument, counsel said that "screwed" means "there could be harm, there could be trouble." (Tr. of Oral Arg. at 47:19–20.) Even if that characterization is true, such a generalized assertion cannot prove Carney had a concrete awareness that newly released inmates faced a risk of physical violence outside the CFCF when the buses were not running.

The Hargroves also invoke a February 2018 *WHYY* article in which a purported member of the Center for Returning Citizens said in relevant part: "On any given night, you can ride down State Road [outside the CFCF] and folks are being released at 10, 11, 12 o'clock at night . . . [and with no support] their first thought is going to be predatory . . . perhaps City Council and the prisons system need to look at what is a more equitable way to release people to make sure they don't come right back into the system or a tragedy doesn't happen." (City: Just-Released Inmate Shot After Ambushing Philly Prison Guard at 3–4, Dkt. No. 75-31.) Again, nothing in this story sheds any light on how newly released inmates supposedly face a risk of violence outside the CFCF.

The Hargroves next point to a February 2021 story from the *Fox 29* website discussing Philadelphia's higher homicide rate in the first few months of 2021 before Rodney's death. (Phila. Homicides Up 55% So Far in 2021 at 1–4, Dkt. No. 75-29.) Whatever the citywide homicide rate was or wasn't on the morning of Rodney's release does nothing to show Carney had a concrete awareness of a risk of physical violence to Rodney at a bus stop within view of the CFCF and the people who guard it.

*Second*, the Hargroves argue four PDP policies put Carney on notice that taking Rodney to the bus stop placed him in danger. The first stated that any inmate "judged to be in need of psychiatric impatient treatment, or who is unable to care for themselves . . . will not be released after 5:00 PM absent the availability of family or the equivalent to accept and care for the inmate." (Phila. Prisons Policy 4.C.3 at 00377, Dkt. No. 75-18.) The second stated the PDP would transport newly released homeless inmates to shelters. (Deborah A. Snyder Dep. at 34–37, Dkt. No. 75-27.) The third allowed newly

10

released inmates to stay within the facility during inclement weather. (Blanche Carney Dep. at 39–41.) And the fourth allegedly permitted female inmates released in the middle of the night to stay within the facility until they could find a ride home. (Xavier Beaufort Dep. at 23–24, Dkt. No. 75-24.) Based on these policies, the Hargroves say, Carney knew "danger could befall vulnerable individuals." (Pls.' Br. in Supp. of their Mot. for Summ. J. at 14, Dkt. No. 75-2.)

This case's foreseeability inquiry is not whether Carney knew some undefined danger or harm could befall vulnerable individuals. The question instead is whether Carney had a concrete awareness of a risk of violence to Rodney, and nothing in these policies gave her one.

*Third*, the Hargroves cite an executive order issued by Carney in November of 2019. Executive Order 19-03 established a "protocol for ensuring the safety of newly-released inmates and citizens who may be in danger on or in close proximity to Philadelphia Department of Prisons (PDP) grounds." (Exec. Order 19-03 at 01752, Dkt. No. 75-21.) In relevant part, the order states that when "PDP staff observe a newly-released inmate or any citizen in danger, appropriate action is to be taken to ensure his/her safety when circumstances warrant." (*Id.*) In issuing Executive Order 19-03, the Hargroves argue, Carney "recogniz[ed] that there could be a danger" to newly released inmates. (Tr. of Oral Arg. at 27:9–12.) This, they say, is all they are "required to show" for purposes of foreseeability. (*Id.* at 71:18–19); *see also* (*id.* at 60:24–25) ("I have to show there's a vulnerability to harm [to prove foreseeability].").

But recognizing a possibility of some undefined danger to newly released inmates is not the standard by which foreseeability is assessed. There "could be a

11

danger"—to put it in the Hargroves' words—every time someone walks out his front door. The question is whether Carney had concrete notice of a risk of violence to Rodney. The record provides no basis for such a finding.

*Lastly*, the Hargroves invoke "common-sense" principles, arguing it is "universally understood that being out in the middle of the night without any form of protection" in Philadelphia "is a more vulnerable circumstance than waiting a few minutes at a SEPTA stop in the midst of other normal traffic activity on a sunny afternoon." (Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. at 15.) Such an overly broad and generalized statement, taken in isolation, may be hard to dispute. But it is not the standard by which foreseeability is assessed in the state-created-danger context.

2

Even if Rodney's murder was foreseeable, the Hargroves must show the violence was a "fairly direct result" of Carney's conduct. *L.R.*, 836 F.3d at 245. Her conduct must have "precipitated" Rodney's death—*i.e.*, "cause[d]" it "suddenly" or "too soon." *Henry v. City of Erie*, 728 F.3d 275, 285 (3d Cir. 2013) (internal quotation marks and citation omitted). This "unavoidably fact specific" standard, *Phillips*, 515 F.3d at 239, requires a "direct causal connection" between the alleged misconduct and the subsequent harm, *Morse*, 132 F.3d at 909. A connection which is too attenuated does not suffice. *Id.* Under this inquiry, random acts of violence will cut against a finding that the resulting harm was a fairly direct result of the conduct at issue. *Phillips*, 515 F.3d at 240.

To begin, there is no "direct" connection between Carney's executive order and Rodney's murder. *Morse*, 132 F.3d at 909. Carney neither handed Rodney over to

Hurst who posed an obvious risk of violence, *see L.R.*, 836 F.3d at 246, nor left him alone with Hurst knowing he was dangerous, *see Mears*, 24 F.4th at 885. And she neither gave confidential information to Hurst about Rodney, allowing him to plan his attack, *see Phillips*, 515 F.3d at 240, nor placed Rodney in an inherently dangerous situation—she didn't "throw[] him into a snake pit," *Ye v. United States*, 484 F.3d 634, 637 (3d Cir. 2007) (internal quotation marks and citation omitted).

The connection between Carney's executive order and Rodney's death is far too attenuated where, as here, a "lengthy period of time and intervening forces and actions" separate the alleged misconduct and the subsequent harm. *Henry*, 728 F.3d at 285. Carney began requiring inmates to be released to the SEPTA stop in February of 2018. More than three years later, Rodney posted bail on the same night Hurst was waiting outside the CFCF to ambush "Sid." Rodney bore a "striking resemblance" to Sid, and Hurst killed him. *Cf. Martinez v. California*, 444 U.S. 277, 285 (1980) (holding a decedent's death five months after a parole board granted a former prisoner release "is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law").

Rodney's murder was an entirely random act, *see L.R.*, 836 F.3d at 245, and Rodney was not even Hurst's intended victim, *Mohammed*, 196 F. App'x at 81. There is no evidence the two men knew each other; Rodney simply "happened to be in the path of danger." *Phillips*, 515 F.3d at 240 (internal quotation marks omitted); *see Morse*, 132 F.3d at 909; *see also A.G. v. Chester Upland Sch. Dist.*, 655 F. App'x 125, 128 (3d Cir. 2016) (holding a plaintiff had not met the fairly-direct requirement where he was the "tragic victim of random criminal conduct") (internal quotation marks and citation

13

omitted); *LaGuardia v. Ross Township*, 705 F. App'x 130, 133–34 (3d Cir. 2017) (holding, where a shooter randomly shot and killed several people, plaintiffs' "harm was a direct result of only the actions of" the shooter).

B

Even if Rodney suffered harm that was a foreseeable and fairly direct result of Carney's conduct, the Hargroves must show Carney "acted with a degree of culpability that shocks the conscience." *Phillips*, 515 F.3d at 240 (internal quotation marks and citation omitted). Deliberate indifference is "sufficient to support . . . culpability" here. *Id.*

Deliberate indifference requires a "conscious disregard of a substantial risk of serious harm." *L.R.*, 836 F.3d at 246 (internal quotation marks and citation omitted). Here, the official must have been aware of facts from which the inference could be drawn that a substantial risk of physical violence existed. *See Kedra v. Schroeter*, 876 F.3d 424, 441 (3d Cir. 2017). And the risk of harm must be substantial, not possible. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 257 (3d Cir. 2010).

Because "the notion of deliberate indifference contemplates a danger that must be at least foreseeable," the Hargroves cannot satisfy the standard. *Morse*, 132 F.3d at 910. As explained, there is no record evidence to show Carney had a concrete awareness of a risk that Rodney would be a victim of violence, so the Hargroves cannot show Carney knew of such a substantial risk. *See, e.g., id.*; *Lesher*, 822 F. App'x at 120 ("In the absence of a foreseeable risk, [a plaintiff] has necessarily failed to [show] deliberate indifference.").

C

To satisfy the third element of their state-created danger claim, the Hargroves must show "a relationship between the state and [Rodney] existed such that [Rodney] was . . . a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." *Bright*, 443 F.3d at 281 (internal quotation marks and citation omitted). "The bar for proving this element is not terribly high." *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 172 (3d Cir. 2017).

Here, Carney concedes Rodney was part of an identifiable and discrete class—newly released inmates—subject to the harm Carney allegedly created. (Tr. of Oral Arg. at 79:9–19.)

D

To succeed on the fourth element of their state-created-danger claim, the Hargroves must show Carney took an "affirmative action" that "created a danger to [Rodney] or rendered [him] more vulnerable to [the] danger." *Ye*, 484 F.3d at 639.

1

The Hargroves cannot show Carney took such an affirmative act. They point primarily to the issuance of the February 2018 executive order requiring inmates to be released at the SEPTA stop across from the CFCF. (Tr. of Oral Arg. at 81:1–15.) But an affirmative act usually involves "conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration." *Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002); *see Henry*, 728 F.3d at 284 (describing *Ruiz*'s affirmative-conduct holding as "instructive"). And the conduct "should be directed at a discrete plaintiff." *Ruiz*, 299 F.3d at 1183. Here, Carney's issuance of the inmate-release policy

15

is too attenuated and indirect to qualify as an affirmative act. Her executive order requiring inmates to be released at the SEPTA stop did not impose an immediate threat of harm to Rodney. Rather, it presented an alleged "threat of an indefinite range and duration." *Id.* And the order affected all inmates similarly situated to Rodney; it was not aimed at him directly. *Id.* The order, in other words, "was not an act directed at [Rodney] which, in and of itself, placed [Rodney] in danger." *Id.*; *see also Mark v. Borough of Hatboro*, 51 F.3d 1137, 1153 (3d Cir. 1995).

In addition, a state officer's failure to act is not an affirmative act. *Sanford v. Stiles*, 456 F.3d 298, 312 (3d Cir. 2006) (per curiam). That is so because the requirement serves to distinguish cases where state officials "might have done more" from cases where state officials "created or increased the risk itself." *Morrow v. Balaski*, 719 F.3d 160, 179 (3d Cir. 2013) (en banc) (internal quotation marks and citation omitted).

Here, the Hargroves also frame Carney's conduct in terms of what she failed to do. They allege Carney "failed to properly protect" Rodney. (Second Am. Compl. ¶ 45, Dkt. No. 27.) For example, according to the Hargroves, Carney's executive order caused inmates to be released at the SEPTA stop "*without appropriate safety precautions*." (*Id.* ¶ 59) (emphasis added.) Carney's order, the Hargroves contend, contained "no alternative release procedure" for inmates like Rodney who were "released late at night or in the early morning hours." (Pls.' Br. in Supp. of their Mot. for Summ. J. at 12.) Carney, for example, failed to maintain "a secure area within [the] CFCF to hold individuals after bail had been posted, should they desire to wait inside the secure CFCF facility instead of outside in the dark." (Second Am. Compl. ¶ 61.) She failed to

offer "cab vouchers" or "ride sharing services" for inmates released in the middle of the night.  (*Id.* ¶ 62.)  And she failed to order correctional officers to drive inmates released in the middle of the night to "24/7" transportation services, like a subway.  (Tr. of Oral Arg. at 35:14–20.)  But Carney's failure to "remediate an allegedly known risk does not constitute an affirmative act that satisfies the fourth element of a state-created danger claim."  *K.W. ex rel. White v. Se. Pa. Transp. Auth.*, 760 F. App'x 104, 108 (3d Cir. 2019).

### 2

Even if Carney took an affirmative act, the Hargroves must show her conduct created the physical violence Rodney faced or made him more vulnerable to it.  *Bright*, 443 F.3d at 281.  They must prove Carney placed Rodney "in a dangerous position that was foreseeable."  *Morse*, 132 F.3d at 915; *Bright*, 443 F.3d at 283 n.7 (explaining "the relevant test involves asking whether . . . the affirmative act created a foreseeable opportunity for harm"); *Kaucher v. County of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006) ("The fourth element of the state created danger test asks whether a defendant exercised his or her authority to create a foreseeably dangerous situation.").  Here, again, Hurst's "deadly attack was not a foreseeable . . . result" of Carney's conduct.  *Morse*, 132 F.3d at 915–16; *see also DeShaney*, 489 U.S. at 201 (holding the State "played no part in [the] creation" of the dangers facing Joshua DeShaney even though it had created the laws that placed him in the custody of his father).

### IV

The Hargroves' inability to prove their state-created danger claim dooms their *Monell* claim.  Section 1983 does not permit a plaintiff to hold a municipality automatically liable for the unconstitutional actions of its employees under a theory of

vicarious liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). But the statute does permit a municipality to be held liable if the plaintiff establishes the municipality's "policy" or "custom" led to a violation of the plaintiff's constitutional rights. *See id.* at 694–95. To prevail on their *Monell* claim, the Hargroves must show (1) Rodney suffered a constitutional violation and (2) a municipal policy or custom caused the violation. *Id.* at 690–92. Thus, it is "well-settled" that "if there is no violation in the first place, there can be no derivative municipal claim." *Mulholland v. Gov't County of Berks*, 706 F.3d 227, 238 n.15 (3d Cir. 2013).

Without any evidence of a substantive due process violation under a theory of state-created danger, the Hargroves cannot show Philadelphia's alleged custom harmed them. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam).

Lastly, the Hargroves assert state-law claims under Pennsylvania's wrongful death and survival provisions. But both require the Hargroves to show an underlying tort. *See* 42 Pa. Stat. and Cons. Stat. Ann. § 8301(a); *id.* § 8302. And here, the Hargroves premise their state-law claims on their state-created-danger constitutional tort. *See* (Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. at 28); (Tr. of Oral Arg. at 88:4–16). Because the Hargroves fail to prove their state-created-danger claim, they cannot prevail on their state-law claims.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
Gerald J. Pappert, J.